## Page 1 (Sheet 3)

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

------------------------------
CARLOS A. AGUEAR          *
    Plaintiff             *
vs.                       *
                          * CA No. 04-12011-MLW
LIMA & CURA FISHING CORP. *
    Defendant             *
------------------------------

DEPOSITION OF: CARLOS AGUEAR

REGAN & KIELY LLP

85 Devonshire Street

Boston, MA 02109

July 15, 2005

Commenced at 11:15 a.m.

LESLIE A. D'EMILIA
Court Reporter

### INDEX

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| CARLOS AGUEAR | | | | |
| By Mr. Regan | 4 | | | |
| By Mr. Anderson | | | | |

### EXHIBITS

| Number | | Page |
|---|---|---|
| 1 | Transcript of recorded statement | 68 |
| 2 | Diagram | 102 |

## Page 2

APPEARANCES:

Representing the Plaintiff, Carlos Aguear:
  LATTI & ANDERSON LLP
  30-31 Union Wharf
  Boston, MA 02109
  BY: DAVID ANDERSON, ESQ.
  (617) 523-1000

Representing the Defendant, Lima & Cura Fishing Corp.:
  REGAN & KIELY LLP
  85 Devonshire Street
  Boston, MA 02109
  BY: JOSEPH REGAN, ESQ.
  (617) 723-0901

## Page 4

1  MR. REGAN: The usual stipulations?
2  MR. ANDERSON: Yep.
3  MR. REGAN: You want to read and sign?
4  MR. ANDERSON: No.
5  MR. REGAN: Okay. So, we'll waive the
6  reading and signing and objections as to form only.
7  All substantive objections and motions to strike
8  will be reserved until the time of trial.
9              STIPULATION
10    It is hereby stipulated and agreed by and
11 between counsel for the respective parties that the
12 reading and signing of the deposition by the witness
13 and the filing of said deposition in court are
14 waived.
15    It is further stipulated that all objections,
16 except as to the form of the question, and all
17 motions to strike are reserved until the time of
18 trial.
19              CARLOS AGUEAR,
20 having been satisfactorily identified by the
21 production of his driver's license and duly sworn by
22 the Notary Public, testified under oath as follows:
23          DIRECT EXAMINATION
24 BY MR. REGAN:

### Page 61

1  Q. More than fifteen?
2  A. Usually, yes.
3  Q. More than twenty?
4  A. I don't know.
5  Q. Somewhere between fifteen and twenty?
6  A. Yes.
7  Q. And you performed this particular operation 50 or
8     more times per trip?
9  A. Correct.
10 Q. And you've been involved in working on draggers at
11    the time of your injury for almost 20 years?
12 A. Something like that.
13 Q. So, this was an operation that you'd performed
14    thousands of times in the past?
15 A. Yes.
16 Q. And you were aware from performing that job that you
17    have to be careful for your own safety; isn't that
18    true?
19 A. That's correct.
20 Q. Because you know the doors can move?
21 A. I know the doors can move.
22 Q. What are some of the things that can cause a door to
23    move?
24 A. The brake is one. The other one is the operator.

### Page 62

1  Q. What about just the weight of the nets in the water
2     itself, can that cause movement in the door up or
3     down?
4  A. No.
5  Q. How about when you pull the door up, are there times
6     when there's mud on it?
7  A. Yes.
8  Q. And can one door maybe weigh more than the door on
9     the other side if it has mud on it?
10 A. Usually the doors comes on the same time, and they
11    stop there.
12 Q. The presence of mud on the doors, can that cause it
13    to slide down?
14 A. No.
15 Q. Anything else that can cause it?
16 A. Besides this, I don't know.
17 Q. In your prior experience, had you seen where the
18    door would come down and splash back into the water
19    before?
20 A. If the operator doesn't tie the brake.
21 Q. Any other time other than the brake not being
22    tightened down?
23 A. The only thing can be it's the operator on the
24    winch.

### Page 63

1  Q. Can the door move down if the net itself gets hung
2     up, say, on the rocks or something under the water?
3  A. Yes.
4  Q. And earlier you told me you didn't actually see
5     Mr. Lima tighten down the brake on that day; is that
6     right?
7  A. Is that right? I see the door stopped.
8  Q. Right. You saw the door stopped. You assumed the
9     brake was on?
10 A. That's the first thing you should do.
11 Q. Right. But I'm asking what was going through your
12    mind. You saw the door stopped. You assumed the
13    brake was on?
14 A. Yes.
15 Q. And then you went in to hook up?
16 A. Correct.
17 Q. But you didn't actually see Mr. Lima put the brake
18    on or tighten it down?
19 A. No.
20 Q. And did you see anything else that he did at the
21    winch in those moments before you were injured?
22 A. No.
23 Q. Did you see if he was even operating the winch?
24 A. Yes, he was operating the winch.

### Page 64

1  Q. By operating I mean--let me strike it. What you
2     mean by operating is he was standing at the winch?
3  A. Yes.
4  Q. And he was ready to operate the controls if he
5     needed to?
6  A. Yes.
7  Q. My question is a little different. Once you went
8     over to hook up, did you see him actually try to
9     raise or lower the doors?
10 A. I didn't see him.
11 Q. When you were in to hook up, would your back had
12    been to Mr. Lima?
13 A. Yes.
14 Q. So, you didn't see anything that he did or didn't
15    do?
16 A. I didn't see.
17 Q. I take it you didn't observe the winch at any time
18    after your injury?
19 A. No.
20 Q. You have no reason to believe that it was
21    malfunctioning; is that correct?
22 A. That's correct.
23 Q. What, if anything, did you do to prepare to come
24    here today to answer my questions?