# EXHIBIT 1

3

UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

```
-------------------------------
                                *
CARLOS A. AGUEAR                *
        Plaintiff              *
vs.                            *  CA No. 04-12011-MLW
LIMA & CURA FISHING CORP.       *
        Defendant              *
                                *
-------------------------------
```

DEPOSITION OF: CARLOS AGUEAR

REGAN & KIELY LLP

85 Devonshire Street

Boston, MA 02109

July 15, 2005

Commenced at 11:15 a.m.

LESLIE A. D'EMILIA
Court Reporter

INDEX

Witness      Direct  Cross  Redirect  Recross
CARLOS AGUEAR

By Mr. Regan      4
By Mr. Anderson

EXHIBITS
Number                                    Page
  1      Transcript of recorded statement 68
  2      Diagram                           102

2

APPEARANCES:

Representing the Plaintiff, Carlos Aguear:
    LATTI & ANDERSON LLP
    30-31 Union Wharf
    Boston, MA 02109
    BY: DAVID ANDERSON, ESQ.
    (617) 523-1000

Representing the Defendant, Lima & Cura Fishing
Corp.:
    REGAN & KIELY LLP
    85 Devonshire Street
    Boston, MA 02109
    BY: JOSEPH REGAN, ESQ.
    (617) 723-0901

4

1   MR. REGAN: The usual stipulations?
2   MR. ANDERSON: Yep.
3   MR. REGAN: You want to read and sign?
4   MR. ANDERSON: No.
5   MR. REGAN: Okay. So, we'll waive the
6   reading and signing and objections as to form only.
7   All substantive objections and motions to strike
8   will be reserved until the time of trial.
9          STIPULATION
10   It is hereby stipulated and agreed by and
11   between counsel for the respective parties that the
12   reading and signing of the deposition by the witness
13   and the filing of said deposition in court are
14   waived.
15   It is further stipulated that all objections,
16   except as to the form of the question, and all
17   motions to strike are reserved until the time of
18   trial.
19          CARLOS AGUEAR,
20   having been satisfactorily identified by the
21   production of his driver's license and duly sworn by
22   the Notary Public, testified under oath as follows:
23          DIRECT EXAMINATION
24   BY MR. REGAN:

**Deposition of CARLOS AGUEAR  taken JULY 15, 2005**

**5**

1    Q. Mr. Aguear, my name, again, is Buddy Regan, and I
2      represent Lima & Cura Fishing Corporation and the
3      fishing vessel My Way. I probably have a couple of
4      hours of questions for you today, and I want to give
5      you some of the ground rules. Have you ever been
6      deposed before?
7    A. No.
8    Q. Okay. I ask questions. You give answers, and the
9      stenographer takes everything down. Mostly for her
10     benefit, I'm going to ask you--sometimes you may
11     know where my question is headed or where it's going
12     to end up, but I'm going to ask you to be a little
13     patient, let me finish before you start answering
14     because she can't take us both down at the same time
15     if we're both talking.
16    A. Okay.
17    Q. And I'll try to afford you the same courtesy and
18     wait until you finish your answer before I ask you
19     another question.
20    A. Okay.
21    Q. If at any time you don't feel like you heard me
22     correctly, or you don't understand the question,
23     stop me and ask me, and I'll be glad to rephrase it
24     or repeat it. Otherwise we'll assume that you

**6**

1     understand all the questions that I'm asking. Okay?
2    A. Okay.
3    Q. Tell us what your full name is and spell your last
4     name, please?
5    A. My name is Carlos A. Aguear.
6    Q. And spell Aguear?
7    A. A-g-u-e-a-r.
8    Q. And where do you live, sir, address?
9    A. 18 Bourne.
10    Q. B-o-u-r-n-e, Bourne?
11    A. Correct, Street, New Bedford.
12    Q. And do you know the zip there?
13    A. 02740.
14    Q. And what is your Social Security number?
15    A. ████████
16    Q. And what is your date of birth?
17    A. ████
18    Q. Are you on any medications today that would
19     interfere with your ability to answer questions?
20    A. No.
21    Q. Are you on any medications today that are related to
22     your finger injury?
23    A. No.
24    Q. Are you married?

**7**

1    A. Yes.
2    Q. And what is your wife's name?
3    A. Celeste.
4    Q. And how long have you been married?
5    A. Since '93.
6    Q. Do you have children?
7    A. One from--one.
8    Q. And a boy or a girl?
9    A. It's a girl.
10    Q. And where you said "from," it leads me to believe
11     that from a previous marriage?
12    A. No, from the second marriage.
13    Q. Is Celeste your first wife or second?
14    A. No, second.
15    Q. So, this child is yours and Celeste's?
16    A. Yes.
17    Q. And what's her name, and how old is she?
18    A. She's four years old.
19    Q. And her name?
20    A. Celeste Aguear.
21    Q. Your daughter is also Celeste?
22    A. No, my daughter is Daniella Aguear.
23        MR. ANDERSON: I think that--I don't know
24     who--did you say four or forty?

**8**

1    A. No, no, wait a minute.
2    Q. (Mr. Regan) I thought you said she was four years
3     old.
4    A. No, no, no. She's going to be three years old.
5     Daniella, she's going to be three years old, my
6     daughter.
7    Q. Okay. I got it now. Do you have any other
8     children?
9    A. Yes.
10    Q. Who?
11    A. From my first marriage.
12    Q. Boys or girls?
13    A. It's a boy.
14    Q. Just one?
15    A. Yes.
16    Q. And what's his name?
17    A. Jason Aguear.
18    Q. And how old is Jason?
19    A. 26.
20    Q. Are you responsible for his financial support?
21    A. No.
22    Q. Does he live with you and Celeste?
23    A. No.
24    Q. Does anyone else besides you, Celeste, and Daniella

9

1    live in the Bourne Street address?
2    A. No.
3    Q. Are you a high school graduate, sir?
4    A. No.
5    Q. Are you a United States citizen?
6    A. Yes.
7    Q. And were you born in this country?
8    A. No.
9    Q. Where were you born?
10   A. Portugal.
11   Q. At what age were you when you first came to the
12      United States?
13   A. I was 19.
14   Q. And since then have become an American citizen?
15   A. Yes.
16   Q. Did you attend school in Portugal?
17   A. Yes.
18   Q. What is the highest grade or level of
19      school/education that you had?
20   A. Fourth grade.
21   Q. Fourth grade?
22   A. Yes.
23   Q. Is that comparable to what would be the fourth grade
24      here in the United States?

10

1    A. No.
2    Q. What would be the equivalent?
3    A. Fifth.
4    Q. But you would have been about ten or
5       eleven years old, something like that?
6    A. Something like that.
7    Q. Since that time have you ever taken any other formal
8       schooling such as an equivalency degree or anything
9       like that?
10   A. No.
11   Q. And prior to coming to this country, were you a
12      fisherman?
13   A. Yes.
14   Q. And when did you first begin commercial fishing?
15   A. The age over here?
16   Q. Let's start over there?
17   A. In Portugal?
18   Q. Portugal, yep.
19   A. The age of 13 years old.
20   Q. What type of fishing was that involved?
21   A. Carrying fish.
22   Q. Can you say that again? I just didn't understand
23      it.
24   A. Carrying fish to the dock.

11

1    Q. Carrying fish?
2    A. Yes.
3    Q. So, sort of what like a lumper does?
4    A. Yes.
5    Q. Were you ever a deckhand on a commercial fishing
6       vessel before coming to the United States?
7    A. No.
8    Q. And when did you first begin fishing in the
9       United States?
10   A. Around more or less '84, '85.
11   Q. And if my math is correct, you would have been about
12      26 or 27 years old at that time?
13   A. Correct.
14   Q. What did you do for employment between the ages of
15      19 and 26, if anything?
16   A. Over here?
17   Q. Yes, over here.
18   A. I worked in some factories.
19   Q. In the New Bedford area?
20   A. Yes, one in New Bedford.
21   Q. What type of businesses were they?
22   A. They were making batteries.
23   Q. Making berries?
24   A. Yes.

12

1          MR. ANDERSON: Batteries.
2    Q. (Mr. Regan) Batteries. Okay. Any other type of
3       employment other than batteries?
4    A. Rhode Island.
5    Q. In Rhode Island?
6    A. Yes, electric wires.
7    Q. And what is it that you did in that profession?
8    A. In Rhode Island?
9    Q. Yeah.
10   A. Just I was a floor boy.
11   Q. And what type of a business was it?
12   A. Electric wires.
13   Q. They sold electric wiring?
14   A. Yes.
15   Q. So, this was a commercial or retail store?
16   A. No, no, that was a big company.
17   Q. And what would they do? Would I, like, hire them,
18      and they'd come to my house and do the wiring?
19   A. No, no, we making big wires, big wires like cable
20      wires.
21   Q. And what would those cable wires be used for?
22   A. Construction for big buildings.
23   Q. Okay. I got ya. How long did you work that job?
24   A. Two years.

13

1  **Q.** And any other types of jobs that you had before you
2      first went to sea?
3  A. I think I worked a little bit in construction.
4  **Q.** Can you tell me what type of job you held?
5  A. I was not a brick laborer.  I was carrying some
6      cement, help.
7  **Q.** Any other pre-fishing employment?
8  A. No.
9  **Q.** And I don't necessarily want to go through every
10      year from '84 to now, but can you sort of summarize
11      for me your fishing experience?
12  A. Yes.  I was a scalloper for a few years, and then I
13      went dragging.
14  **Q.** And the fishing vessel, My Way, is a dragger?
15  A. Yes, correct.
16  **Q.** And after those first few years as a scalloper, were
17      you always on a dragger?
18  A. No.  I started as a scalloper, and then I went
19      dragger.
20  **Q.** And then what, did you go back and forth or--
21  A. Sometimes.
22  **Q.** Let's say in the five years before you were injured
23      on the My Way, did your experience consist
24      completely of working on draggers?

14

1  A. Yes.
2  **Q.** What if I ask the same question with respect to
3      ten years before your injury, was it all on
4      draggers?
5  A. Correct.
6  **Q.** And between '84 or '85, I think you said, and 2003
7      when you were injured on the My Way, did you have
8      any other employment other than commercial fishing?
9  A. No.
10  **Q.** Are you presently employed?
11  A. No.
12  **Q.** The date of your injury that brings us here today
13      was October 4, 2003; is that correct?
14  A. Correct.
15  **Q.** Have you worked at any time since
16      October 4th of 2003?
17  A. No.
18  **Q.** Have you ever been engaged in the United States in
19      any other capacity in the fishing industry other
20      than a deckhand on a commercial vessel?
21  A. No.
22  **Q.** Never were a lumper, for example?
23  A. No.
24  **Q.** Never worked in a fish house?

15

1  A. No.
2  **Q.** Prior to October 4th of 2003, had you ever received
3      a personal injury to some part of your body?
4  A. No.
5  **Q.** Do you recall answering some written questions that
6      we had sent to you through your lawyer?
7  A. Yes.
8  **Q.** And I had asked if you had any accidents or
9      injuries, and your answer talks about some stitches
10      in the head, mini strokes, high blood pressure, and
11      a car accident in '04; is that accurate?
12  A. Yes.
13  **Q.** Let me talk about just that instance on the
14      Ila Docorvo, I-l-a, D-o-c-o-r-v-o.  How did you get
15      cut in the head?
16  A. I was on one side, on the port side, and I was
17      holding back--I think I was in the front of the
18      drum, and the other guy was on the starboard side
19      with the hook, and he let go of the hook.  That's
20      when it hit me in the head.
21  **Q.** As a result of that injury, did you bring a claim
22      against the owners of the Ila Docorvo?
23  A. No.
24  **Q.** Did your injury just consist of the laceration in

16

1      the head?
2  A. Just the laceration in the head.
3  **Q.** And you got stitches and returned to work?
4  A. Yes.
5  **Q.** You mentioned having sustained two strokes.  The
6      first one in March of 1994.  Can you elaborate on
7      that for me, please?
8  A. Yes, it was a mini stroke.
9  **Q.** What do you mean by a mini stroke?
10  A. It was--I lost my speech on my left side.
11  **Q.** Meaning you lost the use of your--
12  A. Control on the left side, yeah.
13  **Q.** By the way, are you right-handed or left-handed?
14  A. Right-handed.
15  **Q.** So, this injury, and I'll refer to it as an injury.
16      I know you ultimately had the finger amputated.
17      That is on your right hand; correct?
18  A. Yes.
19  **Q.** And that's your dominant hand?
20  A. Yes.
21  **Q.** This stroke in 1994, did it resolve itself in time?
22  A. Yes.
23  **Q.** Did you regain full use of the left side of your
24      body?

**17**

1  A. Correct.
2  Q. For how long did you not have control over your
3     speech or not control over the left side of your
4     body?
5  A. Two or three months.
6  Q. Were you treated by a doctor or by a hospital?
7  A. By a doctor and a hospital.
8  Q. What hospital?
9  A. New Bedford Hospital, St. Luke's.
10 Q. St. Luke's.  And do you know the name of your
11    doctor?
12 A. Yes, Robert Sawyer.
13 Q. And Dr. Sawyer is one of the doctors that you've
14    seen in connection with your finger amputation; is
15    that true?
16 A. That's correct.
17 Q. Is he a family doctor?
18 A. He's a family doctor.
19 Q. And how long has he been your family doctor?
20 A. Oh, more than--before I had the strokes.
21 Q. And what did Dr. Sawyer diagnose or tell you was the
22    cause of your stroke, if anything?
23 A. He never tell me that, but I think it's from my
24    family side.

**18**

1  Q. Is there a family history?
2  A. Yes.
3  Q. And why don't you tell me what that history is?
4  A. Blood clots.
5  Q. Say again?
6  A. Blood clots.
7  Q. Block clots?
8         MR. ANDERSON:  Blood clots.
9  Q. (Mr. Regan) Blood clots?
10 A. Blood clots.
11 Q. Got ya.  Sorry, I have the same problem, people
12    trying to understand me.
13 A. Okay.
14 Q. And who on your side, mother, father, brothers,
15    sisters?
16 A. Father.
17 Q. And did he die as a result of blood clots?
18 A. No.
19 Q. Did he have a stroke?
20 A. No.
21 Q. Just had a history of blood clots?
22 A. Yes.
23 Q. And was that taken care of by medication?
24 A. Yes.

**19**

1  Q. Is your father still alive?
2  A. Yes.
3  Q. And how old is he?
4  A. 76.
5  Q. Any other family history that you believe was
6     related to having the stroke?
7  A. I don't know.
8  Q. And were you able to work during that two to three
9     months that you were dealing with the affects of the
10    stroke?
11 A. No.
12 Q. Were you able to return to work after three months?
13 A. Correct, yes.
14 Q. And you again note, I guess what I'll call, a second
15    mini stroke in June of 1995?
16 A. Correct.
17 Q. Which would have been a little over a year later?
18 A. Yes.
19 Q. Between March of '94 and June of 1990--let me
20    withdraw that and ask it in a better way.  After the
21    recovery from the March stroke, you said it was
22    about two to three months.
23 A. Yeah.
24 Q. Between that period of time and June of '95, did you

**20**

1     have any further problems that you related to the
2     stroke?
3  A. No.
4  Q. And then what happened in June?
5  A. I had another stroke.
6  Q. And how did it first affect you, did you just wake
7     up and not have control or something?
8  A. No, I just came from fishing.  I was taking a
9     shower.  As I was in the shower, I just blackout.  I
10    didn't see nothing.
11 Q. Besides not being able to see, did you have any
12    other sensations or feelings?
13 A. No.
14 Q. And did that last, the not being able to see?
15 A. It last for a week.
16 Q. When you say "not being able to see," were you
17    completely blind?
18 A. No.  I would see a light, but not completely blind.
19 Q. Couldn't make out figures and so forth?
20 A. I could not see very far.  I could not see you very
21    close either.
22 Q. And I take it you again went to see Dr. Sawyer?
23 A. Correct.  I went to the hospital.
24 Q. St. Luke's?

21

1   A. St. Luke's.
2   Q. And what did they tell you was wrong with you?
3   A. It was another blood clot.
4   Q. And so you believed the cause of the first stroke
5      was also a blood clot?
6   A. Yes.
7   Q. How did the first stroke manifest itself? Do you
8      understand my question? You're fine, and then
9      something happened. Was it getting out of bed, or
10     was it coming back fishing, taking a shower like the
11     second one?
12  A. No. I was sit down on the table with my wife, and I
13     was trying to speak, and the words wasn't coming
14     out. As I was trying to reach for a glass of water,
15     the hand doesn't command to get the water.
16  Q. The June '95 stroke, did that involve anything other
17     than your vision?
18  A. Just the vision.
19  Q. So, you didn't have problems with your motor control
20     with your left hand, left leg?
21  A. No, nothing like that.
22  Q. So, completely different symptoms from the first
23     one?
24  A. Yes.

22

1   Q. And how long before those symptoms went away?
2   A. I started to see much better ten days, fifteen days.
3      I think in a month, two months I was seeing
4      everything.
5   Q. Did you miss time from work at that period?
6   A. Yes.
7   Q. How long?
8   A. Two months or three months.
9   Q. And do you take medication today to present blood
10     clots?
11  A. Yes.
12  Q. What medication do you take?
13  A. Warfarin.
14  Q. Do you know how to spell it? Best guess.
15  A. Warfarin. I cannot spell it.
16  Q. Does it begin with a "W"?
17  A. Yes.
18  Q. Since June of 1995, have you ever experienced any
19     problems with either stroke, mini stroke, blood
20     clots?
21  A. No.
22  Q. Did you begin taking medication after the first
23     stroke?
24  A. Yes.

23

1   Q. And did that change as a result of the second
2      stroke?
3   A. Yes.
4   Q. And what was it after the first stroke, and how did
5      it change?
6   A. I was on aspirin.
7   Q. And then after the second stroke?
8   A. The aspirin wasn't helping me. That's why they
9     change for Coumadin at first.
10  Q. When did you begin taking Warfarin?
11  A. That's when the doctor told me the same medication.
12     Coumadin and Warfarin, it's almost the same. It's
13     only a different brand. I think it's generic.
14  Q. When did you first begin to take it?
15  A. After I have the second stroke?
16  Q. How long did you have Coumadin before you switched
17     over?
18  A. For a few months, like seven or eight months.
19        MR. ANDERSON: If I'm not mistaken, I
20     think that Coumadin is a brand name, and that the
21     Warfarin is the generic. You know, it's like Bayer
22     versus just CVS aspirin.
23  Q. (Mr. Regan) You also mentioned that you have high
24     blood pressure; is that correct?

24

1   A. Yes.
2   Q. When were you first diagnosed with high blood
3      pressure?
4   A. I think it was in '93.
5   Q. Do you take medication to control your--
6   A. '93, no, 203.
7   Q. 2003--
8   A. 2003.
9   --was the first time somebody told you that you had
10     high blood pressure?
11  A. Correct.
12  Q. Was that Dr. Sawyer?
13  A. Yes.
14  Q. And have you--let me strike that. Was this before
15     or after the incident on the My Way?
16  A. Before.
17  Q. And did Dr. Sawyer prescribe medication for your
18     high blood pressure at that time?
19  A. Yeah.
20  Q. And what did he prescribe?
21  A. Etenol (phonetic).
22  Q. Etenol (phonetic)?
23  A. Yeah.
24  Q. And were you on Etenol (phonetic) at the time that

Deposition of CARLOS AGUEAR  taken JULY 15, 2005

**25**

1  you had the finger injury?
2  A. Yes.
3  **Q.** Do you continue to take that through today?
4  A. Yes.
5  **Q.** You also mentioned high cholesterol. When were you
6  first diagnosed as having high cholesterol?
7  A. After the accident.
8  **Q.** What year?
9  A. 2004.
10  **Q.** Do you take--currently take medication to control
11  your cholesterol?
12  A. Yes.
13  **Q.** What do you take?
14  A. I do not remember the name. I have the medication
15  here in my pocket. Can I check?
16  **Q.** Sure.
17  A. I know what it is, Lipitor.
18  **Q.** Do you have anything there that tells us what the
19  spelling of Etenol (phonetic) or Warfarin is?
20  A. No, because I check here. I didn't see the paper
21  here.
22  **Q.** And are you on Lipitor today?
23  A. No, usually I take it at nighttime.
24  **Q.** But in general, you take Lipitor everyday?

**26**

1  A. Every night.
2  **Q.** Every night. Are you on any other prescription
3  medications at this time, and I don't mean right at
4  this moment, but that you take on a daily or every
5  other day basis?
6  A. Some Percocets.
7  **Q.** Is the Percocet for pain relief from your finger
8  injury?
9  A. Yes.
10  **Q.** And lastly you mentioned a car accident in 2004.
11  Why don't you tell me what was involved in that?
12  A. I was going to the mall, Dartmouth Mall, and
13  somebody hit me from behind.
14  **Q.** Were you driving your vehicle?
15  A. Yes.
16  **Q.** And as a result of that collision, were you injured?
17  A. I was having a little pain in my neck.
18  **Q.** Did you seek medical attention?
19  A. Yes.
20  **Q.** And where?
21  A. The emergency room.
22  **Q.** Of St. Luke's again?
23  A. St. Luke's.
24  **Q.** Did Dr. Sawyer also treat you for the aftermath of

**27**

1  the accident?
2  A. Correct.
3  **Q.** With respect to these other injuries or conditions,
4  the stroke or the high blood pressure, did you treat
5  with anyone other than Dr. Sawyer?
6  A. Dr. Offrey (phonetic).
7  **Q.** Do you know how to spell his name?
8  A. I cannot spell.
9  **Q.** What's his first name?
10  A. Offrey (phonetic). I know it's Offrey (phonetic).
11  **Q.** Do you know is first name?
12  A. No.
13  **Q.** Is he in the New Bedford area?
14  A. He was in the New Bedford area.
15  **Q.** Is he at St. Luke's; do you know?
16  A. No, Hawthorn Medical.
17  **Q.** Hawthorn Medical. Is that where Dr. Sawyer is?
18  A. Correct.
19  **Q.** Would he have been somebody that was in the same
20  practice as Dr. Sawyer?
21  A. Yes, different building.
22  **Q.** Was he like a partner of Dr. Sawyer's?
23  A. No, cardiology.
24  **Q.** He was a cardiologist? Any other physicians that

**28**

1  you treated for any of these injuries or conditions?
2  A. No.
3  **Q.** Any other hospitals that you visited as a result of
4  these injuries or conditions other than St. Luke's?
5  A. No.
6  **Q.** Are there any other injuries, illnesses, diseases,
7  or conditions that you've had other than what we've
8  just discussed?
9  A. No.
10  **Q.** Do you, on a yearly basis, have a physical
11  examination?
12  A. Sometimes.
13  **Q.** When was the last time you had a physical?
14  A. I don't remember.
15  **Q.** Have you had a physical since the My Way accident?
16  A. No.
17  **Q.** Would that have been with Dr. Sawyer?
18  A. Correct.
19  **Q.** Have you ever suffered from chest pains?
20  A. Once in a while.
21  **Q.** Have you been treated for that condition?
22  A. Yes.
23  **Q.** By whom?
24  A. Robert Sawyer.

29

1  Q. Have you ever been admitted to St. Luke's or any
2     other hospital complaining of chest pains,
3     difficulty breathing or so forth?
4  A. St. Luke's.
5  Q. And when did that occur?
6  A. Like three years or four years ago.
7  Q. And do you know what they diagnosed the cause of the
8     chest pains as?
9  A. They said it was a muscle.
10 Q. Did you see a cardiologist at that time?
11 A. Correct, yes.
12 Q. Would that have been this Dr. Offrey (phonetic)?
13 A. Yes.
14 Q. Are you on any medications today to control chest
15    pains?
16 A. No.
17 Q. Now, you said it was a muscle.  Did you have some
18    understanding that it was a heart problem?
19 A. I thought it was a heart problem.  The doctor said
20    there was nothing wrong with the heart.
21 Q. Any other medical condition, injury, illness, or
22    disease that has led you to seek treatment that I
23    haven't mentioned or asked here about?
24 A. No.

30

1  Q. Have you ever been convicted of a criminal offense?
2  A. No.
3  Q. Let me direct your attention to October 4th of 2003,
4     and the accident that happened onboard the fishing
5     vessel My Way.  First of all, what time of the day
6     or evening did it occur?
7  A. What time of the day?
8  Q. Uh-huh.
9  A. It was in the morning.
10 Q. About what time?
11 A. Around 10:00.
12 Q. And you were a member of crew of the My Way at the
13    time?
14 A. Yes.
15 Q. And you were working on deck?
16 A. Yes.
17 Q. How long had you been a crew member on the My Way
18    before the date of your injury?
19 A. Two years and something.
20 Q. How did you get the job?
21 A. I talked to John.
22 Q. John Cura?
23 A. Yes.
24 Q. Is John Cura the son of one of the owners or--

31

1  A. No, he's the captain.
2  Q. He's the captain.  And he was the captain on
3     October 4, 2003?
4  A. Yes.
5  Q. And he hired you?
6  A. Yes.
7  Q. Do you understand John Cura is also one of the
8     owners of the vessel?
9  A. Yes.
10 Q. Had you known John Cura prior to being hired on the
11    My Way?
12 A. Yes.
13 Q. How long had you known him for?
14 A. A few years.
15 Q. And how about Joe Lima, did you know him?
16 A. Yes.
17 Q. How long had you known Joe Lima?
18 A. A few years too.
19 Q. About the same time as John?
20 A. Yes.
21 Q. And did you understand that Mr. Lima was one of the
22    owners of the vessel?
23 A. Yes.
24 Q. Are you familiar with these people because of being

32

1     in the Portuguese community?
2  A. No, they are friends.
3  Q. Right.  But they're Portuguese also?
4  A. Yes.
5  Q. And I'm just asking, did you come to know them
6     because maybe there were social events that you met
7     each other at or--
8  A. Yeah, usually we talked to each other.
9  Q. And you were on other boats as well?
10 A. Yes.
11 Q. So, you were familiar with their vessel?
12 A. Yes.
13 Q. On this particular trip that you were injured on, do
14    you know when you left port, in terms of how many
15    days before your accident?
16 A. I think it was two or three days before.
17 Q. Out of New Bedford?
18 A. Yes.
19 Q. And at that time what did you anticipate as to how
20    long you'd be out?
21 A. You never know how long you're going to be out.
22 Q. Approximately?  Or what's the average length of a
23    trip?
24 A. Could be four days, could be ten days.  We never

Deposition of CARLOS AGUEAR  taken JULY 15, 2005

33

1  know.
2  **Q.** And where were you fishing approximately at the time
3  of your injury?
4  A. The boat before?
5  **Q.** On the day you were injured, do you know the general
6  location of where the boat was fishing?
7  A. No.
8  **Q.** No idea?
9  A. No idea.
10  **Q.** Was land in sight at all?
11  A. No.
12  **Q.** And it takes some time to get out to the fishing
13  ground, doesn't it?
14  A. Yes.
15  **Q.** And when you're steaming out to the fishing ground,
16  the nets aren't in the water obviously?
17  A. No.
18  **Q.** How long did it take to steam out to the fishing
19  grounds before you actually started putting nets in
20  the water?
21  A. Depends where the captain wants to go.
22  **Q.** I'm talking about that trip, that very trip, if you
23  recall?
24  A. It could take ten hours or twelve hours.

34

1  **Q.** And then you start immediately fishing?
2  A. Yeah.
3  **Q.** So, for how many days were you fishing before the
4  morning you were injured?
5  A. One day.
6  **Q.** So, this would have been the second day of actual
7  fishing?
8  A. More or less, one day, two days.
9  **Q.** One or two. And what was the watch schedule?
10  A. Usually the same. I go down from midnight to 4:00
11  in the morning and from 12 in the afternoon to 4:00
12  in the afternoon.
13  **Q.** And that's it, a four-hour shift?
14  A. That's it.
15      MR. ANDERSON: That's when he goes down.
16  He's off.
17  A. That's when I go down to sleep.
18  **Q.** (Mr. Regan) Oh, okay. So, that's not when you're
19  working, that's when you're off work?
20  A. No, no, that's when I'm off work.
21  **Q.** Let me see if I could do the reverse math. So, you
22  would work between 4:00 p.m. and midnight?
23  A. Yes, until 12 p.m. the other day.
24  **Q.** Right. And then you'd get up at 4:00 a.m. in the

35

1  morning and work until noontime?
2  A. Correct.
3  **Q.** So, eight on, four off?
4  A. Correct.
5  **Q.** And you would have stood, what, a minimum of--let me
6  phrase it this way. You would have been on duty a
7  minimum of two times prior to your injury, and maybe
8  as much as four times if you fished two days?
9  A. Something like that.
10  **Q.** And correct me if I'm wrong, I think earlier you
11  told me your accident occurred about 10:00 a.m.?
12  A. Yes.
13  **Q.** So, that would have been about six hours into your
14  watch?
15  A. Yes.
16  **Q.** And you would have been due to get off at noontime?
17  A. Correct.
18  **Q.** During a typical eight-hour watch, how may tows are
19  set and then hauled back?
20  A. Depend on how many hours they're towing.
21  **Q.** It's not towing 24 hours a day?
22  A. No.
23  **Q.** Who were the other crew members? Let's start with
24  the captain. The captain was Mr. Cura; correct?

36

1  A. Yes.
2  **Q.** And Mr. Lima was what on the boat?
3  A. The engineer and a deckhand.
4  **Q.** And then there was yourself. You were a deckhand
5  and a cook?
6  A. Yes.
7  **Q.** And who else was present?
8  A. Joaquim Machado.
9  **Q.** Joaquim Machado. And what was his position?
10  A. Deckhand.
11  **Q.** Did he have any other duties?
12  A. No.
13  **Q.** And was there another deckhand?
14  A. A deckhand and a mate.
15  **Q.** Deckhand/mate was who?
16  A. Joe Abreu.
17  **Q.** Abreu, A-b-r-e-u. So, it was a five-man crew?
18  A. Yes.
19  **Q.** And when you were on, did you work with a regular
20  partner?
21  A. Sometimes.
22  **Q.** I understand on the day of this accident,
23  Mr. Machado was also on deck; is that correct?
24  A. Yes.

**37**

1   Q.  And what side of the boat, or what door was involved
2       for you, for your injury?
3   A.  On my injury?
4   Q.  Yeah.
5   A.  Port side.
6   Q.  So, you were on the port side, and Mr. Machado was
7       on the starboard side?
8   A.  Correct.
9   Q.  Mr. Cura was in the wheelhouse?
10  A.  Yes.
11  Q.  Mr. Lima was operating a winch?
12  A.  Yes.
13  Q.  Are there two winches, one for each side?
14  A.  Yes.
15  Q.  And I take it, then, that the port side winch would
16      raise the port side door, and the starboard side
17      winch would raise the starboard side door?
18  A.  Correct.
19  Q.  And does Mr. Lima go from one winch to another to do
20      his job and to help you guys do your job?
21  A.  He have to stay on his winch.  After it's done, he
22      goes up to the other winch.
23  Q.  So, you work one side at a time?
24  A.  One side.  It's one on each side.

**38**

1   Q.  And Mr. Abreu was where at the time of your
2       accident?
3   A.  Sleeping.
4   Q.  So, he didn't see it?
5   A.  No.
6   Q.  Do you know if Mr. Machado; is that how he
7       pronounces it?
8   A.  Yes.
9   Q.  Do you know if he saw it, saw your accident?
10  A.  I cannot say yes, but I think he saw it.
11  Q.  Let's just take--well, let me ask you this, was it
12      the same crew, let's say, the trip before this trip?
13  A.  Yeah.
14  Q.  How long had you been together as a single crew?
15  A.  Two years, two years.
16  Q.  Who was the last one hired of the five that I've
17      mentioned?
18  A.  Me.
19  Q.  And did the five of you constitute the crew for the
20      whole two-year plus period that you were employed by
21      the fishing vessel My Way?
22  A.  Yes.
23  Q.  So, you were familiar with the other guys and had
24      experience working with them?

**39**

1   A.  Yes.
2   Q.  And correct me if I'm wrong, it sounds like there's
3       always one guy sleeping; is that how it works?
4   A.  Depends.  It could be one or two.
5   Q.  So, would there be times that you would work with
6       Mr. Abreu on deck as opposed to Mr. Machado?
7   A.  Yes.
8   Q.  And does either Mr. Lima or Mr. Cura every come down
9       and help do deckhand duties?
10  A.  Once in a while.
11  Q.  And at the time that you were injured, you were in
12      the process of hauling back?
13  A.  Yes.
14  Q.  And that involves bringing the net up from the ocean
15      floor?
16  A.  Yes.
17  Q.  And the first thing that comes up that you deal with
18      is the door that holds the net open?
19  A.  Yes.
20  Q.  And when you're hauling back, you do one side first
21      then the other side?
22  A.  No.
23  Q.  Both are pulled up at the same time?
24  A.  Yes.

**40**

1   Q.  And so do both doors come out of the water at the
2       same time?
3   A.  Yes.
4   Q.  But they're operated by separate winches, or they're
5       raised by separate winches?
6   A.  They're raised by separate winches.
7   Q.  And why don't you tell me, and let's just talk in
8       general right now, and then I'll talk about your
9       accident.  In general, when there's two of you
10      working the deck and Mr. Lima is controlling the
11      winches, the two doors come up out of the water at
12      the same time.  What happens next?
13          MR. ANDERSON:  I'm just going to object
14      because the scenario you set up can't work that way
15      because if they both come up at the same time,
16      there's two people back there.  You said that both
17      these guys were down at the stern.  One guy is
18      forward, but both doors are coming up at the same
19      time.
20          MR. REGAN:  That's what your client said,
21      that both--I'll ask him again.
22  Q.  (Mr. Regan) Didn't you say that both doors are
23      raised out of the water at the same time?
24  A.  Yes, but the same time you have to have one guy on

**41**

1     each winch.
2   Q. Correct. Oh, I see.
3   A. Because one have to operate one winch, and the other
4     one have to operate one winch.
5   Q. So, it would involve four men?
6   A. No, it involve three men. I'm on the deck, and
7     there has to be two men on the winch.
8   Q. So, either--just as an example, either you or
9     Mr. Machado would go and operate one of the winches?
10   A. Usually it's Mr. Machado and Mr. Lima.
11   Q. Did you ever operate the winches?
12   A. Yes.
13   Q. How frequently did you operate them?
14   A. When Mr. Machado or Mr. Joe Lima is down sleeping.
15   Q. And in particular, did you have experience in
16     operating the port side winch?
17   A. Both of the sides.
18   Q. On the occasions that you had to operate the
19     winches, were they operating correctly?
20   A. Yes.
21   Q. They did what they were supposed to?
22   A. Yes.
23   Q. And I understand that once you get the doors up, you
24     put a brake on?

**42**

1   A. Yes.
2   Q. And that's controlled by the winch?
3   A. It's something you have to tie the brake with one
4     hand. When the door comes up, it hits the rails,
5     and they stop. The first thing they do is tie the
6     brake down.
7   Q. Before you tie the brake down, is there a lever or
8     an actual brake that you would put in place?
9   A. No.
10   Q. What exactly is the braking mechanism, just tying
11     the line?
12       MR. ANDERSON: It's a tight.
13   A. It's a tight.
14   Q. (Mr. Regan) Tighten.
15   A. It's like a wheel.
16   Q. I got it. So, that's part of the operation of the
17     winch?
18   A. Correct.
19   Q. You tighten it, and that operates as a brake?
20   A. Yes.
21   Q. In the times that you operated, in particular, the
22     port side winch, was the brake working the way it
23     was supposed to?
24   A. Yes.

**43**

1   Q. Did you ever have any problems with the winch or the
2     brake?
3   A. I don't think so.
4   Q. Okay. Let me go back to my general question about
5     how this works. You've got two men operating two
6     separate winches, and the doors get raised up;
7     correct so far?
8   A. Yes.
9   Q. And I take it that either of these individuals or
10     both of them then put on the brake?
11   A. Yes.
12   Q. Then what happens?
13   A. The starboard side, he hooks up the chain on the
14     door.
15   Q. Do you always go starboard side first?
16   A. No, that's the guy on the starboard side. I'm on
17     the port side.
18   Q. Right.
19   A. I'm always on the port side.
20   Q. Again, I'm not--I will ask about when you got hurt.
21     I'm just talking in general now. The doors are up.
22     The brakes are on.
23       MR. ANDERSON: Is this with three guys on
24     deck or two guys on deck?

**44**

1       MR. REGAN: Well, let me ask him.
2   Q. (Mr. Regan) Do you ever do this operation with just
3     two men on deck?
4   A. We do.
5   Q. Okay. If there were two men on deck, first the two
6     of you would have to operate the winches?
7   A. Yes.
8   Q. Then you put the brakes on--
9   A. Yes.
10   Q. --and then what, does one man handle starboard side,
11     and one man handle port side?
12   A. Usually we go both to the back when the brake is
13     tied up.
14   Q. Okay. And on the day you were injured, there were
15     three people; correct?
16   A. Correct.
17   Q. And so Mr. Lima--
18   A. Is one side, and Mr. Machado is on the other side.
19   Q. When the doors first came out of the water?
20   A. They have to operate the winch.
21   Q. Right. I understand that, but I just want to be
22     clear. So, up to now I've been talking generally.
23     On October 4th, Mr. Lima was operating one of the
24     winches, and Mr. Machado was operating the other?

45

1　A. Yes.
2　Q. And do you know which was on which side?
3　A. Mr. Lima is on the port side, and Mr. Machado
4　　starboard side.
5　Q. And they got the doors up and put the brakes on?
6　A. Yes, correct.
7　Q. And then what happened next? We might as well just
8　　talk about 4 October rather than in general. What
9　　happened?
10　A. What happens? It's the men have to put the chain on
11　　the door.
12　Q. Okay. And after Mr. Lima and Mr. Machado raised the
13　　doors, and they put the brakes on, what side was
14　　worked on first, your side, the port side or the
15　　starboard side?
16　A. Depends.
17　Q. On the day that you were hurt?
18　　　MR. ANDERSON: I don't think he
19　　understood. Earlier he was talking sort of in
20　　general about two years. I think now he's switching
21　　to the day of your accident.
22　A. Yes.
23　　　MR. ANDERSON: Okay. Just so we're clear.
24　　It's not just in general. The day of your accident.

46

1　　Is that--
2　Q. (Mr. Regan) Do you understand that?
3　A. Yes.
4　Q. So, on the morning of October 4th of 2003, and
5　　again, correct me if I'm wrong, Mr. Lima was
6　　operating the port side winch. Mr. Machado operated
7　　the starboard side winch?
8　A. Correct.
9　Q. And prior to the tow that you were injured on, I
10　　assume there were other tows?
11　A. Yes.
12　Q. And about how many tows do you do in an eight-hour
13　　shift?
14　A. Could be two or three.
15　Q. Do you know how many tows you had done that morning
16　　before you got hurt?
17　A. No.
18　Q. Six hours into your work schedule, this wasn't the
19　　first tow I take it?
20　A. No.
21　Q. So, there was at least one other one before then?
22　A. Yes.
23　Q. And in the one before then, did you yourself operate
24　　the winches?

47

1　A. Yes.
2　Q. And do you recall which side?
3　A. Starboard side.
4　Q. Was there any problem with either the operation of
5　　the winch or the operation of the brake?
6　A. No.
7　Q. Did you have the occasion on this trip at any time
8　　prior to your injury to operate the port side winch?
9　A. No.
10　Q. Do you know whether or not the port side winch was
11　　working properly and the brake was working properly
12　　at the time that you were injured?
13　A. I know that, yes.
14　Q. So again now, let me get you back to just before you
15　　were injured. Mr. Lima is operating the port side.
16　　Mr. Machado is operating the starboard side, and the
17　　doors get raised together?
18　A. Correct.
19　Q. And then Mr. Lima puts the brake on the port side
20　　winch. Mr. Machado puts the brake on the starboard
21　　side winch?
22　A. Yes.
23　Q. Now, what happened next? What did either you do,
24　　Mr. Machado do, or Mr. Lima do once the brakes were

48

1　　put on?
2　A. We had to put the safety chain around the door.
3　Q. Do you do both doors at the same time?
4　A. No.
5　Q. So, on that morning, which door was worked on first?
6　A. I think it was the starboard side.
7　Q. And were you involved in hooking up the safety chain
8　　on the starboard side?
9　A. No.
10　Q. Who did that?
11　A. Joaquim Machado.
12　Q. So, Mr. Machado would have had to of left his
13　　position behind the starboard side winch, walked aft
14　　to get to the starboard side door to hook up the
15　　safety chain?
16　A. Yes.
17　Q. What are you doing while he's doing that, anything?
18　A. I'm on the port side.
19　Q. Are you working, or are you just standing by until
20　　he gets done?
21　A. I'm just standing by.
22　Q. Is there a reason why you only put the safety chain
23　　on one door at a time?
24　A. Because Mr. Lima is operating my winch. After I

49

1  hook up the door, he untied the brake, he lowers the
2  door down, and he goes to the other side.
3  Q. Okay. When Mr. Machado went back to hook up the
4  starboard side door--
5          MR. ANDERSON: Just so we're clear, I
6  believe his response to that question was not with
7  respect to this event, but with respect to why.
8  Just so we're clear on the record. He went back to
9  a general statement again. I don't know if--
10 Q. (Mr. Regan) Let me ask my question again, which was,
11 is there some particular reason why you only put the
12 safety hook on one door at a time instead of doing
13 both at the same time?
14 A. You cannot reach both of the doors. I have to be in
15 my place.
16 Q. Well, if you had two men. Let me give you an
17 example. Mr. Lima is operating the port side winch.
18 Mr. Machado is operating the starboard side winch.
19 The doors are raised. The brakes are put on.
20 Mr. Machado leaves the starboard side winch and goes
21 down to hook up the starboard side safety chain.
22 A. Yes.
23 Q. Is there any reason why you can't be hooking up the
24 port side safety chain at the same time?

50

1  A. Could you repeat again?
2  Q. Sure. I'm just--it's really a simple question. I'm
3  just wondering, is there some reason, either because
4  of the number of men, or safety, or you work one
5  side first, that you hook up the doors one at a time
6  instead of both at the same time?
7  A. Yes, I think it's because of lack of men.
8  Q. And let's get back to this morning now. I think
9  we've covered as far as Mr. Machado, after putting
10 the brake on the starboard side winch, then went aft
11 to hook up the safety chain on the door on the
12 starboard side; correct?
13 A. Yes.
14 Q. And did he finish doing that?
15 A. Yes.
16 Q. And then what happened, it was time to hook up the
17 port side door?
18 A. I was doing the same thing at the same time.
19 Q. You were?
20 A. Yeah.
21 Q. Now, you mentioned that--I believe you said after
22 you hook up the door, the winch operator has to
23 lower the door?
24 A. He have to untie the brake.

51

1  Q. Okay. And what do you untie the brake for at that
2  point?
3  A. To lower the door down.
4  Q. To the deck?
5  A. No, no, the doors on the safety chain--
6  Q. Yep.
7  A. The door is up with the brake. After you hook up
8  the door with the safety chain, the guy on the
9  winch, he has to open the brake to lower the door
10 down, and then he tie it up again.
11 Q. When the door is first brought up, and the brake is
12 put on, is it still outboard of the ship?
13 A. No, it's next to the rail.
14 Q. Is it resting on the rail?
15 A. No, it's next to the rail.
16 Q. Outside the rail or inside?
17 A. Outside.
18 Q. And then you hook up?
19 A. Yeah.
20 Q. And then what happens, do you swing it inside?
21 A. No. When I hook up, they lower the door down.
22 Q. Still outside of the rail?
23 A. Outside.
24 Q. So, it's hanging outboard?

52

1  A. Outboard.
2  Q. And that's the position you leave it in until you
3  empty the nets and get ready to set out again?
4  A. That's the way we should do.
5  Q. And when you lower it--after you're hooked up--let
6  me strike that. With respect to the railing of the
7  vessel, when the door is up, and you're going over
8  to hook on it, how far above the railing is it?
9  A. From the door?
10 Q. From the top of the railing to, say, the bottom of
11 the door?
12 A. Two, three feet.
13 Q. And are you able to--you're standing on the deck?
14 A. Yeah.
15 Q. And you're able to, in a standing position, attach
16 the hook to the triangle on the back of the door?
17 A. It's--I put the chain through the triangle, and I
18 hook up to the gallus.
19 Q. Got ya. All right. So, now let's go back again to
20 October 4th. Mr. Machado is hooking up the
21 starboard side safety chain, and you're working at
22 the same time to hook up the port side safety chain?
23 A. Yeah, more or less.
24 Q. And then tell me what happened once--tell me what

53

1  happened from the moment when Mr. Lima tied off the
2  brake?
3  　　　MR. ANDERSON: I'm just going to object
4  because it assumes that he saw that or observed it
5  or that he can even use that--
6  　　　MR. REGAN: Well, let me ask it again
7  because I thought he testified to that.
8  　　　MR. ANDERSON: But you said it, and he
9  agreed to it, but I don't believe he ever observed
10  that.
11  Q. (Mr. Regan) Mr. Lima was operating the port side
12  winch when the door was raised; correct?
13  A. Yes.
14  Q. And you could see him?
15  A. Yes.
16  Q. And you knew he was doing that?
17  A. Yes.
18  Q. And did you see when the door came to a stop?
19  A. I see the door came up to the stop.
20  Q. Okay. And when did you see Mr. Lima actually tie
21  off the brake?
22  A. I didn't see that.
23  Q. Well, you know for your own personal safety that you
24  don't attempt to hook up that safety chain until the

55

1  the brake on.
2  Q. Did you have any reason to believe the brake was not
3  on?
4  A. I don't know.
5  Q. Let me ask you this, Mr. Aguear. You wouldn't have
6  gone in there to hook up the door if you thought the
7  brake wasn't on yet, would you have?
8  A. No.
9  Q. So, can I take it that you believed that the brake
10  was on when you went in to pass the chain through
11  the triangular piece of metal?
12  A. Yes.
13  Q. You knew from your experience that you'd be putting
14  yourself in a position of danger if you attempted to
15  do that before the brake was applied or tied off?
16  A. Yes.
17  Q. Or tighten off I think you said, tighten down?
18  A. Yes.
19  Q. That's the right word. All right. That morning,
20  you now go in to hook up the door. Tell me what you
21  did and what happened?
22  A. I went back. The door was stopped on the rail. So,
23  I put the chain around the door, and I was going to
24  hook up to the--it looks like a pelican hook. It's

54

1  brake is tied off; is that a fair statement?
2  A. The guy on the winch is the one responsible when the
3  door get up to the rail to tie up the brake. That's
4  the first thing that guy should do.
5  Q. And on this particular occasion, you say you didn't
6  see whether Mr. Lima did that or didn't do that?
7  A. I didn't see.
8  Q. One way or the other?
9  A. I didn't see it.
10  Q. And did he signal you in any way, yell to you, or
11  tell you, "Go ahead. It's tied off," or anything
12  like that?
13  A. No.
14  Q. So, at the time that you actually went to hook up
15  the safety chain, you didn't know whether the brake
16  was tied off or not?
17  A. I know the door was stopped.
18  Q. Was that an indication to you that the brake was on?
19  A. Could be.
20  Q. But you didn't know?
21  A. No.
22  Q. It could be stopped because that's as far as you can
23  raise it?
24  A. No, when it stopped, the first thing they do is put

56

1  a pin, and I was trying to put the safety.
2  Q. And then what happened?
3  A. All of a sudden the door went up, and there was a
4  big splash in the water.
5  Q. All of a sudden the door went up?
6  A. Up and down.
7  Q. And what happened to you when that happened?
8  A. I got hurt on my finger.
9  Q. You, in answering the question, said the door was
10  stopped on the rail. Is that what you mean, it was
11  resting on the rail?
12  A. No, no, it stopped next to the rail.
13  Q. Okay. And in your prior experience as a commercial
14  fisherman on draggers, was this something that had
15  happened before, where the door would come down and
16  go back into the water?
17  A. I didn't see that happen.
18  Q. Had you ever seen that occur before?
19  A. No.
20  Q. This wasn't a common thing that occurs when you're
21  at sea?
22  A. I don't think so.
23  Q. And what happened next?
24  A. When I got hurt--when I took the glove off, that's

Deposition of CARLOS AGUEAR taken JULY 15, 2005 — Sheet 15

**57**

1  when I see in my finger was a bone sticking out. It
2  was my friend, Joaquim Machado, next to me, and I
3  went inside to wash my finger and to go up to the
4  wheelhouse to John to Band-Aid my finger.
5  Q. Did you have any conversation at that time with
6  Mr. Lima about how it was that the door in your
7  words, "Went up and then splashed down in the
8  water"?
9  A. The only conversation when Mr. Lima came up to me
10  and says, "I'm sorry."
11  Q. Did he say anything else?
12  A. No.
13  Q. Did you have any understanding as to what he meant
14  by that?
15  A. No.
16  Q. And this was while you were still on deck and before
17  you went up to the wheelhouse?
18  A. Yes--no, before I went to wash up my finger.
19  Q. Any conversation with Mr. Machado at that time about
20  how it happened?
21  A. I just said, "Did you see what happened," and he put
22  his hand on his head.
23  Q. This is Mr. Machado?
24  A. Mr. Machado.

**58**

1  Q. He didn't say anything?
2  A. He just said, "My God."
3  Q. After you washed your hand and then went up into the
4  wheelhouse to see Captain Cura, what happened?
5  A. Call up the Coast Guard.
6  Q. And how long did it take for the Coast Guard to
7  arrive?
8  A. An hour, two hours, something like that.
9  Q. Did either yourself, or Captain Cura, or anyone else
10  perform any first aid on you?
11  A. John Cura.
12  Q. What did he do?
13  A. He wrap up my finger.
14  Q. Did you have any conversation with Captain Cura
15  about how your injury happened?
16  A. No.
17  Q. Did Mr. Abreu wake up or come up on deck at any time
18  prior to the Coast Guard arriving?
19  A. Yes.
20  Q. And did you have any conversations with Mr. Abreu
21  about how it happened?
22  A. No.
23  Q. So, at no time before being taken off the vessel by
24  the Coast Guard did you ever have a conversation

**59**

1  with anybody about what actually happened and how it
2  happened; is that right?
3  A. Never.
4  Q. By the way, what was the weather like at that time?
5  A. Good weather.
6  Q. How do you define good weather? Do you know what
7  the sea conditions were?
8  A. Ten to fifteen, something like that.
9  Q. Ten to fifteen feet?
10  A. No, no, knots.
11  Q. You're talking about the wind now?
12  A. Wind, yeah. It was calm weather.
13  Q. How about the seas?
14  A. Two to three feet.
15  Q. And when you're raising the doors, is the boat
16  rolling from side to side or front to back or some
17  combination of that?
18  A. We don't know. We never know how the boat rolls.
19  Q. Well, the boat does roll, doesn't it?
20  A. Yes.
21  Q. And this can happen while you're doing your job?
22  A. Yes.
23  Q. Was the boat rolling at the time that your finger
24  got trapped?

**60**

1  A. No.
2  Q. The boat is still underway and going forward at the
3  time you're hooking up the doors; isn't it?
4  A. Yeah, it has to be in gear.
5  Q. And on that morning when you're hooking up the door,
6  do you have any idea how fast or how many knots the
7  vessel is going forward?
8  A. No.
9  Q. Would you describe it as being full steam?
10  A. No.
11  Q. Half?
12  A. It cannot be full steam. It cannot be half. It has
13  go to be very low.
14  Q. But it does have some speed going forward?
15  A. Just a little bit, just in gear.
16  Q. Now, this process of hooking up the door is
17  something that you do 50 times a trip?
18  A. Or more. Depends on how many days we fish.
19  Q. And let's just take the two years you were on the
20  My Way, do you have some idea about how many trips
21  per year that boat made?
22  A. I don't know.
23  Q. More than ten?
24  A. More than ten.

61

1    Q. More than fifteen?
2    A. Usually, yes.
3    Q. More than twenty?
4    A. I don't know.
5    Q. Somewhere between fifteen and twenty?
6    A. Yes.
7    Q. And you performed this particular operation 50 or
8       more times per trip?
9    A. Correct.
10   Q. And you've been involved in working on draggers at
11      the time of your injury for almost 20 years?
12   A. Something like that.
13   Q. So, this was an operation that you'd performed
14      thousands of times in the past?
15   A. Yes.
16   Q. And you were aware from performing that job that you
17      have to be careful for your own safety; isn't that
18      true?
19   A. That's correct.
20   Q. Because you know the doors can move?
21   A. I know the doors can move.
22   Q. What are some of the things that can cause a door to
23      move?
24   A. The brake is one.  The other one is the operator.

62

1    Q. What about just the weight of the nets in the water
2       itself, can that cause movement in the door up or
3       down?
4    A. No.
5    Q. How about when you pull the door up, are there times
6       when there's mud on it?
7    A. Yes.
8    Q. And can one door maybe weigh more than the door on
9       the other side if it has mud on it?
10   A. Usually the doors comes on the same time, and they
11      stop there.
12   Q. The presence of mud on the doors, can that cause it
13      to slide down?
14   A. No.
15   Q. Anything else that can cause it?
16   A. Besides this, I don't know.
17   Q. In your prior experience, had you seen where the
18      door would come down and splash back into the water
19      before?
20   A. If the operator doesn't tie the brake.
21   Q. Any other time other than the brake not being
22      tightened down?
23   A. The only thing can be it's the operator on the
24      winch.

63

1    Q. Can the door move down if the net itself gets hung
2       up, say, on the rocks or something under the water?
3    A. Yes.
4    Q. And earlier you told me you didn't actually see
5       Mr. Lima tighten down the brake on that day; is that
6       right?
7    A. Is that right?  I see the door stopped.
8    Q. Right.  You saw the door stopped.  You assumed the
9       brake was on?
10   A. That's the first thing you should do.
11   Q. Right.  But I'm asking what was going through your
12      mind.  You saw the door stopped.  You assumed the
13      brake was on?
14   A. Yes.
15   Q. And then you went in to hook up?
16   A. Correct.
17   Q. But you didn't actually see Mr. Lima put the brake
18      on or tighten it down?
19   A. No.
20   Q. And did you see anything else that he did at the
21      winch in those moments before you were injured?
22   A. No.
23   Q. Did you see if he was even operating the winch?
24   A. Yes, he was operating the winch.

64

1    Q. By operating I mean--let me strike it.  What you
2       mean by operating is he was standing at the winch?
3    A. Yes.
4    Q. And he was ready to operate the controls if he
5       needed to?
6    A. Yes.
7    Q. My question is a little different.  Once you went
8       over to hook up, did you see him actually try to
9       raise or lower the doors?
10   A. I didn't see him.
11   Q. When you were in to hook up, would your back had
12      been to Mr. Lima?
13   A. Yes.
14   Q. So, you didn't see anything that he did or didn't
15      do?
16   A. I didn't see.
17   Q. I take it you didn't observe the winch at any time
18      after your injury?
19   A. No.
20   Q. You have no reason to believe that it was
21      malfunctioning; is that correct?
22   A. That's correct.
23   Q. What, if anything, did you do to prepare to come
24      here today to answer my questions?

65

1   A. Excuse me, can you repeat again?
2   Q. What, if anything, did you do to prepare for this
3      deposition?
4   A. To prepare for what?
5   Q. To come here to my office to answer questions?
6          MR. ANDERSON: Other than talking to
7      myself.
8   Q. (Mr. Regan) Other than talking to Mr. Anderson?
9   A. I didn't talk to my--I was talking to him.
10  Q. Let me ask you this, did you review any documents?
11  A. No.
12  Q. Did you discuss the incident with anybody other than
13     Mr. Anderson before coming here?
14  A. No.
15  Q. Are you aware that Mr. Anderson has statements from
16     Mr. Abreu and Mr. Machado?
17  A. I don't know.
18  Q. Did you ever read a written statement authored by
19     Mr. Abreu or Mr. Machado?
20  A. No.
21         MR. ANDERSON: We did go over some
22     photographs. One of them was provided by you. The
23     other one I don't have with me today. I have it.
24  Q. (Mr. Regan) Do you recall--let me strike that. Do

66

1      you know an individual named Russel DuBois?
2   A. That's the guy from the insurance.
3   Q. If I suggested to you that Russel worked for
4      Marine Safety Consultants in Fairhaven, would that
5      help you?
6   A. Yeah.
7   Q. Do you recall going into his office to give him a
8      statement two days after the accident?
9   A. He called me.
10  Q. Right. Did he come to your house?
11  A. No.
12  Q. Did you go to his office?
13  A. Yes.
14  Q. So, the discussion was face-to-face? It wasn't over
15     the phone?
16  A. It was face-to-face.
17  Q. And do you recall that he was recording the
18     conversation that he had with you?
19  A. That was after we talked. That was after we talked.
20  Q. What do you mean by that?
21  A. He called me. He ask me how the accident happened,
22     and I explained to him. He says, "Okay. Now I'm
23     going to record you."
24  Q. Let me just back up just for a minute. He called

67

1      you on the telephone?
2   A. Yes.
3   Q. And that's when you first told him how the accident
4      happened?
5   A. No, he told me to reach his office.
6   Q. So, you came into his office?
7   A. Yes.
8   Q. And before he turned the tape recorder on, you had a
9      discussion about how the accident occurred?
10  A. He's the one that asked me, "How that happen, the
11     accident?"
12  Q. But I guess my question is, was the tape recorder
13     already on at that time?
14  A. No.
15  Q. So, you had a conversation with him about how it
16     happened before he put the tape recorder on; right?
17  A. After he says--after the conversation he says,
18     "Okay. Don't worry about it. Now I'm going to
19     record you," and that's when he starts asking and
20     answering other questions.
21  Q. And when you were being recorded, did you again
22     describe for him how the accident occurred?
23  A. Yes.
24  Q. And do you recall telling him that at the moment of

68

1      the accident one guy runs the winch and the other
2      one puts the chain on the door?
3   A. Can you repeat again, please?
4   Q. Yes. Let me do it this way. I'm going to show
5      you--why don't we mark it first?
6          (The transcript of recorded statement was
7      marked Exhibit No. 1 for identification.)
8   Q. I'm going to show you what's been marked as
9      Exhibit 1, which purports to be a transcript of the
10     interview. Let me first of all ask you, obviously
11     you speak English?
12  A. A little bit.
13  Q. Well, you have no translator with you here today?
14  A. Yes.
15  Q. You've understood my questions so far?
16  A. Yeah, but the thing is, I cannot read that much.
17  Q. Well, let's see how far we can get. I'm going to
18     direct your attention to the third page of that, and
19     I'm going to read it to you and ask that you read
20     along with me. Beginning with here where there's a
21     "Q" for question. It says, "Right." And then
22     "Answer: In that day, that moment, it's one guy
23     runs the winch. The other one puts the chain on the
24     door." Let me just stop there. There's more, and

**69**

1  I'll read it to you, but let me stop there and take
2  it in bits. Do you recall telling that to
3  Mr. DuBois?
4  A. I don't remember. That was a long time ago.
5  Q. Let me go on. It continues. "So, the other guy
6  runs on the winch. That was not his fault. I was
7  trying to put the chain on the door. That's my job
8  to put the chain on the door. That's when the door
9  went down here." Do you recall telling that to
10  Mr. DuBois?
11  A. I think. The guy was my friend, man.
12  Q. You're talking about Mr. Lima?
13  A. Yeah.
14  Q. Well, my only question is, do you recall telling
15  Mr. DuBois that it wasn't his fault, Mr. Lima's
16  fault?
17  A. Well, at the beginning when that happens, when he
18  asked me, I thought that wasn't his fault because
19  the guy was my friend. He didn't did it on purpose.
20  Q. And I'm going to continue on to the next question.
21  "So, was there any reason that you know of why the
22  door slipped down?" Answer: No, we don't know.
23  It happens. It's not very common, but it happens.
24  When the boat is hang up on the bottom, something

**70**

1  like that, when you're hauling back, it happens.
2  I've been doing that job for many times and never
3  having it happens. You know, it was that day
4  happen." Do you recall telling Mr. DuBois that?
5  A. I don't remember to say that.
6  Q. I want to continue on down to here, to this
7  question. "So, you said it wasn't related to the
8  guy running the winch. There was no problem with
9  him." "Answer: No, no, no, there was no problem
10  with him. It happens." Do you recall telling that
11  to Mr. DuBois?
12  A. I recall I talked to him, but I don't know if I tell
13  you that, if I had told him that.
14  Q. I take it you'd recognize your own voice if I played
15  it you on a tape recorder?
16  A. Yes.
17  Q. I want to refer you again to Page 6. There's
18  another question that I'll read it to you and read
19  the answer. "Question: Just to summarize again the
20  injury and the circumstances surrounding your
21  injury, was there anything that we did not talk
22  about that may have contributed to your injury as
23  far as maybe the door, and the chain, and the
24  equipment wasn't working properly," and your answer

**71**

1  was, "The equipment was working properly all the
2  time. This, it happens. Once in a while it
3  happens. The door slipped down. It's nothing we
4  can do when I put the chain." Do you recall telling
5  Mr. DuBois that?
6  A. I don't know if this is the right words that I say
7  to him.
8  Q. Do you recall telling Mr. DuBois--let me just ask.
9  You've already told me that as far as you know, the
10  equipment was working properly; is that correct?
11  A. Yes.
12  Q. And do you remember telling Mr. DuBois that all
13  equipment was working properly?
14  A. I think because everything was working fine.
15  Q. The Coast Guard took you off the boat by helicopter?
16  A. Yes.
17  Q. And where did they take you?
18  A. Rhode Island Hospital.
19            (Brief break.)
20  Q. Mr. Ageuar, I think we had gotten as far as to the
21  point that you had been taken to the
22  Rhode Island Hospital?
23  A. Yes.
24  Q. Why don't you pick it up from there, what sort of

**72**

1  treatment did you receive? How long were you there
2  and so forth?
3  A. Okay. I went in a helicopter to the
4  Rhode Island Hospital. They dropped me off. I
5  don't know where--which street was it when the
6  helicopter went down, and then from that point to
7  the hospital, I was in ambulance right here in
8  Rhode Island.
9  Q. Got ya.
10  A. And when I got there, that's when they had care for
11  my finger.
12  Q. What did they tell you the injury was?
13  A. Excuse me?
14  Q. What was the diagnosis, fracture, broken finger?
15  A. It was a broken finger.
16  Q. It wasn't amputated by the accident at that point in
17  time?
18  A. No.
19  Q. And were you admitted?
20  A. I think it was over night. I just stayed there, and
21  then when they finished, they send me home.
22  Q. Did the Coast Guard personnel provide any treatment
23  for you enroute?
24  A. They put me on IV in the helicopter.

73

1  Q. Did they put a splint on your finger, for example?
2  A. No, no, because the hand was closed, and it was all
3     wrapped up in the ball.
4  Q. So, you had made a fist before it was wrapped up on
5     the boat?
6  A. Yes. I went like this (witness indicating). He
7     wrapped up the finger, and I went like this.
8  Q. Okay. I have to describe what you're doing for the
9     record. So, first he wrapped up your right index
10    finger, and--
11 A. Yeah.
12 Q. --then you made a fist with your other fingers and
13    your thumb?
14 A. Yeah, I was holding like this. My hand was closed
15    like this (witness indicating).
16 Q. And then did they wrap bandage around your whole
17    hand?
18 A. No, just on the finger.
19 Q. And the Coast Guard didn't change that dressing or
20    bandage?
21 A. They opened, and they put it back.
22 Q. Okay.
23 A. They opened the bandage, and then they wrap it up
24    back again.

74

1  Q. And what did the doctors at the
2     Rhode Island Hospital do?
3  A. The doctor said it was fractured, the finger was
4     fractured and broke.
5  Q. How did they treat it?
6  A. I don't know how they treat it, but I see him put in
7     a piece of metal. I think it was a wire in the
8     finger all the way up to here (witness indicating).
9  Q. Did you understand that that was some sort of
10    surgical procedure?
11 A. Yeah, I think it was a surgical procedure. That's
12    what the doctor told me, it was going to have to be
13    surgery.
14 Q. And it involved putting in a pin and some wire?
15 A. Yes, yes, that's what he did.
16 Q. Did anybody from the vessel accompany you to the
17    hospital?
18 A. No.
19 Q. And did your wife come down?
20 A. Yes, to pick me up.
21 Q. So, the next day?
22 A. I think I just stay in the hospital for--until I get
23    the treatment. I don't know how many hours. Could
24    be four, or five, or six.

75

1  Q. So, you don't think you stayed overnight, or you do
2     think you stayed overnight?
3  A. I don't think I stay overnight. I just stay there
4     some hours.
5  Q. And after you returned home, when is the next time
6     that you sought treatment?
7  A. That was a long time ago. I don't know if it was in
8     the next three days or the next four days I went
9     back.
10 Q. To the Rhode Island Hospital?
11 A. Yes.
12 Q. Was there a particular reason?
13 A. No, just follow-up.
14 Q. Was it scheduled?
15 A. It was scheduled.
16 Q. So, when you left the first time, the doctor said,
17    "Come back and see me in three or four days"?
18 A. Yeah. I don't know if it was three or four days,
19    but I know it was very soon after I went home.
20 Q. Within a week?
21 A. Yeah, something like that.
22 Q. And what did the treatment consist of on that
23    occasion?
24 A. Just he take some x-rays, if it was everything okay.

76

1     Everything was look fine.
2  Q. And you went back home?
3  A. Yes.
4  Q. And when was the next time you had treatment?
5  A. I don't remember now. It's been a long time. I
6     don't know. I went so many times.
7  Q. When was the first time you saw Dr. Sawyer?
8  A. I think--I don't know if it was weeks later or if it
9     was a month later, something like that.
10 Q. And was there a period of time where you had to go
11    back to the Rhode Island Hospital for other
12    follow-up visits?
13 A. Yes.
14 Q. Over what period of time did you go to the
15    Rhode Island Hospital approximately?
16 A. Usually in the beginning, I think I went every three
17    weeks or every month or every two weeks. I don't
18    know the exact time.
19 Q. And for how long did that continue, one month, two
20    months, six months?
21 A. I think it was six months, and then I was going
22    every month or every two months.
23 Q. Let me just jump ahead briefly. You ultimately had
24    the finger amputated?

77

1   A. No, at that time. Now, I have the finger amputated.
2   Q. Right. That's what I mean, ultimately. At some
3       point in the future--strike that. Originally they
4       put the pin and the wire in?
5   A. Yes.
6   Q. At some later point in time, you elected to have
7       amputation?
8   A. Yes.
9   Q. Was that done at the Rhode Island Hospital?
10  A. Correct, yes.
11  Q. And do you know approximately when that was?
12  A. I think it was last year.
13  Q. 2004?
14  A. I think so.
15  Q. So, was it about a year after the original incident?
16  A. Yes.
17  Q. If I suggested to you that I have an operating
18      record for November 22, 2004, does that sound about
19      right to you?
20  A. I think it's something like that, the amputation.
21  Q. Just before Thanksgiving?
22  A. Yeah, something like that.
23  Q. Do you still go back to the Rhode Island Hospital
24      today for treatment?

78

1   A. Yes, it's my doctor.
2   Q. When you say "my doctor," are you talking about
3       Dr. Sawyer or somebody else?
4   A. No, no, the doctors from Rhode Island, the ones who
5       did the surgery on my hand.
6   Q. And I think I saw the name of Dr. Lawrence Bowen; is
7       that who you're referring to?
8   A. That's the head surgeon in Rhode Island.
9   Q. And do you believe that he's the doctor who actually
10      performed the surgery on you?
11  A. I don't know if it was--there was so many doctors.
12      That's a team of doctors. I don't know which one
13      who operated me, but I think it was Jennifer Lee.
14  Q. You think it was who?
15  A. Jennifer Lee or Dr. Bowen.
16  Q. Jennifer Lee, L-e-e?
17  A. Yes.
18  Q. Or Dr. Bowen?
19  A. Yes, or it could be Dr. Kim too.
20  Q. Dr. Kim, K-i-m. Okay. And when was the last time
21      that you were at Rhode Island Hospital?
22  A. A few months ago.
23  Q. Do you have an appointment scheduled for sometime in
24      the future?

79

1   A. She told me to see her in up to six months.
2   Q. She being Dr. Lee?
3   A. Jennifer Lee. Could be with her or someone else.
4   Q. Right. But when you were last there, she told you
5       you'd have to come back in in about four to six
6       months?
7   A. That's what she told me.
8   Q. Do you actually have a date as you sit here?
9   A. No, no, she told for me to call because usually they
10      cannot reschedule in four or five months. They have
11      to reschedule every month. One month before I go,
12      that's when I have to reschedule, call up the
13      Rhode Island Hospital and reschedule the date.
14  Q. Do you know what Dr. Lee's speciality is?
15  A. I think it's bone, hand surgery.
16  Q. And do you know if Dr. Bowen has any different
17      speciality?
18  A. I don't know.
19  Q. How about Dr. Kim?
20  A. I don't know.
21  Q. Is Dr. Kim a man or a woman?
22  A. It's a man.
23  Q. Do you know Dr. Kim's first name?
24  A. I don't know.

80

1   Q. You understand that they're all part of a single
2       team?
3   A. Yes.
4   Q. In addition to being treated at the
5       Rhode Island Hospital, you've also seen Dr. Sawyer?
6   A. Yes.
7   Q. Are you still under the care of Dr. Sawyer?
8   A. Correct.
9   Q. And what does he do for you, if anything, that's
10      different than what they do down at the
11      Rhode Island Hospital?
12  A. That's the advice for the doctors in Rhode Island.
13      They told for me to see my doctor, Dr. Sawyer.
14  Q. For like follow-up visits?
15  A. Follow-up visits to see what's going on with the
16      hand.
17  Q. And when was the last time that you saw Dr. Sawyer?
18  A. Two months ago, last month. I don't know. I don't
19      remember the right date.
20  Q. Do you presently have an appointment to see him some
21      time in the future?
22  A. Four months.
23  Q. And do you actually have a date, or is it again,
24      you've got to call?

81

1  A. I have a date, but it's at home. I don't know the
2     right date.
3  Q. But you believe it to be about four months from now?
4  A. Yes.
5  Q. And about how many times have you seen Dr. Sawyer;
6     do you know?
7  A. I don't know, five, six times. I don't if that's
8     exactly how many times I've seen Dr. Sawyer.
9  Q. Approximately?
10 A. That's what I'm telling you, it's five or six times.
11    It could more, or it could be less. I don't know.
12 Q. And did these visits take place in his office?
13 A. Correct.
14 Q. And did he provide any treatment for you, or does he
15    just look at your finger and ask you how you're
16    doing and so forth?
17 A. He asked me how I'm doing, and sometimes he writes
18    some painkillers for me or something, you know, some
19    medication.
20 Q. Prescription?
21 A. Yes.
22 Q. Is he the doctor who prescribed Percocet?
23 A. He's the doctor who prescribed the Percocets.
24 Q. In addition to the Rhode Island Hospital and

82

1     Dr. Sawyer, I see that you also underwent either
2     physical or occupational therapy at HealthSouth;
3     does that ring a bell to you?
4  A. Yes.
5  Q. And where is HealthSouth?
6  A. It's in New Bedford.
7  Q. And I want to be careful to distinguish from
8     St. Luke's, which is now known as Southcoast
9     Rehabilitation.
10 A. Yeah.
11 Q. HealthSouth is different from Southcoast?
12 A. I don't know. The only thing is I go there for
13    therapy. That's the only thing, and I see people
14    doing therapy.
15 Q. Did you go to two different places for therapy at
16    different times?
17 A. Yes.
18 Q. And where physically was the first place?
19 A. Faunce Corner Road.
20 Q. Faunce or Fox?
21 A. Faunce.
22 Q. F-a-u-n-c-e?
23 A. I think something like that.
24 Q. And do you believe that that's--strike that. Let me

83

1     represent to you that Southcoast is affiliated with
2     St. Luke's.
3  A. Yeah.
4  Q. Does that help you--this location at
5     Faunce Corner Road, does that help you to know
6     whether that was St. Luke's or the other place?
7  A. It's the same company.
8  Q. And are you still undergoing physical therapy?
9  A. Yes.
10 Q. And when was the last time you were at physical
11    therapy?
12 A. Last week.
13 Q. And do you have an appointment for this week or next
14    week?
15 A. I don't know. They have to call me.
16 Q. To set up further appointments?
17 A. Yes.
18 Q. And I understand that recently you had an evaluation
19    or something called a Work Tolerance Screening?
20 A. It was something like that.
21 Q. And that was done at St. Luke's?
22 A. No.
23 Q. Where was that done?
24 A. Southcoast.

84

1  Q. And the records that I have, sir, suggest that that
2     was on June 6th of 2005 or a little over a month or
3     so ago; does that--
4  A. That's correct.
5  Q. Is that consistent with your memory?
6  A. Something more like that.
7  Q. And as a result of that evaluation, did they
8     prescribe some other sort of physical therapy or
9     work hardening for you?
10 A. That's what the doctor recommend.
11 Q. And did you actual do it?
12 A. I've been doing therapy.
13 Q. Were you recently discharged from the work hardening
14    program?
15 A. No.
16 Q. The therapy or the exercises that you've had since
17    June 6th, when you had that evaluation, are they
18    different from what you had before?
19 A. It's more aggressive.
20 Q. And do you believe that you're still undergoing that
21    form of therapy?
22 A. I think so.
23 Q. You're not at an end?
24 A. I'm not at an end.

Deposition of CARLOS AGUEAR taken JULY 15, 2005

85

1  Q. Has any of the physical therapists, or Dr. Sawyer,
2     or the other doctors that you've treated with
3     indicated to you either that you can go back to work
4     or when you could go back to work as a fisherman?
5  A. No.
6  Q. Do you expect to go back to work as a fisherman?
7  A. Yes.
8  Q. And do you have any idea when?
9  A. No, as soon I get better.
10 Q. Let me break it down to two periods, before and
11    after you had the amputation, and let's talk about
12    before the amputation first. What sort of pain and
13    recovery period and so forth did you experience with
14    your finger up until the time you had the
15    amputation?
16 A. It was a lot of pain and swelling and a lot of
17    shocks.
18 Q. What do you mean by shocks?
19 A. I don't know. It's coming up to here (witness
20    indicating), to the elbow.
21 Q. How did you feel that? Is this something that was
22    constantly there?
23 A. It's something that was constant. It comes and
24    goes. It comes and goes.

86

1  Q. And when it comes, what do you feel?
2  A. It's like a shot.
3  Q. Do you feel pain? Do you feel numbness? Do you
4     feel something else?
5  A. No, no. It's a shock. If you have something in
6     your hand, if you have that, you go like this
7     (witness indicating). You're scared. It's like
8     electric shock.
9  Q. And how about after the amputation, any change?
10 A. After the amputation, what I see is my hand starts
11    to swell when I start to lifting weights, and I
12    still have shocks.
13 Q. How does your hand and the what remains of your
14    index finger feel today?
15 A. The thing I feel over here is sometimes it's--when I
16    grab anything cold, it hurts a lot, and when I close
17    my hand, if I close too much, the hand starts to
18    swell even with a little bit of weight. When it
19    swells up, the shocks come up all the way through
20    the arm and pain.
21 Q. Where are you experiencing the pain?
22 A. Sometimes I wake up in the middle of the night, and
23    I think I have the finger.
24 Q. Has anybody, either the doctors at Rhode Island, or

87

1     the physical therapists, or Dr. Sawyer, given you
2     any sort of prognosis for the future?
3  A. No.
4  Q. Have you attempted to return to work in any other
5     capacity other than as a commercial fisherman?
6  A. I want to go back as a fisherman.
7  Q. Have you tried to get employment, say, factory work
8     like you used to do before you became a fisherman?
9  A. No.
10 Q. Have you attempted to get any sort of employment
11    since October of 2003?
12 A. No.
13 Q. Have you been treated by anyone for this injury
14    other than the doctors at Rhode Island Hospital, the
15    physical therapists at HealthSouth and Southcoast,
16    and Dr. Sawyer?
17 A. No.
18 Q. Have you been treated at any other hospital other
19    than the Rhode Island Hospital, and I guess I'll
20    include St. Luke's in there?
21 A. No, Rhode Island Hospital. My hand, it's
22    Rhode Island Hospital.
23 Q. Do you have any expectation at all as to when you'll
24    be able to return to work?

88

1  A. As soon I get better I want to go back working.
2     That's my way to live.
3  Q. Do you have any idea as to whether that will be two
4     months, six months, a year?
5  A. I don't have an idea.
6  Q. And nobody has given you a timetable?
7  A. Nobody give me a timetable yet.
8  Q. Other than your inability to work, in what other
9     ways has this injury changed the way you do things?
10 A. I don't have that much power as I used to have in my
11    hand.
12 Q. How does that affect you? Are there other
13    activities other than work that you used to do that
14    you can't do now?
15 A. Yes, it's some I cannot do now.
16 Q. Like what?
17 A. Lifting weights, if it's too heavy.
18 Q. Do you mean lifting weights as a form of exercise?
19 A. No. It's like carrying 20 or 30 pounds or
20    40 pounds. Sometimes that's so much, and the hand
21    swells up fast.
22 Q. And in your day-to-day life, what would cause you to
23    come into contact with something that's 30 pounds or
24    more?

89

1   A. Nothing, but the thing is that I do that when I go
2       to therapy.
3   Q. So, this is as your exercises?
4   A. As an exercise in therapy because I've been doing
5       therapy at home too.
6   Q. I got ya. My question is more towards if you have
7       any hobbies, or you work at home, gardening,
8       painting, anything else? I'm trying to find out,
9       sir, what can't you do now that you used to be able
10      to do before the injury, other than fishing? We've
11      talked about that.
12  A. Okay. I can do now. What I can do now?
13  Q. Cannot do now that you used to be able to do before
14      the injury?
15  A. Like in the wintertime, I cannot shovel anymore
16      because it's very cold. It's like a burning
17      sensation come up through my hand.
18  Q. Anything else?
19  A. And the thing is, it's sometimes I think I have the
20      finger. That's the the--and it's in a lot of pain.
21  Q. When was the last time you took Percocet?
22  A. I think two days ago.
23  Q. Anything else that you can't do today or any other
24      way in which it gets in the way?

90

1   A. The only thing that's worst for me today is when I
2       put my hand in cold water. It's like a burning
3       sensation.
4   Q. Since the time of this accident in October of '03,
5       have you had any conversations with John Cura?
6   A. About what?
7   Q. About the accident, and about how it happened, or
8       how you're recovering?
9   A. No.
10  Q. How about with Joe Lima, have you had any
11      conversations with him since the accident about how
12      it happened?
13  A. No.
14  Q. How about with Joe Abreu?
15  A. I don't think I have.
16  Q. And how about with Mr. Machado?
17  A. No.
18  Q. So, you haven't talked to any of the former--
19  A. We talk to each other, but not about the accident.
20      We are friends.
21  Q. Right. I understand.
22  A. We are a bunch of friends. We talk to each other,
23      but we don't talk about the accident.
24  Q. That's exactly what I'm asking you, is if you have

91

1       talked with these people about the accident?
2   A. No, I didn't talk about the accident.
3   Q. I'm not interested in them asking you how Celeste
4       and Daniella are doing and things like that. No
5       conversations about what happened on
6       October 4, 2003?
7   A. No.
8   Q. When was the last time you saw or spoke to Mr. Cura?
9   A. Could be last week, say hi to each other.
10  Q. And Mr. Lima?
11  A. Yeah, he shows up once in a while the same place as
12      I go to have a coffee.
13  Q. And when was the last time you saw or spoke to
14      Mr. Abreu?
15  A. I don't remember, but I see him two weeks ago.
16  Q. And how about Mr. Machado?
17  A. That I didn't see him for more than a month because
18      he works on another vessel.
19  Q. So, if I understand your testimony here today, the
20      accident happened, and you've really had no
21      discussion with anybody about how it happened,
22      either on the deck then or at any time thereafter;
23      is that correct?
24  A. We don't talk about the accident. Nobody talks

92

1       about the accident. We say hi to each other. We
2       just friends.
3   Q. But even while you were still on the boat for those
4       next couple of hours, you never said to Mr. Lima,
5       "What happened"?
6   A. No, no.
7   Q. Did you ever accuse him of dropping the door
8       intentionally or--
9   A. No. Mr. Lima is my friend. We are a bunch of
10      friends over there. Everybody knows each other over
11      there.
12  Q. Well, you've told me today that what might cause it
13      is either something wrong with the winch or the
14      brake, or something that the operator might do; is
15      that correct?
16  A. That's correct.
17  Q. Did you ever discuss with Mr. Lima whether he did
18      something or didn't do something to cause the door
19      to come down?
20  A. No.
21  Q. Did you ever discuss with Mr. Lima whether the brake
22      was on or off?
23  A. It cannot be the brake because we towing for four
24      hours, and you have to have the brakes on. You know

93

1  how many pressures of water it comes up when you're
2  towing the net. That brake is fine.
3  Q. Okay.
4  A. I assume that it's fine.
5  Q. Yep. You saw nothing in the operation out there at
6  sea that would lead you to believe there was
7  anything wrong with the brake?
8  A. I don't think so.
9  Q. So, one of the possibilities you mentioned was
10  something Mr. Lima might have done?
11  A. That's reasonable.
12  Q. You never discussed it with him? You never said,
13  "Joe, what did you do," or anything like that?
14  A. No, I never discussed that.
15  Q. And you never saw what he did?
16  A. I never saw.
17  Q. And you don't know what he did, or what he didn't
18  do?
19  A. No.
20  Q. And you have no evidence or any personal knowledge
21  of anything that Mr. Lima did or didn't do that
22  contributed or caused your injury; is that a fair
23  statement?
24  A. The fair statement is, I don't think that's from the

94

1  brake. I think it was somebody had to touch in the
2  winch. I think that was the operator, but I ain't
3  going to blame Joe Lima for that. That's the only
4  reason I see how the accident happened.
5  Q. But as you sit here today, you have no evidence of
6  anything that he did; is that true?
7  A. Yeah, I didn't see him. I don't have no evidence.
8  Q. And you have no personal knowledge of anything he
9  did or didn't do?
10  A. I have a personal knowledge what he did.
11  Q. And what is that?
12  A. I think he messed up with the winch.
13  Q. I'm not asking you for your thoughts or opinions.
14  I'm asking you, do you have first-hand knowledge,
15  did you see him mess up with the winch?
16  A. I didn't see it.
17  Q. And you're making an assumption that that's what
18  happened; is that true?
19  A. No, that's not an assumption. That's what I think.
20  In my knowledge that's the only way it could happen.
21  Q. I'm going to ask you to draw a picture for me, and I
22  recognize you're probably not an artist, but try to
23  use the whole piece of paper. What I'd like you to
24  do is to draw me the fishing vessel My Way, and I'm

95

1  going to at some point ask you to put in where the
2  winches are, where the doors were, where Lima was,
3  etc. So, for right now, draw like looking down on
4  the deck of the fishing vessel My Way, and use the
5  whole paper.
6  A. Yeah. Winch, port side.
7  Q. Why don't you put in "PW" in there for port winch,
8  so that we'll understand what you're referring to.
9  A. "PW".
10  Q. And is this the starboard winch?
11  A. Yes.
12  Q. Write "SW".
13  A. "SW". This is the drum, net drum.
14  Q. Why don't you write "ND" for net drum, or just write
15  drum, d-r-u-m.
16  A. I'm going to put "ND".
17  Q. "ND" for net drum.
18  A. Okay.
19  Q. And there are two net drums, one on each side?
20  A. Yes.
21  Q. Why don't you put "ND" in the other one. And is the
22  edge of the paper the railing of the boat?
23  A. It looks more like the deck, something over here
24  (witness indicating). That's where you put the

96

1  nets, in the center of the decks.
2  Q. Why don't you write nets in there, n-e-t-s.
3  A. N-e-t.
4  Q. N-e-t. Okay. We can use another piece of paper if
5  you'd like too, but let me ask you first, it seems
6  to me that what you've drawn is the rear or the
7  stern of the vessel; is that right?
8  A. No, no, that's the deck of the vessel.
9  Q. Well, that doesn't include all the way up to the
10  bow?
11  A. No.
12  Q. In fact, that doesn't include the wheelhouse, does
13  it?
14  A. No.
15  Q. So, this is only really half the deck?
16  A. Yeah, something like that.
17  Q. It's the stern of the deck?
18  A. Yeah, something.
19  Q. Or the working deck?
20  A. The working deck.
21  Q. Now, before you do anything else, and again we might
22  have to use another piece of paper, I'd like to have
23  you draw in the gallus frame and the door, and then
24  I'm going to have you position yourself. Do you

97

1    have enough room on this piece of paper to do that,
2    or should we use another piece of paper?
3  A. It's all right. We can put the gallus over here
4    (witness indicating).
5  Q. Go ahead and draw in the gallus frame.
6  A. The net drum is over here. The gallus frame is over
7    here (witness indicating).
8  Q. And can you put a "G" in there to indicate the
9    gallus frame. We can just use the port side, the
10    side you were injured on, can you draw in the door?
11  A. The door comes up right here (witness indicating)
12    more or less. That's not accurate.
13  Q. And you've drawn a line on the bottom left-hand side
14    of that piece of paper near the gallus frame, and
15    you've gone over it a couple times to make it
16    thicker blue to indicate the door; is that correct?
17  A. Yes.
18  Q. Why don't you put an "X" as to where you were
19    standing?
20  A. "X". Where was I standing?
21  Q. Yes. At the time you were injured.
22  A. This is drum net, and the door comes up right here
23    (witness indicating).
24  Q. And put "JL" for Mr. Lima, where he was at the time

98

1    you were injured.
2        MR. ANDERSON: I'm just going to object
3    because I don't think that he actually knows.
4  Q. (Mr. Regan) All right. Let me ask it this way, draw
5    in "JL" to indicate where Mr. Lima was the last time
6    that you saw him before you were hurt.
7  A. The last time I saw him before I was hurt?
8  Q. Right.
9  A. Was next to the winch.
10  Q. Next to the port side winch; right?
11  A. Yeah.
12  Q. Well, draw "JL" to indicate where he was the last
13    time that you saw him before you were hurt. No, not
14    an "X" because we used that for you. Cross that out
15    and use his initials "JL" so that we know.
16  A. "JL".
17  Q. Okay. He's drawn "GL" it looks like to me, but "GL"
18    instead of "JL" will stand for Joe Lima. And then
19    lastly I want you to use "JM" to show me where
20    Joaquim Machado was when you last saw him before you
21    got hurt?
22  A. Before I got hurt or after I got hurt?
23  Q. Before you got hurt? Use a "JM".
24  A. Before I seen him over here (witness indicating).

99

1    "JM".
2  Q. Again, it looks to me like he's done "GM", but I
3    think we'll know who it is. You've placed him by
4    the starboard winch; is that right?
5  A. What, Mr. Machado?
6  Q. Yes.
7  A. Before I got hurt--let's put it this way, I don't
8    understand your right question. You asked me what's
9    the positions they are? They're supposed to be
10    here, and then I'm right here (witness indicating).
11  Q. Yep, where you've drawn the "X".
12  A. Okay. When I'm right here (witness indicating), the
13    doors are in the water, both of the doors are in the
14    water.
15  Q. Okay.
16  A. I'm just waiting for the doors to come up.
17  Q. And when the doors came up, in particular the door
18    on your side, the port side, did your position
19    change?
20  A. No, my position is right here.
21  Q. Did you ever see Mr. Lima leave the port side winch?
22  A. No.
23  Q. So, this is where Mr. Lima was before the doors come
24    out of the water, and also where he was the last

100

1    time you saw him before the accident?
2  A. Yes.
3  Q. Is the same true for Mr. Machado?
4  A. No.
5  Q. This is Mr. Machado by the starboard winch while the
6    doors are in the water; is that right?
7  A. Yes.
8  Q. Don't draw it in right now, but point to me, where
9    was he the last time you saw him before you got
10    hurt? Was he still at the starboard winch, or was
11    he back by the starboard gallus frame?
12  A. He was coming up here (witness indicating).
13  Q. Where you drew him in by the winch, and it looks to
14    me like "JM", can you put a dash and put "1" next to
15    that. So, that's Joaquim Machado No. 1 is where he
16    was while the doors were in the water; is that
17    right?
18  A. Yes.
19  Q. And do "JM2" to indicate his position where he was
20    the last time you saw him before you got hurt?
21  A. Before I got hurt--
22  Q. Let me see if I can help you a little bit, and
23    correct me if I'm wrong, you've told me that after
24    he put on the brake, he then went back to hook up

101

1    the starboard side door?
2  A.  Correct.
3  Q.  So, was he in the vicinity of the starboard side
4    door or starboard side gallus frame or starboard
5    side net drum when you last saw him before you were
6    hurt?
7  A.  No.
8  Q.  He had left that area?
9  A.  Left that area.
10  Q.  So, he had already hooked the door up?
11  A.  Yes.
12  Q.  And then where did he go next?
13  A.  Right here (witness indicating).
14  Q.  All right.  You've put an "X" next to that.  Why
15    don't you underneath that "X" write "JM-2" to
16    indicate Mr. Machado's--
17  A.  "JM" for Joaquim Machado.
18  Q.  Dash 2.
19  A.  Dash 2.
20  Q.  And for the record, this time he used a "J" instead
21    of a "G".
22  A.  Okay.
23  Q.  So, his first position was where he was when he was
24    operating the starboard winch, and his second

102

1    position was where you last saw him before you were
2    hurt?
3  A.  Yes.
4  Q.  Maybe in the middle at the bottom here, can you sign
5    your name and date it. Today is July 15th, so we
6    know whose picture this is.
7  A.  My name?
8  Q.  Sign it, your name, and put today's date, which is
9    July 15th.
10  A.  7-15.
11  Q.  7-15-05. Can we have this marked as Exhibit 2,
12    please?
13          (The diagram was marked Exhibit No. 2 for
14    identification.)
15  Q.  Mr. Aguear, your lawyer has provided me with your
16    tax returns for 1999, 2000, and 2001, 2002, and
17    2003.
18  A.  Yeah.
19  Q.  I assume he got them from you?
20  A.  Yeah.
21  Q.  And I notice on that that you don't file jointly
22    with your wife, you file singlely?
23  A.  Yes.
24  Q.  Is there a particular reason for that, tax reason or

103

1    some other reason that you do that?
2  A.  No.
3  Q.  So the income that's reflected on your tax return is
4    yours and yours alone?
5  A.  Yeah, but I think it was one year I put joint, me
6    and my wife together.
7  Q.  And if you did that, that would be on the tax
8    return?
9  A.  Yeah.
10  Q.  I could see that it's a joint return?
11  A.  Yeah.
12  Q.  And if it's not on there, that means you filed just
13    singlely?
14  A.  Yes.
15  Q.  And if you filed singlely, the numbers for income in
16    there just reflects what you and only you have
17    earned?
18  A.  Yes.
19  Q.  And during those years, did you make any income
20    other than fishing, 1999 and 2003 when you were
21    hurt?
22  A.  No.
23  Q.  So, all of the income on those five years of tax
24    returns reflect fishing income?

104

1  A.  That's right.
2  Q.  Did you file, or have you filed yet a tax return for
3    last year, 2004?
4  A.  2004? No.
5  Q.  It would have been due this past April?
6  A.  Yeah.
7  Q.  You didn't file?
8  A.  I didn't make any money.
9  Q.  Do you plan to file an income tax return for last
10    year?
11  A.  For the last year?
12  Q.  For last year, yes, 2004.
13  A.  Yeah.  I didn't file it because I didn't make any
14    money.
15  Q.  Okay.
16  A.  I stopped.
17  Q.  I understand that you didn't make any money.
18  A.  And I went to my accountant, and I ask him if I
19    could file a tax. He said, "If you don't make any
20    money, you don't have to file the tax."
21  Q.  So, you don't have any intention on filing anything
22    for last year?
23  A.  I have intentions to file.  If I make money, I have
24    intention to file the tax.

105

1   Q.  No, for last year.  Last year is over.
2   A.  Yeah.
3   Q.  You can't make any money now for last year.
4   A.  No, I didn't make any money.
5   Q.  But people sometimes get an extensions.  That's what
6       I'm trying to get.  You didn't come in April and get
7       an extension to file taxes, did you?
8   A.  No.
9   Q.  Because you didn't earn anything, you don't intend
10      to file a tax return for the year 2004; is that
11      right?
12  A.  Because I did not have any monies.
13  Q.  Okay.  And if you go back to work like this year,
14      for example, you'd file a tax return next year?
15  A.  That's right.
16  Q.  I want to show you again a document entitled--not
17      show you again because I didn't show it to you
18      before, but I'm going to show you "Plaintiff's
19      Answers to Interrogatories Propounded by the
20      Defendant."  It's 12 pages, and I'm just going to
21      show you Page 12, and ask you, is that your
22      signature, sir?
23  A.  Yes.
24  Q.  And does that reflect that you signed this on

106

1       June 21st of 2005?
2   A.  Yeah.
3   Q.  And did you read these answers before you signed
4       them?
5   A.  Yeah.
6   Q.  I want to show you Questions and Answer No. 20,
7       which basically asks you to list for me what you've
8       earned the last five years?
9   A.  Yeah.
10  Q.  Do you see that?  Do you see where it lists '99,
11      2000, 2001, 2002, 2003?
12  A.  Yeah.
13  Q.  And it has figures next to each of those years?
14  A.  Yes.
15  Q.  For example, in 1999 it says approximately $43,000?
16  A.  Yeah.
17  Q.  Can you see that?  Can you read that?
18  A.  Yeah.
19  Q.  You can read English somewhat?
20  A.  Not that much, but I can read some.
21  Q.  But you recognize 43,000 and the other figures
22      there?
23  A.  Yeah.
24  Q.  Where did you get that information from when you

107

1       answered that question?
2   A.  Where do you I--
3   Q.  Right.
4   A.  The $43,000?
5   Q.  Yes.  Let's say 1999 you indicated you were earning
6       approximately $43,000.  Where did you come up with
7       that figure, or how did you come up with that
8       figure?
9   A.  It's from my taxes.
10  Q.  So, is that the same for the other five years?
11  A.  Yeah.
12  Q.  So, when you list, for example, in 2002 you made
13      $58,000, you believe you got that from your tax
14      returns?
15  A.  Yes.
16  Q.  And if your tax return differs from any of the
17      figures here, your tax return would be the correct
18      figure?
19  A.  Yes, I think so.  That's the amount of money I made.
20  Q.  When you answered this question, did you consult
21      anything else other than your tax return in order to
22      be able to answer that question?
23  A.  No, I see my taxes.  When I filed the taxes, that's
24      what I see.

108

1   Q.  And to date, all of your hospital and medical bills
2       have been paid?
3   A.  I don't know.
4   Q.  Have you had to pay any of your own hospital bills
5       or doctor's visits?
6   A.  From the injury?
7   Q.  Yes, from the injury.
8   A.  No, I didn't pay nothing.
9   Q.  You have an understanding that
10      Marine Safety Consultants has taken care of your
11      bills?
12  A.  I think so.
13  Q.  I don't want to confuse you, but Mr. DuBois,
14      Mr. Russel Dubois is not there any longer.  Have you
15      ever dealt with an individual by the name of Frank
16      Sweeney?
17  A.  No.  I don't that name.
18  Q.  You received checks from time to time for what's
19      called maintenance?
20  A.  Maintenance, Cure, yeah.
21  Q.  And you understand that Cure is the payment of your
22      medical bills?
23  A.  Yeah.
24  Q.  And maintenance is a daily allowance that you are

109

```
 1     entitled to?
 2  A. Yes.
 3  Q. And you've received that maintenance allowance?
 4  A. Yes.
 5  Q. Are you still receiving maintenance?
 6  A. Yes.
 7  Q. And has that check come from Mr. Sweeney; do you
 8     know?
 9  A. I don't know.
10  Q. Do you know who's sending it now?
11  A. Marine Safety--I think it as workmen's comp.,
12     Marine Safety or something like that.
13  Q. Let me give you another name and see if that's
14     familiar to you, Maritime Claims Associates; does
15     that ring a bell at all?
16  A. No.
17  Q. Do the checks come in the mail, or do you have to go
18     in and pick them up?
19  A. No, they come in the mail.
20  Q. And are you aware that in addition to the Cure or
21     payment of your hospital bills, and in addition to
22     the maintenance check, that you have received
23     advances?
24  A. Yes.
```

110

```
 1  Q. And if I suggested to you that our records show that
 2     you've received $6,600 in advances, would that be
 3     consistent with your memory?
 4  A. More or less, yeah.
 5  Q. And do you recall that you signed for those advances
 6     at the time you received them?
 7  A. Yes.
 8  Q. On the day of your accident, October 4, 2004, were
 9     you taking any medication, drugs, or prescription
10     drugs?
11  A. On the day of the accident?
12  Q. Before the accident, yeah.
13  A. Before the accident? No.
14  Q. Had you consumed any alcoholic beverages at any time
15     prior to the accident that day?
16  A. No.
17         MR. REGAN: I don't have any other
18  questions. Thank you, Mr. Aguear.
19         MR. ANDERSON: I have none.
20         (Deposition concluded at 1:33 p.m.)
21
22
23
24
```

111

COMMONWEALTH OF MASSACHUSETTS
CERTIFICATE

I, Leslie A. D'Emilia, Notary Public in and for
the Commonwealth of Massachusetts, do hereby certify
that there came before me on the 15th day of July,
2005, the deponent herein, who was duly sworn by me;
that the ensuing examination upon oath of the said
deponent was reported stenographically by me and
transcribed into typewritten form under my direction
and control; and that with within transcript is a
true record of the questions asked and the answers
given at said deposition to the best of my
knowledge, skill, and ability.

I FURTHER CERTIFY that I am neither attorney nor
counsel for, nor related to or employed by any of
the parties to the action in which this deposition
is taken; and, further, that I am not a relative or
employee of any attorney or financially interested
in the outcome of this action.


_____
LESLIE A. D'EMILIA
NOTARY PUBLIC
COMMONWEALTH OF MASSACHUSETTS

MY COMMISSION EXPIRES MARCH 13, 2009