# EXHIBIT 4

Page 1

1                 Volume: I
2                 Pages: 42
3                 Exhibits: 0
3     UNITED STATES DISTRICT COURT
4     DISTRICT OF MASSACHUSETTS
5
6
7   CARLOS A. AGUIAR
        Plaintiff
                 Docket No.
8     vs.      04-12011-MLW
9  LIMA & CURA FISHING CORPORATION,
        Defendant
10
11
12
       DEPOSITION of JOAO RIGEIRO CURA, a
13  witness called by and on behalf of the Plaintiff, taken
     pursuant to the Federal Rules of Civil Procedure,
14  before Cynthia F. Stutz, Certified Shorthand Reporter
     and Notary Public in and for the Commonwealth of
15  Massachusetts, at the offices of Latti & Anderson, LLP,
     46 Union Street, New Bedford, Massachusetts, on
16  Wednesday, November 9, 2005, commencing at 12:51 p.m.
17
18
19
20
21
22
23
24

Page 2

1  APPEARANCES:
2     DAVID J. BERG, ESQ.
      Latti & Anderson, LLP
3     30-31 Union Wharf
      Boston, Massachusetts 02109
4     on behalf of the Plaintiff
5     JOSEPH A. REGAN, ESQ.
      Regan & Kiely, LLP
6     85 Devonshire Street
      Boston, Massachusetts 02109
7     on behalf of the Defendant
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1             I N D E X
2
  WITNESS:   DIRECT  CROSS  REDIRECT  RECROSS
3
4  Joao Cura    4    30     37
5
  EXHIBITS:     DESCRIPTION       PAGE
6
7  N O N E
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1         P R O C E E D I N G S
2      IT IS HEREBY STIPULATED AND AGREED BY
3  AND BETWEEN COUNSEL that the reading and signing of the
4  deposition by the deponent shall be done within thirty
5  days; that the notarization of the signature and the
6  filing of the deposition be waived; and that all
7  objections, except as to form, and motions to strike be
8  reserved for the time of trial.
9        *  *  *  *
10  Whereupon:    *Ribeiro*
11          JOAQ RIGEIRO CURA,
12  having been satisfactorily identified and duly sworn by
13  the Notary Public, was examined and testified as
14  follows:
15  *0*     DIRECT EXAMINATION
16    BY MR. BERG:
17    Q.  Could you state your name, please?
18    A.  Joao Rigeiro, R-i-g-e-i-r-o Cura, C-u-r-a.
19    Q.  Your current address?
20    A.  101 Nautilus Street.
21    Q.  Who do you work for?
22    A.  Lima & Cura Fishing Corp.
23    Q.  Do you own part of the corporation?
24      THE WITNESS:  Yes.

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

9b2bd398-9cfe-4O99-a27f-d8328bd154b8

Page 5

1  Q. How much?
2  A. Since we bought in '86.
3  Q. What percentage of the corporation?
4      THE WITNESS: 50. I'm sorry. 25% me,
5  25% by my wife.
6  Q. Do you hold an office in the corporation? Are
7  you the president, the vice president?
8  A. No.
9  Q. Do you own any other -- And does the
10 corporation own the Fishing Vessel MY WAY?
11 A. Yes.
12 Q. Do you own any other fishing boats?
13 A. No.
14 Q. Have you ever owned any other fishing boats?
15 A. No.
16 Q. You're the captain of the MY WAY?
17 A. Yes.
18 Q. Have you been the captain since you bought it
19 in 1986?
20 A. Yes.
21 Q. Had you worked on any other fishing boats
22 before 1986?
23 A. Fishing Vessel LUCI MAR, mate and captain.
24 Q. When did you start working on the LUCI MAC?

Page 6

1  A. 1980.
2  Q. And you worked on that boat from 1980 to 1986?
3      THE WITNESS: 1980, 1986 yeah, right.
4  Q. Did you work on any fishing boats before the
5  LUCI MAC?
6  A. In Portugal.
7  Q. Do you have any Coast Guard licenses?
8  A. Yes, operator.
9  Q. When did you get that license?
10 A. When they asked us to.
11 Q. How long ago was that?
12     THE WITNESS: I don't know.
13 Q. Have the Coast Guard ever had any proceedings
14 against your license?
15 A. No.
16 Q. Have you ever been convicted of a crime?
17 A. Never.
18 Q. What are the duties of the captain on the MY
19 WAY?
20 A. The responsibility to take and bring the boat
21 back and fish, look for fish to make money.
22 Q. You steer the boat?
23 A. Yes.
24 Q. You decide where the boat will fish?

Page 7

1  A. Yes.
2  Q. You decide who you will sell the fish to?
3  A. Yes.
4  Q. If the weather is bad, you decide whether to
5  keep fishing or go back in?
6  A. Sure.
7  Q. If someone gets hurt, you have to get them off
8  the boat?
9  A. Yes. I either take him or find a way of
10 having him taken out.
11 Q. You're responsible for keeping all the
12 equipment safe?
13 A. Yeah.
14 Q. And you're responsible for the safety of the
15 crew members?
16 A. Yeah, yeah.
17 Q. Are the deck hands required to do what you
18 tell them to do?
19 A. Yes, because I mean, I don't have them do
20 anything that's not supposed to be done.
21 Q. Are you friends with Carlos Aguiar?
22 A. Yes.
23 Q. How long have you known him?
24 A. I knew him before he started working for me, I

Page 8

1  knew him.
2  Q. Are you still friends with him?
3  A. Yes.
4  Q. Do you see him socially?
5  A. Yes.
6  Q. When is the last time you saw him?
7  A. Before we went to sea.
8  Q. You haven't seen him at all in two years?
9  A. Yeah, I see him regularly.
10 Q. When is the last time before today that you
11 saw him?
12 A. Just before I went on my last trip.
13 Q. I see, okay. How long did he work on the boat
14 before he got hurt?
15     THE WITNESS: A couple years, maybe.
16 Q. He was the deckhand?
17 A. Deckhand and cook.
18 Q. Did you have any complaints about his work?
19 A. No, never.
20 Q. Did anyone ever complain to you about his
21 work?
22 A. No.
23 Q. Did you think he was a safe fisherman?
24     MR. REGAN: Objection.

2 (Pages 5 to 8)

Page 9

1   A.  Yes, he was.
2   Q.  Did you ever see him doing anything unsafe?
3   A.  No.
4   Q.  Before he got hurt had he ever complained to
5   you about any physical problems?
6   A.  No, not physical.
7   Q.  Had he ever missed a trip because of some
8   physical problem?
9   A.  No.
10  Q.  On the trip that he got hurt on did he ever
11  tell you that he had any pain at any time before he got
12  hurt?
13  A.  No.  The only thing that he mentioned was a
14  problem with high blood pressure and the blood or
15  something.
16  Q.  Did that cause him any problems in doing his
17  job?
18  A.  No, he never complained.
19  Q.  Do you operate the winch on the MY WAY
20  yourself?
21  A.  Sometimes, if it's necessary.
22  Q.  Do you do it every trip?
23  A.  Yes, when needed.
24  Q.  Do you recall if you had operated the winch on

Page 10

1   the trip in which Carlos got hurt?
2   A.  Yes, after the accident, I had to.
3   Q.  Did you operate it before the accident?
4   A.  Yes.
5   Q.  Was the winch in good condition on that trip?
6   A.  Yes, because then we finish the trip.  We
7   finished, we completed the whole trip.
8   Q.  As of the time that Carlos got hurt did the
9   winch have any mechanical problems?
10  A.  No.
11  Q.  Did you have any complaints about either of
12  the winches on the boat as of that trip?
13  A.  No.
14  Q.  Did anyone complain to you about either of the
15  winches?
16  A.  No.
17  Q.  Had you noticed any problems with either of
18  the winches during the year before Carlos got hurt?
19  A.  No.  When there's repairs it's just
20  maintenance, but nothing else.
21  Q.  After Carlos got hurt did you check out the
22  left side winch to see if it was defective?
23  A.  If I did see?
24  Q.  Yeah, did you?

Page 11

1   A.  No, there was nothing wrong with the winch.
2   Q.  Do you have any rule on your boat that after
3   the winch operator brings the door out of the water and
4   puts the brake on, he should give the hook-up man a
5   signal that he's put the brake on?
6   A.  We never do that, because that's the normal
7   work.  We know what we're going to do.  We prepare it.
8   We use the brake, we lock it.  He does his job and then
9   the person that sets the winch then brings the door to
10  where it should be.
11  Q.  How does the hook-up man know that the winch
12  operator has put the brake on?
13  A.  Because he sees it.  The door is stopped and
14  he sees it.
15  Q.  The hook-up man can see the winch operator
16  turn the brake?
17  A.  Yes.
18  Q.  The hook-up man is supposed to wait until the
19  brake is on before he goes up to the door?
20  A.  Yes, he waits.
21  Q.  And the winch operator should never move the
22  door while the hook-up man is standing near the door?
23  A.  No, he doesn't touch it when it's close to.
24  When he goes over to the other side, he goes to the

Page 12

1   side and then that's when he goes on.
2   Q.  And that's because it's not safe to move the
3   door when someone is standing near it?
4   A.  No, it's not.
5   Q.  Do you know who made the winch, the
6   manufacturer?
7   A.  No, it's from Marko.
8   Q.  Do you know what model it is?
9   A.  No.
10  Q.  Did you buy it used or new?
11  A.  I bought it used.
12  Q.  How long ago?
13  A.  Six or eight years, I don't know.  I'm not
14  sure.
15  Q.  On the trip in which Carlos got hurt you had a
16  four man crew in addition to you?
17  A.  Yes, we were five all together.
18  Q.  Five all together.
19  A.  Yeah.
20  Q.  Have you ever had six all together on the
21  boat?
22  A.  Yes.
23  Q.  When is the last time you had six people on
24  the boat?

9b2bd398-9cfe-4

Page 13

1  A.  I don't know, I have no idea.
2  Q.  Why did you switch to five?
3  A.  Because there was less work and in order for
4  us to make a little more money, we have to work more.
5  Q.  Is it easier to do the fishing with four men
6  working on the deck?
7  A.  It's about, it's the same.  I mean, we have a
8  little more work, because we have one less person, but
9  it's about the same thing.
10  Q.  Is it safer for the hook-up men if there were
11  four men on deck?
12        MR. REGAN:  Objection.
13  A.  It's the same thing.  It's the same thing.
14  Q.  When the brake on the winch is on, that means
15  the winch can't move?
16  A.  Exactly.
17  Q.  And when the brake --
18  A.  Only on a very exceptional case.
19  Q.  When the brake is on, that means the cable
20  doesn't move?
21  A.  No.
22  Q.  What are the very exceptional cases that would
23  make the winch move?
24  A.  If there is a huge weight that would put a lot

Page 14

1  of strength on it.
2  Q.  Okay.  Any other reason, any other exceptional
3  cases?
4  A.  No.
5  Q.  Does the door often come up out of the water
6  with mud on it?
7  A.  Yes, it does.
8  Q.  Is the door having mud on it an exceptional
9  case?
10  A.  Yes.
11  Q.  So if the door has mud on it, that could make
12  the winch move?
13  A.  If the door has mud, it's a sign that the net
14  will have mud, as well.  Of course, then it's an extra
15  weight.
16  Q.  So if the net -- When you say a huge weight,
17  that means if the net has mud in it?
18  A.  Depends on the amount of mud, but yes.
19  Q.  When the brake is on, that means the cable to
20  the winch can't move?
21  A.  No, it does not, again.
22  Q.  And if the door is hanging on the winch when
23  the brake is on, that means the door shouldn't move
24  either?

Page 15

1        MR. REGAN:  Objection.
2  A.  No, it doesn't move.
3  Q.  Are you saying that if there is a lot of mud
4  in the net, that can cause the door to drop even when
5  the brake is on?
6  A.  Yes.
7  Q.  And that's because the weight in the net is
8  stronger than the brake holding the cable?
9  A.  Of course it is, yeah.
10  Q.  Are there bigger winches that have stronger
11  brakes that you could buy?
12  A.  That is the ideal for me.
13  Q.  Which, the winch that you have right now is
14  the ideal winch?
15  A.  Yes, it's the same, yeah.
16  Q.  Do you know if there are any other winches
17  that have stronger brakes?
18  A.  Possibly, yes.
19  Q.  And a winch with a stronger brake could hold
20  the door without moving even when there is mud in the
21  net?
22        MR. REGAN:  Objection.  Go ahead.
23  A.  Can you repeat that question again?
24  Q.  Yes.  Would a winch with a stronger brake keep

Page 16

1  the door from moving even when there is mud in the net?
2        MR. REGAN:  Objection.
3  A.  Probably would do the same thing.
4  Q.  Is it dangerous for the hook-up man when the
5  door moves while he's trying to hook it up?
6  A.  Yes.
7  Q.  Do you give the hook-up man any instructions
8  on how to do the hooking up?
9  A.  He knows what he's doing.
10  Q.  Do you tell him what to do in case the door
11  moves?
12  A.  He knows what he has to do.
13  Q.  And basically, the way to avoid getting your
14  hand hurt when the door moves while you're trying to
15  hook it up is to get your hand away from the door?
16  A.  Yes.
17  Q.  Is there anything that the winch operator can
18  do to make the job of hooking up safer for the hook-up
19  man?
20  A.  What he has to do, it's what he does.
21  Q.  Were you looking at Carlos when he got hurt?
22  A.  Yes.
23  Q.  Had you been watching him before he got hurt?
24  A.  Yes, I was watching the whole thing from

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

9b2bd398-9cfe-4099-a27f-d8328bd154b8

Page 17

1  upstairs.
2      Q.  Did you see the door come out of the water?
3      A.  Yes.
4      Q.  And from where you are can you also see the
5  winch operator, Lima?
6      A.  No.
7      Q.  So you can't see if he put the brake on?
8      A.  No.
9      Q.  So you saw the door come out of the water and
10  then you saw it stop moving?
11      A.  I saw the door coming from the water.  The
12  door stopped.  Carlos put the chain through and then I
13  saw the door going down slowly and then he screamed and
14  that was it.
15      Q.  How was the weather?
16      A.  Good.
17      Q.  Do you remember what the winds and seas were?
18      A.  It was calm.
19      Q.  Was the boat rolling?
20      A.  It will always moves a little bit.
21      Q.  Did you see mud on the door?
22      A.  Not on the door.  I saw it on the net.
23      Q.  Did you see more or less mud on the net than
24  average?

Page 18

1      A.  It was the normal when we get mud.  I mean,
2  sometimes more or sometimes less, but it was just about
3  the normal.
4      Q.  You could see that Carlos had actually put the
5  hook into the chain?
6      A.  Yes.
7      Q.  Was he standing where he was supposed to be
8  for doing that job?
9      A.  Yes.
10      Q.  And was he putting the hook in the chain the
11  way he's supposed to?
12      A.  Yes.
13      Q.  Did you see whether he had closed the hook
14  before he got hurt?
15      A.  He probably didn't have time to close the,
16  close it, because it opened up.  If it was closed and
17  locked, it wouldn't open.
18      Q.  Did you see whether he started moving the ring
19  down toward the hook?
20      A.  I saw him putting the hook through and then he
21  start pulling it and then the door went and that was
22  it.
23      Q.  How far down did the door go?
24      A.  A little.

Page 19

1      Q.  A couple inches?
2      A.  No, more.
3      Q.  Like two feet?
4      A.  Probably a foot.
5      Q.  Did the door go down to the water?
6      A.  No, no.
7      Q.  So it went down maybe a foot and then stopped?
8      A.  Yes.
9      Q.  And by that point, Carlos had jumped away from
10  the door?
11      A.  Yes, he immediately moved.
12      Q.  And he was holding his hand?
13      A.  Yes, he was complaining.  He took the glove
14  out and then I came downstairs.  And then we stopped
15  the boat.  And then I helped him with the treatment.
16      Q.  Did you bring him back up to the wheelhouse?
17      A.  Carlos?
18      Q.  Yes.
19      A.  I don't know what he said.
20      Q.  Did Carlos go back up to up to the wheelhouse
21  with you after the accident?
22      A.  No, pilot house.
23          THE INTERPRETER:  I'm sorry, I couldn't
24  understand it.

Page 20

1          MR. BERG:  That's okay.
2      Q.  Pilot house.  And did you call Coast Guard?
3      A.  He did.
4      Q.  Carlos called?
5      A.  Carlos.  Mine is not too good and Carlos
6  speaks English.
7      Q.  Carlos spoke the best English on the boat?
8      A.  Yes, better.
9      Q.  How much time passed from the time he got hurt
10  until the time the Coast Guard came?
11      A.  Maybe about an hour.  Wasn't that long, or
12  maybe two hours.
13      Q.  How much time passed from the time you saw the
14  door stop moving until the time Carlos got hurt?
15      A.  It was instantly.
16      Q.  When you came up to Carlos after he got hurt
17  did he tell you what happened?
18      A.  I saw what happened.
19      Q.  At any point after he got hurt until he left
20  the boat did he talk to you about how the accident
21  happened?
22      A.  No.
23      Q.  At any point from the time he got off the boat
24  until today have you talked with Carlos about how the

5 (Pages 17 to 20)

Page 21

1  accident happened?
2     A.  No.
3     Q.  Have you ever talked with Mr. Lima about how
4  the accident happened?
5     A.  Yes, I did.
6     Q.  What did he tell you?
7     A.  What he said?
8     Q.  Yes.
9     A.  He was just surprised.  He was just surprised,
10  like, look what happened to the guy.
11     Q.  Did he tell you that he had the brake on?
12     A.  Yes.
13     Q.  And he told you that the winch was in neutral?
14     A.  That I don't know.
15     Q.  Did he tell you if he started lowering the
16  winch before Carlos got hurt?
17     A.  No.  He has to lock the winch.  I mean, why
18  would he say that?
19     Q.  Okay.  While Carlos was hooking up the door,
20  the door was hanging from the winch or is hanging from
21  the cable?
22     A.  Yes.
23     Q.  And so the cable is taut?
24     A.  Yes.

Page 22

1     Q.  And the door is not resting on anything?
2     A.  No.
3     Q.  Does the winch operator have to move the door
4  any differently when there is mud on the door or the
5  net?
6     A.  The maneuver is the same.
7     Q.  Does the hook-up man have to do the hook up
8  any differently when there is mud on the door or the
9  net?
10     A.  No, the same job.
11     Q.  Was the net in the water?
12     A.  Yes.
13     Q.  Was the net floating in the water or did it
14  have a weight on the door?
15     A.  It was on the bottom still.
16     Q.  Bottom of the ocean?
17     A.  Well, it's not like totally at the bottom, but
18  it's down there.
19     Q.  When Carlos was hooking up the door was the
20  net pulling on the door?
21     A.  Yes.
22     Q.  On the MY WAY will the hook-up man give the
23  winch operator a signal once he is done hooking up the
24  door?

Page 23

1     A.  There's no need for signals.
2     Q.  Because the winch operator can see what the
3  hook-up man is doing?
4     A.  He sees what he's doing and the other one sees
5  what -- They watch each other.
6     Q.  And once the hook-up man walks away from the
7  door, then the winch operator will lower it into
8  position?
9     A.  Yes.
10     Q.  At any time while Carlos was hooking up the
11  door did you see the door go up?
12     A.  No.
13     Q.  Was the door swaying while Carlos was hooking
14  it up?
15     A.  It could be, but it was very little, because
16  the weather was nice.
17     Q.  When the door went down, you said it went down
18  slowly?
19     A.  Yes.
20     Q.  Is there anything that could make the door go
21  down slowly like that other than having a huge weight
22  on it?
23     A.  In this case, no.
24     Q.  The door could also go down like that if the

Page 24

1  winch operator started lowering it?
2     A.  He can't do that, because the winch is locked.
3     Q.  But if the winch operator took the brake off
4  and lowered it, the door could go down like that?
5     A.  Yes, of course.
6     Q.  And you saw that there was no mud on the door?
7     A.  I don't remember seeing any.
8     Q.  Okay.  And you saw that there was an average
9  amount of mud on the net?
10     A.  After the net was pulled in, yes, that's what
11  I saw, there was mud.
12     Q.  An average amount of mud?
13     A.  Well, out of the ordinary, because normally it
14  doesn't bring mud.
15     Q.  Normally there's no mud in the net?
16     A.  No.
17     Q.  After you brought the net up and dumped the
18  fish out, was it an average amount of fish in the net?
19     A.  Yes, it did for the short amount of time that
20  the net was in, yes.
21     Q.  Was it greater than average or less than
22  average?
23     A.  I don't remember.
24     Q.  Did you ever ask Mr. Machado if he saw what

6 (Pages 21 to 24)

9b2bd398-9cfe-4099-a27f-d8328bd154b8

Page 25

1  happened?
2  A. Machado couldn't see, because he was doing the
3  same type of job, but on the opposite side and he had
4  his back to him. It's back to back.
5  Q. Did Machado ever tell you that Carlos told him
6  what happened?
7  A. No.
8  Q. Did Mr. Abreu ever tell you that Carlos told
9  him what happened?
10  A. No.
11  Q. Have you seen the door go down slowly like
12  that before on times before Carlos got hurt?
13  A. Sometimes, yes.
14  Q. How often does that happen?
15  A. We do so many maneuvers. If the weather is
16  bad or if we have weight, that's about it.
17  Q. How would bad weather make it go down like
18  that?
19  A. Because when the boat moves he makes a sudden
20  pressure or movement.
21  Q. Well, when the brake is on, that means the
22  cable can't move?
23  A. It shouldn't move.
24  Q. So if the cable can't move, that means the

Page 26

1  door can't move?
2  A. Logic.
3  Q. So how does the bad weather make the door go
4  down?
5  A. I need to draw it, because -- Well, do you
6  want me to draw it? If we have a boat that's down here
7  and all of a sudden it goes six or seven feet up,
8  that's a big strength and that could originate the door
9  to move.
10  Q. Gotcha. Did you tell anyone from the Coast
11  Guard how the accident happened?
12  A. No. All the conversation that went on
13  between -- I was present, between the Coast Guard was
14  all done through Carlos.
15  Q. Okay. Did you ever give a tape-recorded
16  statement to anyone at all?
17  A. Yes.
18  Q. When was that?
19  A. I don't know.
20  Q. Who did you give it to?
21  A. This man.
22  MR. REGAN: For the record, he's
23  pointing to me.
24  Q. You gave it to Mr. Regan?

Page 27

1  THE WITNESS: Marine Safety.
2  Q. You gave it to Marine Safety?
3  A. Yes.
4  Q. Did you make any decisions about how much
5  maintenance and cure Carlos would get?
6  A. Me? No, I have nothing to do with that.
7  Q. As far as you know, did Marine Safety make
8  those decisions?
9  A. I don't know anything. I just sat and told
10  them what happened.
11  Q. I'm showing you this document which is answers
12  to interrogatories. Have you seen those before?
13  (Document handed to the witness.)
14  A. This? Whose is this?
15  Q. Look on the last page. Is that your
16  signature?
17  A. Yes, it is.
18  Q. The answer to Question Number 3, I'm going to
19  read it and it says, The date of the alleged accident was
20  October 4, 2003 at approximately 8:00 a.m. or later in
21  the morning. At the time the F/V MY WAY was
22  approximately 50 miles east of Nantucket. Is that
23  right?
24  A. Yes.

Page 28

1  Q. The weather was calm?
2  A. Correct.
3  Q. The plaintiff, Mr. Aguiar was hooking up the
4  port side door to the fishing net, which door and net
5  had mud on it, when the door dropped down and crushed
6  the plaintiff's finger.
7  A. It was the door that he was working on at the
8  port side.
9  Q. Now, you said today that the door did not have
10  any mud on it.
11  A. I don't remember. The net, yes, had mud. I
12  don't recall the door having it, because that is why I
13  had to pull the net in.
14  Q. And but at the time Carlos got hurt you
15  couldn't see whether the net had mud on it?
16  A. No, I couldn't.
17  Q. You only saw the mud on the net after the net
18  came up onto the boat?
19  A. Exactly, because experience in my line of work
20  tells me that if the boat is stuck, then it's because
21  of mud.
22  Q. Had the boat been stuck while you were
23  trawling?
24  A. Not at the time of the accident. Before.

7 (Pages 25 to 28)

9b2bd398-9cfe-4O99-a27f-d8328bd154b8

Page 29

1    Q.  Before the accident?
2    A.  Yes.
3    Q.  What had happened before the accident?
4    A.  We dragged the net in the water and we didn't
5    do that, it stopped, the boat stopped.  And in a case
6    like that, we have to bring up the net.
7    Q.  So the boat stopped and then you brought up
8    the net?
9    A.  The boat totally stops while the net is stuck
10   on the bottom of the water or moves slower.
11   Q.  So on the trawl right before Carlos got hurt,
12   that's when the boat had stopped, because the net was
13   stuck?
14   A.  Yes.
15   Q.  Had you ever talked with Carlos and told him
16   that he should be careful when hooking up if the boat
17   stops during the trawling?
18   A.  No.  He's a man of this type of work.  He
19   knows he has to be careful.
20   Q.  Does he have to be more careful when the boat
21   stops because now there's going to be mud on the net?
22   A.  Of course, if there's danger, you have to be
23   more careful.
24   Q.  Do you remember if there was this problem on

Page 30

1    the LUCI MAC of very heavy weights on the net?
2    A.  LUCI MAR.
3    Q.  LUCI MAR, oh.  LUCI MAR, I thought LUCI MAC.
4    MR. REGAN:  MAR, M-A-R?
5    Q.  Did the LUCI MAR have the same problem with
6    the door dropping when there was a lot of weight on the
7    net?
8    MR. REGAN:  Objection.
9    A.  LUCI MAR?
10   Q.  Yeah.
11   A.  Everybody, every boat or every ship has the
12   same problem.
13   MR. BERG:  I don't have any other
14   questions.  Sorry.  I should have told you that
15   five minutes ago.
16   MR. REGAN:  Let's go off the record and
17   I'll have him call and I might have a few.
18   (Brief recess.)
19   *0*    CROSS EXAMINATION
20   BY MR. REGAN:
21   Q.  Following Mr. Aguiar's accident did you have
22   to have the winch repaired in any way?
23   A.  No.
24   Q.  How many more days did you remain at sea?

Page 31

1    A.  On that trip I think eight days.  It's a
2    normal trip.
3    Q.  And a normal trip is how many days?
4    THE WITNESS:  Seven, nine days.  Depend
5    the fishing.
6    Q.  And how many days into the trip was it when
7    Mr. Aguiar was injured?
8    A.  That was the first one.
9    Q.  First day, first tow?
10   A.  Yeah, the first tow.
11   Q.  The first tow of the entire trip?
12   A.  Yeah.
13   Q.  And as a result of his injury, did you shorten
14   the trip at all?
15   A.  No, it was normal.
16   Q.  So you stayed and you fished an additional
17   seven or eight days?
18   A.  Yes, I made a normal trip.
19   Q.  Did you experience any difficulties at all
20   with that winch on the port side?
21   A.  No, it was normal.
22   Q.  Did you hire Mr. Aguiar?
23   A.  He asked me for the job.
24   Q.  But I mean, did you make the decision to bring

Page 32

1    him on board as a crew member?
2    A.  Yes.
3    Q.  And did you know him before that time?
4    A.  Yes.
5    Q.  In a normal day of fishing about how many tows
6    do you do?
7    A.  It depends.  In deep water about five tows a
8    day.
9    Q.  Five tows a day and --
10   THE WITNESS:  Shallow water, it's eight,
11   ten.
12   Q.  Were you in deep water or short water on this
13   particular trip?
14   A.  Deep water.
15   Q.  And so if you were out there for eight days,
16   you would have done about 40 tows?
17   THE WITNESS:  Yeah, four or five tows a
18   day.
19   Q.  So eight times four or five would be somewhere
20   between 32 and 40 toes a trip?
21   THE WITNESS:  A trip, yeah.
22   Q.  And about how many trips a year?
23   THE WITNESS:  I have 65 days, about
24   three trips, seven days.  About last year I think 13

Page 33

1 trips or 14 trips.
2     Q.  How about the year he was injured, would it
3 have been any more or any less trips?
4     A.  I don't know.
5     Q.  So about 13 trips?
6     A.  It was in October, wasn't it?
7     Q.  Yes.
8     A.  We had probably made ten trips, at least.
9     Q.  That year?
10    A.  Yes.
11    Q.  Okay?
12    A.  Or more.
13    Q.  And every time you haul back in, the person
14 doing Mr. Aguiar's job has to hook up the door?
15    A.  Yes.
16    Q.  So that person that hooks the door up, say in
17 the course of a year, does this hundreds and hundreds
18 of times?
19        THE WITNESS:  Yeah.
20    Q.  And was Mr. Aguiar an experienced deckhand?
21    A.  Yes.
22    Q.  And was Mr. Aguiar aware of the need to be
23 careful when hooking up the door?
24    A.  Yes.

Page 34

1     Q.  What type of fishing were you doing on the
2 trip that Mr. Aguiar was injured?
3     A.  Monk fish, lobsters, gray sole.
4     Q.  Dabs?
5     A.  Dabs.
6     Q.  Does that type of fishing tend to pull up more
7 mud than other type of fishing?
8     A.  Yes.
9     Q.  Are you aware that since his injury, Mr.
10 Aguiar has gone on to have the finger amputated?
11    A.  Yes.
12    Q.  And he still experiences severe pain in the
13 site of the amputation?
14    A.  That I don't know.  I ask him if he's better
15 or, you know, how is he feeling and he says fine.
16    Q.  Well, I'm going to represent to you that Mr.
17 Aguiar has testified that he still experiences severe
18 pain at the amputation site, that he has what he
19 describes as electric-like shocks up his arm and that
20 he has phantom pain where the finger used to be and
21 that it's more severe in cold weather or when his hand
22 gets wet.  With those limitations, would you take Mr.
23 Aguiar back on board the MY WAY as a crew member?
24    A.  If he's capable of working, yes.

Page 35

1     Q.  How much does a door weigh, the door on the
2 fishing vessel?
3     A.  Those were about 600 pounds -- kilograms.
4     Q.  600 kilos?
5     A.  600 kilos.
6     Q.  And that's before you take into account the
7 added weight of the net being in the water, is that
8 correct?
9     A.  Yes.  That's just the weight for the door.
10    Q.  Now, you testified in response to Mr. Berg's
11 questions that you could not see Mr. Lima operating the
12 winch?
13    A.  No, I can't see.
14    Q.  Can you tell from looking at the door as to
15 whether or not the brake is on?
16    A.  No.
17    Q.  Okay.  When the door is up and it's stopped,
18 does that indicate to you that the brake is on?
19    A.  That is the normal, yes.
20    Q.  When you looked out there and you saw Mr.
21 Aguiar going in to hook up, were you of the belief that
22 the brake was on?
23    A.  Yes.
24    Q.  And from what information or from what did you

Page 36

1 observe that led you to believe that?
2     A.  What?
3     Q.  If you can't see Mr. Lima actually put the
4 brake on, what is it that you observed or saw that led
5 you to believe the brake was on?
6     A.  Because if the brake is not on, the weight of
7 the net, the whole thing would just like just drop
8 suddenly.
9     Q.  Did you observe the door drop back into the
10 water?
11    A.  No, the door didn't go.
12    Q.  Did you observe anything that would have led
13 you to believe the brake was not working properly?
14    A.  No.
15    Q.  If Mr. Aguiar was in the process of hooking up
16 and the brake was released or somehow failed, what
17 would have happened to the door?
18    A.  Can you repeat the question?
19    Q.  Sure.  If the brake was not on or if the brake
20 failed, what would have happened?
21        MR. BERG:  Objection to form.
22    A.  The door would drop.
23    Q.  And did you observe that on the occasion when
24 Mr. Aguiar was injured?

9 (Pages 33 to 36)

9b2bd398-9cfe-4099-a27f-d8328bd154b8

Page 37

1    A.  No.  The door was there until he put the chain
2  through and when he was connecting the hook, that's
3  when the door went down.
4    Q.  Did you observe anything out of the order?
5    A.  No.
6    Q.  Have you had conversations with Mr. Aguiar
7  since his injury?
8    A.  Yes.
9    Q.  About how many times have you talked to him?
10    A.  Every time I see him.
11    Q.  On any occasion that you have ever talked to
12  him has he ever told you that the door dropped into the
13  water?
14    A.  Never, he never told me that.
15    Q.  On any occasion that you talked to him did he
16  tell you that Mr. Lima did anything that caused or
17  contributed to his injury?
18    A.  No.
19    Q.  At any time that you talked to him did he ever
20  tell you that he believed the brake failed?
21    A.  No.
22        MR. REGAN:  I don't have anything else.
23  Thank you.
24  *0*        REDIRECT EXAMINATION

Page 38

1  BY MR. BERG:
2    Q.  Have you and Carlos ever discussed anything
3  that happened in the accident since he left the boat?
4    A.  No.
5    Q.  You said the door weighs about 600 kilograms?
6    A.  Yes.
7    Q.  How much does the net weigh?
8    A.  I don't know.  That I don't know.
9    Q.  Is the net heavier or lighter than the door?
10        MR. REGAN:  I assume you're talking
11  about when it's in the water, not just when it's on the
12  dock.
13    Q.  Let's start with the weight of it.  Do you
14  know how much the net weighs, how heavy or light it is?
15        MR. REGAN:  Object to the form.
16    A.  When the net is around the drum is one weight.
17  I have no idea what it is.  It's more than 600 kilos.
18  Now, with fish, mud, trash, it's impossible to have an
19  idea.
20        (Phone ringing.)
21    Q.  Do you know how much, how many pounds or
22  kilograms of fish you brought up on the trawl in which
23  Carlos got hurt?
24    A.  No, there was mud.

Page 39

1    Q.  But there was some fish?
2    A.  Yes, it did.
3    Q.  If the brake failed and the winch was in gear,
4  the door wouldn't drop, would it?
5        MR. REGAN:  Objection to the form.
6    A.  What you mean?
7    Q.  If the brake is on, but it fails, but the
8  winch operator had the winch in gear, the door would
9  not drop?
10        MR. REGAN:  Objection.
11    A.  No.
12    Q.  When you saw the door going down right before
13  Carlos got hurt, was it going down with the same speed
14  that the winch operator would usually lower it?
15    A.  I think it was going slower.
16    Q.  When the winch operator lowers the door after
17  it's been hooked up, how far does he lower it?
18    A.  Maybe one to two feet.
19    Q.  And he's not going to lower it very fast?
20    A.  No.
21    Q.  He lowers it slowly?
22    A.  Yes.
23        MR. BERG:  Nothing else, thanks.
24        MR. REGAN:  Nothing by me.  Thank you.

Page 40

1        (Whereupon, at 1:53 o'clock p.m.,
2        the deposition was concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

10 (Pages 37 to 40)



Page 41

1        C E R T I F I C A T E
2   I, JOAO RIGEIRO CURA, do hereby certify under the pains
    and penalties of perjury that I have read the foregoing
3   transcript of my testimony given on November 9, 2005,
    and I further certify that said transcript is a true
4   and accurate record of said testimony (with the
    exception of the following corrections listed below):
5
    Page     Line     Correction
6
7
8
9
10
11
12
13
14
15
16   _____
17   _____
18   _____
19   _____
20
21   Dated at           , this     day
22   of       , 2005.
23
24   cfs         JOAO RIGEIRO CURA

Page 42

1           CERTIFICATE
2   COMMONWEALTH OF MASSACHUSETTS
    COUNTY OF SUFFOLK
3
4
      I, CYNTHIA F. STUTZ, Certified Shorthand
5   Reporter and Notary Public duly commissioned and
    qualified in and for the Commonwealth of Massachusetts,
6   do hereby certify:
      That JOAO RIGEIRO CURA, the witness whose
7   testimony is hereinbefore set forth, was duly sworn by
    me and that such testimony is a true and accurate
8   record of my stenotype notes taken in the foregoing
    matter, to the best of my knowledge, skill and ability.
9
      I further certify that I am neither attorney
10   nor counsel for, nor related to or employed by any of
    the parties to the action in which this deposition is
11   taken; and further that I am not a relative or employee
    of any attorney or counsel employed by the parties
12   hereto or financially interested in the action.
13       IN WITNESS WHEREOF, I have hereunto set my
    hand this 21st day of November, 2005.
14
15
16
17
18
19       CYNTHIA F. STUTZ, Notary Public
20
21
22
23
24

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

9b2bd398-9cfe-4O99-a27f-d8328bd154b8

# EXHIBIT 5

Page 1

```
1              Volume: I
               Pages: 66
2              Exhibits: 11
3         UNITED STATES DISTRICT COURT
4           DISTRICT OF MASSACHUSETTS
5
6
     CARLOS A. AGUIAR
7          Plaintiff
                    Docket No.
8      vs.          04-12011-MLW
9    LIMA & CURA FISHING CORPORATION,
           Defendant
10
11
12
        INTERPRETED DEPOSITION of JOSE LIMA, a
13   witness called by and on behalf of the Plaintiff, taken
     pursuant to the Federal Rules of Civil Procedure,
14   interpreted by Maria Margaret Furtado before Cynthia F.
     Stutz, Certified Shorthand Reporter and Notary Public
15   in and for the Commonwealth of Massachusetts, at the
     offices of Latti & Anderson, 46 Union Street, New
16   Bedford, Massachusetts, on Wednesday, November 9, 2005,
     commencing at 11:04 a.m.
17
18
19
20
21
22
23
24
```

Page 3

```
1               I N D E X
2
3    WITNESS:   DIRECT CROSS REDIRECT RECROSS
3
4    Jose Lima      4
5
     EXHIBITS:        DESCRIPTION       PAGE
6
7    1  Photograph              4
8    2  Photograph              4
9    3  Photograph              4
10   4  Photograph              4
11   5  Photograph              4
12   6  Photograph              4
13   7  Photograph              4
14   8  Photograph              4
15   9  Photograph              4
16   10 Photograph              4
17   11 Photograph              4
18
19
20
21
22
23
24   *ALL EXHIBITS RETAINED BY ATTORNEY BERG *
```

Page 2

```
1    APPEARANCES:
2       DAVID J. BERG, ESQ.
        Latti & Anderson, LLP
3       30-31 Union Wharf
        Boston, Massachusetts 02109
4         on behalf of the Plaintiff
5       JOSEPH A. REGAN, ESQ.
        Regan & Kiely, LLP
6       85 Devonshire Street
        Boston, Massachusetts 02109
7         on behalf of the Defendant
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1           P R O C E E D I N G S
2        IT IS HEREBY STIPULATED AND AGREED BY
3    AND BETWEEN COUNSEL that the reading and signing of the
4    deposition by the deponent shall be done within thirty
5    days; that the notarization of the signature and the
6    filing of the deposition be waived; and that all
7    objections, except as to form, and motions to strike be
8    reserved for the time of trial.
9        (Exhibit Nos. 1 - 11 marked
10       for identification.)
11       *   *   *   *
12   Whereupon:
13        JOSE LIMA,
14   having been satisfactorily identified and duly sworn by
15   the Notary Public, was examined and testified as
16   follows:
17   *0*        DIRECT EXAMINATION
18     BY MR. BERG:
19     Q.  Could you state your name, please?
20     A.  Jose Lima.
21     Q.  Your address?
22     A.  95 Bonney Street.
23     Q.  What town?
24     A.  New Bedford.
```

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

cdbc4ced-0d5e-499c-abba-9dad8fdaf°

Page 5

1  Q. How old are you?
2  A. 57.
3  Q. Who do you work for?
4  A. Lima and Cura Fishing Corporation.
5  Q. And do you work on the Fishing Vessel MY WAY?
6  A. Yes.
7  Q. Do you hold any offices in the corporation?
8  A. Yes.
9  Q. What office?
10 A. Part owner, 50%.
11 Q. And who is the other owner?
12 A. My son is also there, so it's 25 for myself,
13 20 for my son and 50% to John Cura.
14 Q. What's your son's name?
15 A. John Paulo Lima.
16 Q. Do you own any other fishing vessels?
17 A. No.
18 Q. Have you ever owned any fishing vessels before
19 the MY WAY?
20 A. No.
21 Q. When did you buy the MY WAY?
22     THE WITNESS: 1986.
23 Q. Have you worked on the MY WAY since 1986?
24 A. No.

Page 6

1  Q. When have you, since when have you worked on
2  the MY WAY?
3  A. Eight years ago.
4  Q. Since about 1997?
5  A. I think, I'm not sure, but yes.
6  Q. What has your position been on the MY WAY?
7  A. I'm engineer.
8  Q. Before you worked on the MY WAY what vessel
9  did you work on?
10 A. CAPTAIN MANO, JUDY & JOE, SEA SIREN.
11 Q. SEA SIREN.
12     THE WITNESS: Yeah.
13 Q. Any others?
14 A. I don't remember any more.
15 Q. When did you first start working on a fishing
16 vessel in this country?
17 A. And I have another one. The first one was
18 NIAGRA FALLS.
19 Q. The NIAGRA FALLS was the first boat you worked
20 on?
21 A. Yes.
22 Q. When did you begin on the NIAGRA FALLS?
23 A. 1980.
24 Q. Have you done anything other than commercial

Page 7

1  fishing since 1980?
2  A. Yes, I worked in land.
3  Q. What type of work did you do in land?
4  A. Luzo Fishing Gear, it sells the tire for
5  fishing, everything.
6  Q. What positions did you hold on the other four
7  boats that you worked on?
8  A. Just that's the NIAGRA FALLS I was not an
9  engineer. All the others I was.
10 Q. Okay. On the NIAGRA FALLS you were a
11 deckhand?
12 A. Yes.
13 Q. Do you have any Coast Guard licenses?
14 A. My, my own?
15 Q. Yes.
16 A. No, I don't think anybody does.
17 Q. Have you ever been convicted of a crime?
18 A. No.
19 Q. What are your duties on the MY WAY as the
20 engineer?
21 A. I do everything that a deck man does and then
22 I have to check the machine.
23 Q. As of 2003 who hires the crew on the MY WAY?
24 A. It's the captain that will have a dialogue

Page 8

1  with everybody and discuss.
2  Q. Who does the settlements for the MY WAY?
3  A. What do you mean by settlements?
4  Q. Who calculates how much, does all the
5  paperwork for the crew?
6  A. Marine Service.
7     THE WITNESS: 114 McArthur Drive.
8  Q. What are the captain's duties on the MY WAY?
9  A. Is the head chief, he's got all the
10 responsibility as far as directing the people, the
11 crew. We work under his orders.
12 Q. Do you work under the captain's orders also?
13 A. Yes, of course.
14 Q. What are the deck hands' duties on the MY WAY?
15 A. What do they have? They work, their own
16 responsibility for their own work.
17 Q. Are the deck hands required to do what the
18 captain tells them to do?
19 A. Yes.
20 Q. Are they required to do what you tell them?
21 A. The deck hands and myself, everybody.
22 Q. Are the deck hands required to do what you
23 tell them to do?
24 A. I can't give an order. I'll receive orders

2 (Pages 5 to 8)

cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 9

1  from the captain. So if we are all working together,
2  sometimes I may say, you know, let's do it this way.
3    Q.  When did Carlos Aguiar start working on the
4  boat?
5    A.  How long has this case been?
6      THE WITNESS:  Two years?
7    Q.  From 2003?
8      MR. REGAN:  I think he's saying the case
9  is two years old.
10   A.  No, we started before the accident. It's just
11 for me to have an idea, so that I can have an idea.
12   Q.  Okay. So going on for two years?
13     MR. REGAN:  The accident was two years
14 ago.
15   A.  Maybe two or three years before. I'm not
16 sure. Maybe the captain will remember better than
17 myself.
18   Q.  Had you ever worked with Carlos Aguiar before
19 the MY WAY?
20   A.  No.
21   Q.  Did you know him before he started working on
22 the boat?
23   A.  Yes.
24   Q.  How did you know him?

Page 10

1    A.  He's a nice guy, normal person.
2    Q.  Were you friends with him?
3    A.  Yes, and I am.
4    Q.  You are friends now with him?
5    A.  Yes.
6    Q.  Do you see him socially?
7    A.  Every so often, yes, I do meet him.
8    Q.  When is the last time you saw him?
9    A.  About three to four weeks ago.
10   Q.  Who hired him?
11   A.  Nobody hired him. He asked for the place or
12 his place in the boat with the captain. And because we
13 have, we had a vacancy, we took him to work with us.
14   Q.  So he talked with the captain?
15   A.  Yes.
16   Q.  What was his position on the boat?
17   A.  Cook.
18   Q.  And did he also work on the deck?
19   A.  Yeah, we all have to work on the deck.
20   Q.  And he did all the fishing duties also?
21   A.  Yes, all.
22   Q.  Did you have any complaints about his work?
23   A.  Never.
24   Q.  Did anyone ever tell you that they had

Page 11

1  complaints about his work?
2    A.  Not with me. I don't remember anybody saying
3  anything.
4    Q.  Did you ever see him doing anything unsafe?
5    A.  No, I didn't.
6    Q.  Did you think he was a safe fisherman?
7      MR. REGAN:  Objection.
8    A.  I think so. As all of us, we all try to work
9  with as much safety as we can.
10   Q.  Who were the other crew members on the trip in
11 which Carlos Aguiar got hurt?
12   A.  Besides myself?
13   Q.  Yes.
14   A.  Myself, Joao Cura, Joaquim Machado, Jose Abreu
15 and Carlos Aguiar, five people.
16   Q.  Five men. What was Machado's position?
17   A.  Deck man.
18   Q.  And what was Abreau's position?
19   A.  Mate.
20   Q.  What are the duties of the mate?
21   A.  To replace the captain when the captain was
22 resting and he also does do the job of the deck man.
23   Q.  When did Abreu start working on the boat?
24   A.  Seven, eight years. Five, six. I don't know

Page 12

1  exactly.
2    Q.  Does Abreu still work on the boat?
3    A.  Yes.
4    Q.  When did Machado start working on the boat?
5    A.  '87. I bought the boat in '87 and he started
6  working there -- I'm sorry, '86.
7    Q.  Does Machado still work on the boat?
8    A.  No.
9    Q.  When did Machado leave the boat?
10   A.  Two, three months before.
11   Q.  Do you know why?
12   A.  Or maybe. It was before the summer.
13   Q.  Do you know why he stopped working on the
14 boat?
15   A.  What he said was that there was no problems
16 with anyone, but he went to a company that has more
17 than one boat. And then he gets more days to work and
18 then he can gain, he can receive more wages at the end
19 of the year.
20   Q.  If you had room on your boat and Machado
21 wanted to come back, would you hire him again?
22   A.  Yes, I have no reason not to.
23   Q.  Are you friends with Abreu and Machado?
24   A.  Yes, very much.

3 (Pages 9 to 12)

cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 13

1  Q.  Do you see them socially?
2  A.  Yes.
3  Q.  Do you remember when the trip took place that
4  Aguiar got hurt?
5  A.  Which trip was that?
6  Q.  The trip in which he got hurt.
7  A.  If I recall -- What you mean?
8  Q.  The trip in which he hurt his hand, when was
9  it?
10  A.  Yes, I do.
11  Q.  Do you remember when it was?
12  A.  When it was?
13  Q.  When it was.
14  A.  Three years ago or so or a little over
15  two years., I'm not sure.  We need to look at the date
16  of the case.  I don't know.
17  Q.  Do you recall on that trip where the boat left
18  from?
19  A.  From New Bedford.
20  Q.  How many days at sea was the boat before he
21  got hurt?
22  A.  I don't recall exactly, five, six, seven.  I
23  don't recall exactly.
24  Q.  Did the boat have watches on that trip?  A

Page 14

1  watch is a shift.  A watch is a shift.
2  A.  Yeah, we do work like that.
3  Q.  Who worked when you were on deck, who worked
4  with you?
5  A.  Carlos Aguiar and Machado and the captain will
6  be up there, too.  And sometimes there was other
7  shifts, but at the time of the accident I was present,
8  Aguiar, Machado and the captain was upstairs and Abreu
9  was resting.
10  Q.  And when the captain rests, Abreu steers the
11  boat?
12  A.  Yes.
13  Q.  Do you ever steer the boat?
14  A.  No., I may be up there for a little bit, but
15  normally that doesn't happen.
16  Q.  Do Machado or Aguiar ever steer the boat?
17  A.  Only in a very exceptional case.
18  Q.  Who ran the winches?
19  A.  I have one winch that I take care of if I'm
20  not resting.  And there's -- It's not always the same
21  person and another man will be on the other one.
22  Q.  Do all of the other people, Abreu, Machado,
23  Aguiar run the other winch?
24  A.  Yes, they do when they're downstairs.

Page 15

1  Q.  Did Aguiar tell you at any time before he got
2  hurt that he was having any physical problems?
3  A.  I know he was taking pills.  That's all I
4  know.  He had high cholesterol, that's it.
5  Q.  Do you know why he took the pills?
6  A.  Because he said he had high cholesterol.
7  Q.  Did he ever have any other complaints about
8  his physical condition before he got hurt?
9  A.  Except for that the cholesterol, physically he
10  never complained.
11  Q.  On the trip that he got hurt did he do all of
12  his work okay before he got hurt?
13  A.  Yes, normal.
14  Q.  Did Aguiar ever miss a trip because of a
15  physical problem?
16  A.  I don't think so, no.
17  Q.  I'd like to show you these pictures and we'll
18  go over them one by one and I'll ask you what's in the
19  pictures.
20  A.  Okay.
21  Q.  Can you tell me what is in Picture Number 1?
22  A.  This is the door, this is the gallus.
23  Q.  Gallus and --
24  A.  And this is the chain and this is, he got hurt

Page 16

1  with this thing here.  (Indicating.)
2  Q.  I'm going to get another pen.  Can you draw an
3  arrow to what he got hurt on?
4  A.  This.  (Indicating.)
5  Q.  Draw an arrow all the way from here to there.
6  A.  Okay.  (Indicating.)
7  Q.  And what is in Picture Number 2?
8  A.  It's the same thing.  There's a door, the
9  gallus, the drum with the nets.
10  Q.  The drum with the fishing net is this?
11  (Indicating.)
12  A.  Yes.
13  Q.  And what is Picture Number 3?
14  A.  The same thing.  This is the same door.  This
15  is the piece where he, where he had the accident.
16  Q.  What do you call this piece?  (Indicating.)
17  A.  We call it like a pistol or a gun.
18  Q.  A pistol.  This?
19  A.  This is the same thing.  (Indicating.)
20  Q.  Okay.  And Exhibit 4 has four pictures.  What
21  is the top left picture?
22  A.  Yeah, I took those.
23  Q.  Okay.
24  A.  Here we maneuvering.  Here this is  exactly

4 (Pages 13 to 16)

**Page 17**

1  when the door came up and these men -- I don't know who
2  he is. I think it might be myself. We have to put
3  this chain through and then bring another one over to
4  the other side. On this picture here the net is
5  already up.
6      Q.  And that's the picture --
7      A.  On this one it's in the water. Here it's
8  still in the water.
9      Q.  Hold on one second. In the top right picture
10  the net is still in the water?
11     A.  Yes, it is.
12     Q.  And on the top left picture the fishing net is
13  up?
14     A.  Yes, it's up.
15     Q.  All right. And the bottom left picture is
16  just a picture of the boat?
17     A.  Yes.
18     Q.  And what is the bottom right picture?
19     A.  And this is the boat going with the net in the
20  water. The net is still in the water. They're
21  starting to bring it up. They're starting to bring it
22  up with these cables.
23     Q.  And these are the cables right in the middle
24  of the picture?

**Page 18**

1      A.  Yes.
2      Q.  And Exhibit 5 is two pictures. What is the
3  picture on the left?
4      A.  This is the gallus. This is the door and the
5  gallus.
6      Q.  And what does Exhibit 6 show?
7      A.  This shows the back of the ship with the
8  drums, the fishing nets, the gallus with a door on each
9  side and the deck.
10     Q.  What does Exhibit 7 show?
11     A.  Shows the winch, which is the winch that I was
12  working on when the accident happened.
13     Q.  And which winch is that, the port or
14  starboard, meaning left or right?
15     A.  It's the my left hand side. If you looking to
16  the front of the ship and the back is behind me, it's
17  the left one.
18     Q.  Okay.
19     A.  For us, it's the back.
20     Q.  And what is in Exhibit 8?
21     A.  It's basically the same thing, the winch. Now
22  the picture is taken from further away.
23     Q.  And up here, is this the wheelhouse?
24     A.  Yes.

**Page 19**

1      Q.  The wheelhouse is where the captain steers the
2  boat?
3      A.  Yes, that's where the captain is.
4      Q.  And Exhibit 9 is basically the same as
5  Exhibit 8?
6      A.  Yes.
7      Q.  And what is Exhibit 10?
8      A.  This is the same one that shows on one of the
9  other pictures. It shows the two drums, the gallus.
10  That's the same thing. It's just in another angle.
11     Q.  And at the bottom of the picture, is this the
12  winch drum?
13     A.  Yes, where you put the cable.
14     Q.  Was the person who took the picture in
15  Exhibit 10 basically standing at the winch controls?
16     A.  No. The control is over here.
17     Q.  Okay.
18     A.  The person was behind that.
19     Q.  He was behind the winch?
20     A.  Yes. I don't know who took it, but --
21     Q.  And what is Exhibit 11?
22     A.  It's basically the same thing. It just shows
23  another angle.
24     Q.  I'd like to ask you to tell us how the

**Page 20**

1  deckhand hooks up the door and because of the
2  translator, I'd like to go real slow and we'll do it
3  one step at a time.
4      A.  Okay.
5      Q.  It begins with at some time the fishing net
6  and the door are in the water, right?
7      A.  Yes, the door and the net are in the water.
8  Everything is in the water.
9      Q.  And now you decide that you're going to bring
10  up the nets.
11     A.  The captain decides that.
12     Q.  And the captain decides you will bring up the
13  nets?
14     A.  Yes, he gives us the signal.
15     Q.  What happens next?
16     A.  He turns on the power takeoff, the power
17  takeoff, what we call it.
18         MR. REGAN:  Takeoff.
19     Q.  Who turns that on?
20     A.  The captain.
21     Q.  Okay. What is the power takeoff?
22     A.  Power takeoff, that's where the pumps are
23  connected to that transfer the oil to the winch.
24     Q.  Okay. So the power takeoff gives the winch

5 (Pages 17 to 20)

Page 21

1  power?
2      A.  Yes, it does, but the winch doesn't work
3  unless we start it up.  The operator has to be there.
4      Q.  Okay.  Now the operator goes to the winch?
5      A.  Each one is taking care of its own winch.  He
6  opens the, we open the brakes.
7      Q.  Okay.  Hold on.  I'm showing you Exhibit 7.
8  Can you point out where the brake is?
9      A.  Here.  (Indicating.)
10     Q.  That wheel?
11     A.  This is the controller.  And we put it on the
12 position to lift.  There's three positions, neutral,
13 one to lift and one to bring it down.
14     Q.  I see.  Can you take the pen and draw an arrow
15 to the brake?  And just put B.
16     A.  (Indicating.)
17     Q.  B for brake.  So this wheel is the brake?
18     A.  Yes.
19     Q.  And then can you draw an arrow to the lever
20 for the winch control?
21     A.  (Indicating.)
22     Q.  And put an L.
23     A.  (Indicating.)
24     Q.  And this is the winch control.

Page 22

1          THE WITNESS:  This, yeah.
2      Q.  Okay, right.
3          MR. REGAN:  What is the L, lever?
4          MR. BERG:  Lever.
5      Q.  That right there is the winch control?
6  (Indicating.)
7      A.  There's a valve and there's a handle that goes
8  like that, and neutral.  Neutral, one.
9      Q.  Where does the operator stand?
10     A.  The operator is in this area, is in the
11 middle.
12     Q.  Okay.  So the operator takes off the brake and
13 what does he do next?
14     A.  Puts the lever down to start rolling up.
15     Q.  He starts rolling the winch?
16     A.  Okay.
17     Q.  And that will start raising the net and the
18 door?
19     A.  Exactly.  The cable and then the door and then
20 the net.
21     Q.  Okay.  So the cable starts winding and the
22 door starts coming up?
23     A.  Exactly.
24     Q.  What does the hook-up man doing during this

Page 23

1  time?
2      A.  He's not doing anything.  He's just watching.
3  He only goes in the back when the door is almost up.
4      Q.  Okay.  And the door starts coming up and it's
5  over the side of the boat, right?
6      A.  Yes.  It's almost like about this height.
7      Q.  And it's like --
8      A.  This is the position that it stays at when we
9  want to put the chain through.
10     Q.  Okay.  And that is what's shown in the top
11 right picture of Exhibit 4?
12     A.  Yes, it is.
13     Q.  And in this picture the door is still over the
14 side?
15     A.  Yes.
16     Q.  And it's hanging from the cable?
17     A.  Yes, it is.  But once the guy lifts that, the
18 door comes back a little bit and then it's only holding
19 onto the chain, which is exactly like this.
20 (Indicating.)
21     Q.  Does the bottom right picture in Exhibit 4
22 show the door after it's been hooked up?
23     A.  Yes, that's the way it is.
24     Q.  Okay.  So before it's hooked up, it's like it

Page 24

1  is in the top right picture?
2      A.  Yes, exactly.
3      Q.  All right.  So it gets brought into the
4  position shown in the top right picture of Exhibit 4
5  and then once it gets to that position, what does the
6  winch operator do?
7      A.  Brings the brake over to the other side and
8  puts the control on neutral.
9      Q.  So you set the brake?
10     A.  Yes, we close it.
11     Q.  And put the up/down control in neutral?
12     A.  Yes.
13     Q.  Okay.  And do you then stand at your winch
14 control while the hook-up man does his work?
15     A.  I stand -- I don't leave here until the door
16 is in that position there.
17     Q.  You don't leave your winch control until the
18 door is in the position, until the position shown in
19 the bottom right picture of Exhibit 4?
20     A.  Exactly.  That's when I go in the back and
21 help them.
22     Q.  And once you have turned the winch to neutral
23 and put the brake on, what does the hook-up man do?
24     A.  He's going to do what this one is doing.  He

6 (Pages 21 to 24)

cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 25

1  puts the chain through it, he puts the chain through
2  it. After the chain is put through, he goes in the
3  back and grabs another chain, which is the one for the
4  net. And the man who's taking control of the winch
5  lifts the door to that position on four.
6      Q. Okay. Now, let's go back. The hook-up man
7  will put the first chain through?
8      A. Yes.
9      Q. All right. Can you show us on Exhibit 3 or
10  Exhibit 5 or Exhibit 1 which the first chain is?
11     A. It's always the same, this one, which is this
12  one. It's all the one that goes through that loop.
13  (Indicating.)
14     Q. Is it the chain that the person is holding in
15  his finger on Number 3?
16     A. Yes, exactly.
17     Q. Where does that chain come from? What is on
18  the other side of that chain?
19     A. On the other side of the door?
20     Q. No. On the chain. The chain that he hooks
21  into the door, what does the chain hook up to?
22     A. It's not, it's on-- The chain is on one side
23  of the gallus, which is this big piece here.
24  (Indicating.) And then these are the smaller piece

Page 26

1  that goes on to the gallus. The large piece goes
2  through the loop, goes to that gun. We put it through
3  that loop off the gun, it goes like that and then this
4  thing here holds it to the pistol. (Indicating.)
5      Q. Okay. So we're looking at Exhibit 5, the
6  right picture. So the chain starts at the right side
7  of the gallus and it goes down through the big ring on
8  the right?
9      A. Yes, to go to the door.
10     Q. Okay. It goes through the big ring on the
11  right?
12     A. Yes.
13     Q. It goes down to the bottom of the gallus?
14     A. It depends. It's there because it happened.
15  It could have been on the other side.
16     Q. And it goes back up to the left of the gallus?
17     A. Yes.
18     Q. And can you draw an arrow to the pistol?
19         MR. REGAN: Just for the record, counsel
20  was describing its position in the right photo of
21  Exhibit 5.
22         MR. BERG: Yes, I think the pen has run
23  out. Try that one. You have to have a ball point.
24     Q. Draw it in from this way. There we go.

Page 27

1  Whatever. And write a P for pistol?
2      A. P?
3      Q. P. So at the pistol, is that where the chain
4  gets hooked up?
5      A. Yes.
6      Q. And is there a closer picture of the pistol in
7  Exhibit 3?
8      A. Yes, it's this one.
9      Q. Can you draw an arrow to the pistol in
10  Exhibit 3. Yeah. That way, yeah. And write P.
11     A. P.
12     Q. P. I'm going to draw a picture. Well, the
13  line has kind of ended, but what is this little ring
14  here?
15     A. This is what, what's going to hold it, because
16  that goes into the chain. So you can see it's opening
17  there. We put it through the chain. We pull that loop
18  up or ring. This goes in and then the loop comes down
19  and holds it together.
20     Q. So the left picture of Exhibit 3 shows the
21  pistol when it's open?
22     A. Exactly.
23     Q. And the chain goes through the hook, is that
24  right?

Page 28

1      A. Yes, it goes inside there, yes.
2      Q. And then you pull -- The hook-up man pulls the
3  hook up and then lets this ring down over it?
4      A. To hold it so it won't open again.
5      Q. And the ring locks the hook into place?
6      A. Yes, it does.
7      Q. And have I drawn another arrow to the ring on
8  the left side, so that's the ring?
9      A. Yes, that is.
10     Q. And I'm going to write an R and that shows the
11  R ring on the left side of Exhibit 3. (Indicating.)
12     A. This one is the same as that one.
13     Q. Okay. So there are arrows drawn on the left
14  picture and on the right picture to the ring. On the
15  left picture the hook is open and on the right picture
16  in Number 3 --
17     A. It's closed.
18     Q. The hook is locked, okay. Once the hook-up
19  man closes the ring on the pistol, what happens next?
20     A. The chain is there and then we come to the
21  stage where we bring the door down. We come to this
22  stage here. It's first like that and then it comes to
23  this stage.
24     Q. So you come to the stage of where the door is

Hennessey Corp d/b/a Robert H. Lange Co.
617-557-1874

cdbc4ced-0d

Page 29

1  in the bottom right picture of Exhibit 4?
2      A.  As the operator?
3      Q.  Yes.
4      A.  Yes, the operator then goes over there,
5  because normally the person that works with the winch
6  then goes and works with the drum.
7      Q.  After the hook-up man puts the ring to lock up
8  the hook, what does the hook-up man do next?
9      A.  He goes to do that job, takes the chain out to
10 turn the door up.
11     Q.  After the hook-up man puts the ring on the
12 hook, does he now work with a different chain?
13     A.  Yes, which is already loose, so that he can
14 put it back to turn the -- It is hard to explain if you
15 don't know exactly what it is, but he puts that in
16 order to turn the net.
17     Q.  Okay.  Can you see if any of the pictures we
18 have here show that second chain that the hook-up man
19 works with?
20     A.  You can't see on this one.
21     Q.  Okay.
22     A.  Oh, it's here.  It's this one here.
23 (Indicating.)
24     Q.  Can you draw an arrow?

Page 30

1      A.  (Indicating.)
2      Q.  Okay.  So you have drawn an arrow on
3  Exhibit 1, yes?
4      A.  Yes.
5      Q.  And that arrow is drawn to the second chain
6  that the hook-up man works with?
7      A.  You calling it a second chain.  It's really
8  not the second chain.  It's a chain that you have to
9  turn once the door is up after the job is all done.
10     Q.  Okay.  I'm just going to -- Can I borrow this?
11 I'm just going to write a C on Exhibit 1 for the other
12 chain.
13         MR. REGAN:  Objection to the
14 terminology, "other chain".
15         MR. BERG:  Okay, to the chain, the part
16 of the chain that he's just been talking about.
17     A.  Okay.
18     Q.  What does the hook-up man do with this part of
19 the chain?
20     A.  That's what I just explained.  That is, it is
21 attached to the cable that turns the net, so he takes
22 it out and then he hooks it to this cable so that he
23 can turn it onto the drum.  (Indicating.)
24     Q.  And he hooks it to the cable in the left part

Page 31

1  of the top right picture on Exhibit 4?
2      A.  Either one.  Each door has one.  It has to be
3  turned.
4      Q.  Can you draw an arrow on Exhibit 4 to what you
5  were just talking about?
6      A.  It attaches to this one, this one here and the
7  one from the other side.  (Indicating.)
8      Q.  Put -- I guess draw the arrows from in the
9  white part.  There we go.
10     A.  Okay.  (Indicating.)
11     Q.  And another one.
12     A.  (Indicating.)
13     Q.  Okay.  And after the hook-up man does that,
14 now is he done with the hook up?
15     A.  Nobody works after that.  Once the net comes
16 up, just the drum is working.
17     Q.  So once the hook-up man does this part of the
18 second part of the chain --
19     A.  Just one moment.  After that job that we just
20 described we start turning and then we have to take
21 another set of chains so that the net is only attached
22 to the drum.
23     Q.  But after the hook-up man has hooked up the
24 door, the winch operator moves the door to the position

Page 32

1  shown in the bottom right picture on Exhibit 4?
2      A.  After he's done the top job, yes, that's what
3  he, yes, that's when he does that.  The operator lowers
4  the door.
5      Q.  And when the operator lowers the door, does
6  the hook-up man move away from the door?
7      A.  Yes.
8      Q.  Because you don't want to have the hook-up man
9  standing next to the door?
10     A.  Never.
11     Q.  While you're moving it with the winch?
12     A.  No, just to do that work.
13     Q.  Okay.  After you move the door into the
14 position shown in the top right picture of Number 4 and
15 you turn on the brake, do you give the hook-up man a
16 signal that it's okay for him to go hook up?
17     A.  It's automatic.  I mean, we work on a team.
18 All we need is to look at each other.
19     Q.  So you do not give him a signal?
20     A.  Normally, no.  I mean, once in a while, yes,
21 maybe, but we always look at each other.
22     Q.  How far away are you from the hook-up man?
23     A.  It depends on the boat.
24     Q.  On the MY WAY.

8 (Pages 29 to 32)

cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 33

1    A. Maybe about 50 feet.
2    Q. 50, 5-0?
3    A. Yes, I think. No, no, sorry, 30.
4    Q. 30 feet?
5    A. Yes, more or less, more or less. More five or
6    less five, but that's about it.
7    Q. 30 feet, plus or minus five?
8    A. Yes.
9    Q. Okay. Have you worked as hook-up man on the
10   MY WAY?
11   A. I have done all the jobs there, yes.
12   Q. When you hook up on the MY WAY can you see the
13   winch operator turning the wheel of the brake?
14   A. Yes, I do.
15   Q. And when you were the hook-up man on the MY
16   WAY you don't start hooking up the door until you see
17   the winch operator turn the wheel on the brake?
18   A. Normally when I'm up there doing that kind of
19   job, I only start doing it when I see the door is, has
20   stopped and I see that he has turned the wheel for the
21   brake.
22   Q. Okay. Do you know the, what company made the
23   winch?
24   A. They're the brand name is Marko, M-a-r-k-o.

Page 34

1    Q. Do you know what model number it is?
2    A. Oh.
3    Q. No, I take it?
4    A. No.
5    Q. How long has that winch been on the boat?
6    A. How am I going to remember? I have no idea.
7    Q. Is it the original winch?
8    A. No, it's not.
9    Q. So at some point you bought that winch for the
10   boat?
11   A. I got a set of winches to replace the old
12   ones.
13   Q. So you bought two winches?
14   A. Yes, we can only work with two.
15   Q. When you bought that winch, was it new or
16   used?
17   A. No, it was a rebuilt one.
18   Q. Do you know who you bought it from?
19   A. I bought it, I bought it off an Italian man in
20   Gloucester.
21   Q. Do you remember his name or the company he
22   worked for?
23   A. I have no idea.
24   Q. On the trip in which Carlos got hurt there

Page 35

1    were three men on deck?
2    A. The captain, myself, Machado and.
3    Q. The captain was in the wheelhouse, correct?
4    A. Yes.
5    Q. And he's steering the boat?
6    A. Yes.
7    Q. And doing the haul back are three men?
8    A. Yes, exactly.
9    Q. You, Machado and Carlos?
10   A. Yes.
11   Q. In the past did you ever have four men on deck
12   to do the haul back?
13   A. Yes.
14   Q. And then you'd have two winch operators and
15   two hook-up men?
16   A. Yes, they are the ones ready to work.
17   Q. When is the last time you had four men on deck
18   for the fishing?
19   A. It's a long time ago, because the laws have
20   changed, we don't, we don't make that much money, so we
21   have to work with less people.
22   Q. Does the law say you can only have five men on
23   the boat?
24   MR. REGAN: Objection.

Page 36

1    A. I can have four, five, six. There's no law
2    for that.
3    Q. Okay. So you could have a six man crew today
4    if you wanted?
5    A. Yes, I could.
6    Q. Would it be easier to do the haul back with
7    four men on deck?
8    MR. REGAN: Objection.
9    A. It would be faster.
10   Q. Would it be safer for the hook-up man if there
11   were four men on deck?
12   MR. REGAN: Objection.
13   A. No, it's the same thing.
14   Q. As of the trip that Carlos got hurt, did the
15   winch have any mechanical problems?
16   A. No.
17   Q. Was the winch in good condition as of that
18   trip?
19   A. Yes, it was.
20   Q. Did you have any complaints about the winch?
21   A. No.
22   Q. As of that trip did anyone complain to you
23   about that winch?
24   A. No.

9 (Pages 33 to 36)

cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 37

1  Q.  Had you noticed any problems with the winch
2  for the year before Carlos got hurt?
3  A.  No.
4  Q.  For the year before Carlos got hurt had anyone
5  told you they had a problem with the winch?
6  A.  No, no, I don't remember.  I mean, little
7  things that we need to fix, but it's like we fine and
8  we got sick all of a sudden, but --
9  Q.  When is the last time before Carlos got hurt
10  that any repairs were done on the winch?
11  A.  I've done some, but I can't know the exact
12  dates.  It's things that we don't really take notice
13  of.
14  Q.  After Carlos got hurt did you examine the
15  winch to see if anything was wrong with it?
16  A.  Every trip all the winches are checked.
17  Q.  And after Carlos got hurt and you checked the
18  winch, did you find anything wrong with it?
19  A.  No.
20  Q.  When you operate the winch and you're bringing
21  up a door, do you always look at the door?
22  A.  Always.  I can't do anything else.
23  Q.  And when you're lowering a door, you will look
24  at the door?

Page 38

1  A.  Of course.
2  Q.  And when the winch is braked and the hook-up
3  man is hooking up the door, do you watch the hook-up
4  man?
5  A.  Yes, I do.
6  Q.  And you a wait until the hook-up man steps
7  away from the door before you lower the door into
8  position?
9  A.  Yes, exactly.
10  Q.  Will the hook-up man give you any signal that
11  he is done with the hook up?
12  A.  There's no need, because as I said before,
13  it's so automatic that I can -- I'm watching him when
14  he finishes that job, he moves to the other side to
15  start working, so now we know it's fine.
16  Q.  How far away from the door will the hook-up
17  man get before you start lowering the door?
18  A.  Three, four, five, six feet.
19  Q.  You would never lower the door while the hook-
20  up man is standing right next to it?
21  A.  No, never.
22  Q.  That's because it's unsafe?
23  A.  It's never safe.  Anything could happen, so
24  you don't do it.

Page 39

1  Q.  Do you remember what time of day it was when
2  Carlos hurt his hand?
3  A.  It was like almost early morning.  It was
4  after 4:00 a.m., because Carlos was up.
5  Q.  Had the sun come up yet?
6  A.  No, not yet.
7  Q.  Are there any lights on the boat?
8  A.  Yes, enough.
9  Q.  Is the area where the door is coming up well
10  lit?
11  A.  Yes, it is.
12  Q.  And can you see the hook-up man well?
13  A.  Yes, almost as I'm seeing this pen.
14  Q.  And you can see what he's doing with the door?
15  A.  Yes, exactly.
16  Q.  At the time that Carlos got hurt what was the
17  weather?
18  A.  It's not bad.  It was good, fairly good, but
19  the boat moves.  We're not on the highway, so it always
20  moves.
21  Q.  Do you know what the winds were?
22  A.  Not too windy.  15 knots.
23  Q.  Do you remember what the seas were?
24  A.  You know, it was wavy, but I can't tell you

Page 40

1  exactly how high the waves were.
2  Q.  Was the boat rolling at the time Carlos was
3  hooking up the door?
4  A.  It's always, yes.  The minute you leave New
5  Bedford to come back, it never stops.
6  Q.  When Carlos was hooking up the door where was
7  Mr. Machado?
8  A.  He was doing the same job on the other side.
9  Q.  He was hooking up the door on the other side?
10  A.  Yes.
11  Q.  When you brought up the door did you see mud
12  on the door?
13  A.  Yes, it had a little bit.  It always brings a
14  little bit.
15  Q.  Do you have to raise the door any differently
16  when there is mud on the door?
17  A.  No, same thing.  Always the same job.
18  Q.  Does the hook up man do the hook-up any
19  differently when there is mud on the door?
20  A.  No, it's always the same.
21  Q.  And will you lower the door into its final
22  position any differently when there's mud on the door?
23  A.  No, it's always the same way.  The job is
24  always the same.

10 (Pages 37 to 40)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874
cdbc4ced-0d5e-499c-a...

Page 41

1   Q.  What did you see when Carlos got hurt?
2   A.  What did I see?
3   Q.  Yeah.
4   A.  I saw that he put the chain through, meanwhile
5   the boat went to one side.  I think the net, the
6   fishing net was a little heavier because of the mud and
7   all that and he didn't pull his hand out quick enough
8   and the pistol opened up and caught him on his finger.
9        MR. BERG:  Could you just read that
10  back, please?
11       (Answer read back by the reporter.)
12  Q.  Okay.  So before he got hurt, you had pulled
13  the door up to the position shown in the top right of
14  Exhibit 4?
15  A.  Not the top one.  Not the top there.
16  Q.  I mean you had put the door into the position?
17  A.  Yes.
18  Q.  Let me rephrase that.  Before Carlos got hurt
19  you had pulled the door into the position shown in the
20  top right picture of Exhibit 4?
21  A.  Yes.
22  Q.  Carlos then went to hook up the chain into the
23  pistol?
24  A.  Yes, he did this job here.

Page 42

1        MR. REGAN:  For the record, he's pointed
2   to the right-hand photo in Exhibit 3 when he said this
3   is the job.
4   Q.  And did you see him put the chain over the
5   hook of the pistol?
6   A.  Yes, I saw him putting it in and then when he
7   was pulling the pistol, that's when it happened,
8   because it pulled and that thing came back and cut him
9   on his hand.
10  Q.  So you saw him -- Let's just do it slowly,
11  because of the translator.  You saw him put the chain
12  over the hook of the pistol?
13  A.  It's the other way.  You put the hook onto the
14  chain.
15  Q.  Okay.  You put the hook into the chain.
16       THE WITNESS:  Yeah.
17  Q.  So the hook is open?
18  A.  Yes, it was open.
19  Q.  And Carlos put the hook into the chain?
20  A.  Yes.
21  Q.  And then he closed the hook?
22  A.  And when he went to close it, that's when the
23  door -- the chain got straightened out and he didn't
24  have time enough to take the hand out and that piece

Page 43

1   came down.  It came down and hit him on his finger.
2   Q.  He had the hook -- Before he got hurt he had
3   the hook closed, is that right?
4   A.  No, it's always opened.  If you not working
5   with it, then it's opened.  If the doors are in the
6   water they're open.
7   Q.  But after he put the hook through the chain,
8   did he close the hook?
9   A.  When he was going to close it, that's when it
10  happened.
11  Q.  I see.  Did you ever see if he started pulling
12  the ring down to lock the hook?
13  A.  Yes, he had both hands, he was working with
14  both hands.  He was pulling it down, that's when it
15  happened.
16  Q.  He was holding the hook closed with one hand
17  and pulling the ring down with the other?
18  A.  Exactly.
19  Q.  Which hand was he holding the hook closed
20  with?
21  A.  I think the left one.
22  Q.  And he was pulling the ring down with his
23  right hand?
24  A.  In my opinion -- It might have been the right

Page 44

1   hand.  The hand that he had the accident with was the
2   one that was holding the --
3   Q.  Hook?
4   A.  The hook closed.  I think it might be the
5   right one.
6   Q.  And he never got the ring over the hook, is
7   that right?
8   A.  If he did, he wouldn't have had the accident.
9   Q.  Okay.  So he never got the ring over the hook
10  and then the hook opened up?
11  A.  Yes.
12  Q.  And he got his finger caught?
13  A.  Exactly.
14  Q.  How close did he get the ring to the hook
15  before the hook opened up?
16  A.  That I couldn't tell you.  It had to be a
17  distance lower than this showing here, because it never
18  closed, so if it came farther down, it would have held
19  it together.
20  Q.  And you said the chain got straightened out?
21  A.  It had to be, because the thing opened and it
22  opened when the chain got straightened out.
23  Q.  And this is the chain going to the door?
24  A.  Exactly.

11 (Pages 41 to 44)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 45

1    Q.  Did the door move?
2    A.  Yes, of course.
3    Q.  The door dropped?
4    A.  Maybe just a little bit.  Not like maybe four
5    to five inches, but due to the movement of the boat and
6    the weight on the net.  That is when we need to be
7    careful and pay attention in order to do that.
8    Unfortunately, he wasn't able to remove his hand on
9    time.
10    Q.  While he was doing the hook up, you were
11    standing next to the winch?
12    A.  Yes, I was.  I was the one who was doing that
13    job.
14    Q.  And while he was doing the hook up the winch
15    was in neutral?
16    A.  When he was getting the chain into the hook,
17    yes, the brake was closed or locked and the winch was
18    unused.
19    Q.  While he was doing that hook up before he got
20    hurt was the wheel of the brake turned as far as it
21    would go?
22    A.  What do you mean, tightened up?
23    Q.  Yes.  Was the wheel as tight as it could be?
24    A.  Yes, as much as you can, yes.  We have to do

Page 46

1    it as much as we can.
2    Q.  While he was doing that hook up did the door
3    move up at all?
4    A.  No, no.  It can't go up, because the winch is
5    not moving.  It's just that the movement of the boat
6    and I keep on saying maybe with the weight on the net,
7    maybe it give out.  It's very hard to explain if you
8    don't actually do it.  I understand your position, but
9    it's hard, it's very hard for me to make you understand
10    how that works.
11    Q.  When the door is in the position shown in the
12    top right picture of Exhibit 4 is it resting on
13    anything?
14    A.  It's resting on the wire, on the cable.
15    Q.  And below it, it's not resting on any part of
16    the boat?
17    A.  No, it's out of the boat and it's just
18    holding.
19    Q.  It's just hanging from the wire?
20    A.  Yes, it's hanging from the wire.
21    Q.  All of its weight is on the wire?
22    A.  Yes.
23    Q.  And the wire is very tight?
24    A.  Yes, it has to be.  Otherwise, we couldn't

Page 47

1    work.
2    Q.  Right.  There's no slackness in the wire, is
3    that right?
4    A.  No, it has to be all, it has to be the way it
5    looks in here.  That's the way it has to be.  It just
6    with the movement, the door, because it's holding on to
7    that hook, it moves back and forth.
8        MR. REGAN:  And for the record, when he
9    said like it is here, he's referring to the upper right
10    photograph of Exhibit 4.
11        MR. BERG:  We have to have a rule only
12    one picture per page.
13        MR. REGAN:  That's how I got it.  I
14    didn't take four and put it in there.  My original copy
15    looks like that.
16        MR. BERG:  I'm sure.  No.  They should
17    have given you one per page.
18    Q.  What kind of wire is it?
19    A.  Steel.
20    Q.  How thick is it?
21    A.  Seven-eighths.
22    Q.  Seven-eighths.
23        THE WITNESS:  I think seven-eighths.
24    Q.  Do you inspect the wire periodically?

Page 48

1    A.  We have to, many, many times during the year
2    we have to do that.
3    Q.  And do you replace it from time to time?
4    A.  Yes, we do.  Sometimes we don't want to
5    because it's too expensive, but we have to.
6    Q.  And on the trip in which Carlos got hurt was
7    the wire in good condition?
8    A.  If it wasn't, it would broke.
9    Q.  When the door is hanging on the wire and the
10    wire is tight, how can the door go down?
11    A.  As I said, as I said before, because the
12    movement of the boat from one side to the other, if the
13    winch is not tightened, then, you know, it's going to
14    move and then it's going to go down.  And even with the
15    brake in the off position or tightened, because a brake
16    never works 100% even in the cars, so maybe it could
17    have let go a little bit.
18    Q.  Have you ever asked someone who repairs the
19    winch if the brake could be made to always hold 100% of
20    the time?
21    A.  I'm the one who does the repairs normally and
22    normally it's working 100%.  We tighten it to the max,
23    but it could be that maybe just moves a little bit.  As
24    I said, the movement of the boat, the boat is rolling,

12 (Pages 45 to 48)

cdbc4ced-0d5e-499c-abba-...dad8fdaf863

Page 49

1  with the weight on the net at the time, it could
2  happen. It could go down four, five inches, and if
3  you're not fast doing it, you know, something could
4  happen.
5      Q. So when a hook-up man is putting the hook in
6  the chain and in the door drops four or five inches,
7  that will be dangerous to the hook-up man?
8      A. It could be. And that was his case, I'm sure.
9      Q. And if the door drops four or five inches
10 while the hook-up man is putting the hook in the chain,
11 he has to be careful and get his fingers out of there?
12     A. Yes, he has to be careful, because he's
13 working with both hands. And we all feel on our hands,
14 myself and all the others, if the chain is going, you
15 know, anywhere, and we have to take care of ourselves,
16 as well.
17     Q. In the last eight years on the MV WAY have you
18 seen the door drop four or five inches while the
19 hook-up man is trying to hook it up?
20     A. With bad weather, it's been even worse than
21 that. But at that time we have to wait and we have to
22 sort of double the way we do things, the care.
23     Q. How many times have you seen the door drop
24 four or five inches while the hook-up man is trying to

Page 50

1  hook it up?
2      A. I couldn't tell you, because sometimes we
3  think that the door could come down and the door
4  doesn't come down. It just balances from one side to
5  the other. And we have to put the chain through when
6  the door is still in the middle. That's why I keep on
7  saying it's very difficult. If you don't really know
8  that kind of life, it's hard to explain.
9      Q. While Carlos was putting the hook into the
10 chain, which way did the boat roll?
11     A. Which side?
12     Q. Yes.
13     A. It moves all the time. It doesn't go -- If
14 one side goes down, the other one goes up. It's a
15 solid boat.
16     Q. Did the door fall back into the water after
17 Carlos got hurt?
18     A. No.
19     Q. At any point from the time you put the brake
20 on until the time that you saw Carlos get hurt had you
21 touched any of the controls of the winch?
22     A. No. I have one hand on the brake, one hand on
23 the control ready to act in case there is any abnormal
24 thing happening.

Page 51

1      Q. So you had your hands on the controls, but you
2  weren't operating them?
3      A. No, no. The hand is there as security, so to
4  speak.
5      Q. From the time that you put the brake on until
6  you saw Carlos get hurt, how much time was that?
7      A. I couldn't tell you exactly. Maybe a minute.
8  It's, the maneuver is very fast. We do that as fast as
9  we can.
10     Q. What did you do after Carlos got hurt?
11     A. We saw that he had an accident, so immediately
12 Cura came, the captain came to take care of him. And
13 then the captain gave him his first aid and then Abreu
14 had to get up, you know, the first to be able to
15 maneuver the boat to turn, to finish bringing the net
16 in.
17         And as I said, the captain continue was
18 giving him his first aid and we weren't sure at that
19 time whether we needed to bring him to land or not.
20 The captain called the Coast Guard. The Coast Guard
21 came. Otherwise, we would come -- They went to pick
22 him up. The Coast Guard brought him in and then we
23 just went on working.
24     Q. How much time passed from the time that he got

Page 52

1  hurt until the time the Coast Guard got him?
2      A. I don't want to lie about this or anything
3  else, but I mean, I'm not even sure I have no idea. I
4  want to say maybe an hour and a half to two hours or
5  maybe an hour.
6      Q. Okay.
7      A. Because time goes fast when we nervous, when
8  we have an accident. Sometimes we think it was like
9  too long and it was really fast. So I really couldn't
10 tell you.
11     Q. From the time he got hurt until the time the
12 Coast Guard came did you talk to Carlos about what
13 happened?
14     A. Yes, I did. I asked him, I said, Carlos, are
15 you in pain? Yes, he said, I'm in a lot of pain. But
16 I didn't actually saw the wound. It was all wrapped
17 up.
18     Q. Did you talk to him about how the accident
19 happened?
20     A. No.
21     Q. Did he say anything to you about how the
22 accident happened?
23     A. No, because he knows I saw it.
24     Q. After he left the boat you have seen him from

13 (Pages 49 to 52)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

Page 53

1  time to time over the last two years?
2      A.  Yes, I saw him several times and I always ask
3  him and I still ask him how he's feeling.
4      Q.  Have you and he ever talked about how the
5  accident happened?
6      A.  Never, no, never.
7      Q.  Did you ever talk with Mr. Cura about how the
8  accident happened?
9      A.  We did talk.  I mean, we did talk, as I said
10  here, we do talk and that's what we talked about.
11      Q.  Did Mr. Cura say anything to you about what
12  Carlos told him?
13      A.  No.
14      Q.  Have you ever talked with Machado about how
15  the accident happened?
16      A.  Machado did not see the accident.  He was
17  working, but he was on the other side.  He had his back
18  to us and he only found out about the accident that's
19  when Carlos screamed.  Now, if Carlos talked to Machado
20  about the accident, I have no idea.
21      Q.  Did you ever talk to Abreu about whether he
22  talked to Carlos about the accident?
23      A.  I have no idea.  No, I don't know.
24      Q.  Did you ever give a tape-recorded statement to

Page 54

1  anyone?
2      A.  Yes, I did.
3      Q.  When was that?
4      A.  Maybe a month ago.
5      Q.  Who did you give it to?
6      A.  To this man here.
7      MR. REGAN:  For the record, he's
8  referring to me, Mr. Regan.
9      MR. BERG:  You're the only other man in
10  the room.  Well, he didn't give it to me.
11      MR. REGAN:  I know, but the record
12  wasn't clear when he said to this man here, he was
13  pointing to me.
14      Q.  Did you ever give a tape-recorded statement
15  soon after the accident?
16      A.  No.
17      Q.  Have you made any decisions about how much
18  maintenance and cure Carlos would get?
19      THE INTERPRETER:  I'm sorry.  Could you
20  ask the question again?
21      Q.  Maintenance and cure, it's kind of a term we
22  use.  Basically, money paid to Carlos.
23      MR. REGAN:  He'll know what maintenance
24  and cure means.

Page 55

1      Q.  The question is did you make any decisions
2  about how much maintenance and cure Carlos would get?
3      A.  No, I haven't done that.
4      Q.  Do you know who made those decisions?
5      A.  I don't know if there are any decisions made.
6      Q.  Did you ever tell Carlos that you were sorry?
7      MR. REGAN:  Objection.
8      A.  Yes, I am sorry for anyone.  I mean,
9  regardless of being Carlos or anyone else, yes, I am
10  sorry for that happening.  And I am sorry for myself,
11  because I also got blinded on my left eye from an
12  injury.
13      Q.  Not on this trip?
14      A.  No, a long time ago.
15      Q.  Did you lower the winch while Carlos was
16  hooking up the chain?
17      A.  No, I did not.  The brake was tightened up and
18  I had my hand on the handle.
19      Q.  Do you think that the fact that there was mud
20  on the door caused the door to drop?
21      A.  Not the door, but maybe the weight on the net,
22  the movement of the boat and maybe didn't even go down,
23  but it might have been going sideways with the movement
24  of the boat.  And unfortunately, it so happened that he

Page 56

1  wasn't as fast as he should have been.
2      Q.  That Carlos wasn't as fast as he should have
3  been?
4      A.  I think, yes.
5      Q.  When you brought the net up was there more
6  fish in it than usual?
7      A.  It had mud, it had fish.  I mean, to remember
8  exactly at that time if it had more or not, I mean,
9  it's just a difference of a few pounds.
10      Q.  Do you think the contents of the net were any
11  heavier than usual on that haul back?
12      A.  Yes, because, I mean, if that mud comes with
13  it, it's heavier than normal.
14      Q.  But is the brake on the winch strong enough to
15  hold the door and hold the net?
16      A.  Yes, I've already answered that question
17  several times, yes.
18      Q.  Do you think that maybe the net didn't drop at
19  all and it just swayed outboard?
20      A.  I don't think.  I'm not sure.  I mean, it
21  could be what happened, but I'm not sure if that's for
22  sure.  I don't know.
23      Q.  And when you were watching did you see the
24  door drop?

14 (Pages 53 to 56)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874
cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 57

1    A.  As I said already, I already answered that.
2  It's almost impossible for me to see if it drops or
3  not, because just the movement of the boat and I will
4  still see that at 30 or 35 feet of this distance, it's
5  hard to say if it moves down five or six inches.  I
6  mean, how are you going to do to know?
7         I do apologize, but it's difficult for
8  us to be explaining this kind of work if you really
9  don't know the type of work it is and if you're not
10  inside the boat.
11    Q.  So you couldn't tell if the door dropped?
12    A.  No, I cannot.  The boat moved, so the door may
13  come down or not.  I mean, even both things could
14  happen at the same time.
15    Q.  But if the cable is taut, the cable will not
16  move, is that right?
17    A.  Supposedly it's not supposed to move.  It
18  shouldn't move.
19    Q.  Okay.  And if the cable doesn't --
20    A.  I'm sorry.  As I said, there's a hook there
21  and before it gets to this position down here, it's
22  subject to swayed the door.  While up here, you know,
23  that's a hook that holds it and it could move.
24    Q.  When the brake --

Page 58

1         MR. REGAN:  Hold on.  Again, for the
2  record he's referring, he was referring to both the
3  upper right and lower right photos in Exhibit 4 and he
4  was pointing at what I would call a block when he was
5  talking about the hook that holds the cable in the
6  upper right photo.
7    Q.  When the brake is on, that means the drum on
8  the winch doesn't move?
9    A.  Yes, I've said that several times.  I mean,
10  we're talking about the same thing.  When it's, when
11  it's on, it's totally stopped, the winch is totally
12  stopped.
13    Q.  And when the brake is on, the cable can't
14  move?
15    A.  No, if the drum doesn't move, the cable
16  doesn't move.
17         MR. BERG:  Okay.  That's it, nothing
18  else.
19         MR. REGAN:  Let's go off the record.
20         (Discussion off the record.)
21  *0*    CROSS EXAMINATION
22  BY MR. REGAN:
23    Q.  Did you consider Carlos Aguiar to be an
24  experienced deckhand?

Page 59

1    A.  Yes.
2    Q.  And he's done this particular operation of
3  hooking up the door hundreds of times?
4    A.  Yes, during his whole life.
5    Q.  And he's well aware that it can move because
6  of movement of the boat?
7         MR. BERG:  Objection to form, leading.
8    A.  Yes, it does.
9    Q.  And he knows that he has to be careful in
10  doing this hook-up job?
11         MR. BERG:  Objection to form, leading.
12    A.  Yes, all of us.
13    Q.  And was the brake on at the time of Mr.
14  Aguiar's accident?
15    A.  Yes, it was tightened.
16    Q.  Was it working properly?
17    A.  Yes.
18    Q.  Did it ever have to be repaired after that
19  incident?
20    A.  No.
21    Q.  Did the door at any time prior to the accident
22  move down and actually into the water?
23    A.  No.  It came from the water up.
24    Q.  Okay.  And the movement that you did observe,

Page 60

1  was that normal movement that you always observe?
2    A.  Yes, it is the same movement.
3    Q.  And since the date of this accident about how
4  many times have you spoken with Mr. Aguiar?
5    A.  About --
6    Q.  My question was --
7    A.  About --
8    Q.  Just in general, how many times have you
9  talked to him?
10    A.  About the accident?
11    Q.  Just in general, about anything, how many
12  times have you --
13    A.  I don't talk to him many times.
14    Q.  About how many times since the accident?
15    A.  Since the accident, ten, fifteen, twenty.
16  Every time I see him.  Every time I see him, we talk.
17  Not about the accident.
18    Q.  Right.  At any time in those ten or fifteen
19  conversations has he ever told you that the door
20  dropped back into the water?
21    A.  No.  I just ask him if he's better, if he's
22  not.
23    Q.  At any time in these conversations did he ever
24  suggest that you did something as the operator of the

15 (Pages 57 to 60)

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

cdbc4ced-0d5e-499c-abba-9dad8fdaf863

Page 61

1   winch to hurt him?
2       A.   No, not me, never.  As I said before, I'm
3   never really had any talks with him about the accident.
4       Q.   Are you aware that since that time he has
5   actually had that finger amputated?
6       A.   Yes, I do.
7       Q.   Would you take him back as a crew member on
8   the Fishing Vessel MY WAY?
9       A.   Yes, of course.
10      Q.   And referring to Exhibit 4, in particular the
11  photograph in the lower right-hand side.
12      A.   Okay, in this picture.  What?
13      Q.   That's the position of the door after the
14  hook-up man has done his job?
15      A.   Exactly.
16      Q.   And then you, as the winch operator, lower it
17  down?
18      A.   Yes, exactly.
19      Q.   Had that occurred on the day that Mr. Aguiar
20  was injured?
21      A.   This particular picture here?
22      Q.   Yes.
23      A.   No.
24      Q.   Did this accident occur while the door was in

Page 62

1   the position that is shown in the photograph in the
2   upper right?
3       A.   Yes, exactly, that's when he put the chain
4   through.  But this pictures are pictures that I take
5   with my camera when we go out.  I just take it as
6   souvenirs.
7       Q.   Is getting your hand caught one of the risks
8   involved when hooking up a door, a fishing door?
9       A.   Well, when we holding it, nothing is supposed
10  to touch our hand or grab our hand.
11      Q.   Is it something that happens to fishermen from
12  time to time?
13      A.   Yes, it has happened.
14      Q.   And is a hand injury, is that something that
15  happens to fishermen from time to time doing this
16  operation?
17      A.   Yes, I don't think that's the first time.  I
18  think that has happened before.
19          MR. REGAN:  That's all I have.
20  *0*      REDIRECT EXAMINATION
21  BY MR. BERG:
22      Q.   Have you seen other people get their finger
23  caught in the pistol while hooking up?
24      A.   Not yet, but I've heard people talk about

Page 63

1   accidents like that.
2       Q.   You have heard about people talking about
3   getting their finger hurt in the same way Carlos did?
4       A.   I mean, sometimes, sometimes they don't lose
5   their finger, but in case of Carlos was, I guess, a
6   little more serious.  But yes, we can get hurt.
7       Q.   And did you tell Mr. Regan that what you saw
8   that day was the normal movement of the door?
9       A.   That is the normal movement.
10      Q.   When it goes down, when it drops?
11      A.   As I say, with the movement of the boat, with
12  the weight on the net, it could happen.  I think I've
13  answered that question 100 times.
14      Q.   When the, if the door moves like that while
15  the hook-up man is putting the hook in the chain, it
16  makes it very dangerous for the hook-up man?
17      A.   It is, if he's not careful.  If he's careful,
18  it's not dangerous.
19      Q.   Is there anything that you as the winch
20  operator can do to make it less dangerous for the
21  hook-up man?
22      A.   The only thing I can do is put it in neutral
23  and tighten up the brake.  That's what I always do.
24          MR. BERG:  Okay, nothing else.

Page 64

1           MR. REGAN:  Nothing by me.  You're all
2   set.  Thank you.
3           (Whereupon, at 12:46 o'clock p.m.,
4           the deposition was concluded.)

16 (Pages 61 to 64)

Page 65

```
 1         C E R T I F I C A T E.
 2   I, JOSE LIMA, do hereby certify under the pains and
     penalties of perjury that I have read the foregoing
 3   transcript of my testimony given on November 9, 2005,
     and I further certify that said transcript is a true
 4   and accurate record of said testimony (with the
     exception of the following corrections listed below):
 5
     Page    Line    Correction
 6
 7
 8
 9
10
11
12
13
14
15
16   _____
17   _____
18   _____
19   _____
20
21   Dated at                  , this      day
22   of          , 2005.
23
24   cfs            JOSE LIMA
```

Page 66

```
 1              CERTIFICATE
 2   COMMONWEALTH OF MASSACHUSETTS
     COUNTY OF SUFFOLK
 3
 4
         I, CYNTHIA F. STUTZ, Certified Shorthand
 5   Reporter and Notary Public duly commissioned and
     qualified in and for the Commonwealth of Massachusetts,
 6   do hereby certify:
         That JOSE LIMA, the witness whose testimony is
 7   hereinbefore set forth, was duly sworn by me and that
     such testimony is a true and accurate record of my
 8   stenotype notes taken in the foregoing matter, to the
     best of my knowledge, skill and ability.
 9
         I further certify that I am neither attorney
10   nor counsel for, nor related to or employed by any of
     the parties to the action in which this deposition is
11   taken; and further that I am not a relative or employee
     of any attorney or counsel employed by the parties
12   hereto or financially interested in the action.
13       IN WITNESS WHEREOF, I have hereunto set my
     hand this 21st day of November, 2005.
14
15
16
17
18
19           CYNTHIA F. STUTZ, Notary Public
20
21
22
23
24
```

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

cdbc4ced-0d5e-499c-abba-9dad8fdaf863