Page 13

1  Associates and Marine Safety Consultants?
2       MR. REGAN: I object generally to the
3  relevancy of this. He is here today to be deposed
4  in his capacity as an expert witness and his
5  opinions on the issues of negligence and
6  seaworthiness and contributory negligence, and the
7  fact that he might incidentally have other personal
8  knowledge of either the investigation or the areas
9  you have been asking about doesn't change things.
10 That is not the reason why he is here. I'm going to
11 object on the form of relevancy to all of these
12 questions that don't have directly to do with his
13 opinion.
14      MR. ANDERSON: Read the question back.
15      *[The record was read.]
16      MR. REGAN: You can answer the question.
17 A  Maritime Claims Associates is a limited liability
18 corporation involved in investigating accidents in
19 the maritime community. Marine Safety Consultants
20 is a corporation in the Commonwealth of
21 Massachusetts engaged in conducting surveys and
22 accident investigations. Marine Safety Consultants
23 provides work space and management oversight of
24 Maritime Claims Associates' activities.

Page 14

1  Q  With respect to when Maritime Claims Associates
2  bills somebody for work performed, is there a
3  certain percent that goes to Marine Safety
4  Consultants or is there a monthly fee that goes to
5  Marine Safety Consultants? How does that work?
6  A  It's a monthly fee based on the level of effort and
7  the associated expenses incurred by Marine Safety
8  Consultants as computed by our bookkeeping and
9  accounting department.
10 Q  So a file might get transferred from Marine Safety
11 Consultants to Maritime Claims Associates. If
12 Marine Safety Consultants Associates continued to do
13 a lot of work on that file, billings would be
14 higher; if they do minimal work on the file, the
15 work coming to Marine Safety Consultants would be
16 lower?
17      MR. REGAN: Objection to the question.
18 A  I don't think of it in those terms. That's not the
19 rationale on the basis for the management fee
20 between Marine Safety Consultants and Maritime
21 Claims Associates.
22 Q  What is the basis?
23 A  The basis of the amount of square footage of space
24 that Maritime Claims Associates occupies in our

Page 15

1  office, based on the amount of salary paid to the
2  Maritime Claims Associates' staff.
3  Q  Who pays the salaries to Maritime Claims Associates'
4  staff?
5  A  Marine Safety Consultants does. We provide the
6  management oversight for Maritime Claims Associates.
7  Q  It's located, both Maritime Claims Associates and
8  Marine Safety Consultants are all located within one
9  office space?
10 A  That's correct, one building.
11 Q  Do those two companies share secretarial work,
12 things of that nature?
13 A  Yes.
14 Q  Mr. Sweeney is the, does he work for Marine Safety
15 Consultants, Mr. Sweeney?
16 A  On occasion he does, but he is basically a Maritime
17 Claims Associates' employee.
18 Q  Does he have any support staff that is employed by
19 Maritime Claims Associates?
20 A  Again a percentage of the salary or wages or
21 expenses incurred by the oversight provided by
22 Marine Safety Consultants is paid from the Maritime
23 Claims Associates' account to Marine Safety
24 Consultants on a management fee basis, and that's

Page 16

1  all calculated on the percentage of the level of
2  effort that the staff provides the Maritime Claims
3  Associates' files in any given month.
4  Q  But Mr. Sweeney's basically a Maritime Claims
5  Associates employee?
6  A  Yes.
7  Q  Is there anyone else in your offices at 26 Water
8  Street, the main office?
9  A  Yes.
10 Q  Is there anyone else at 26 Water Street who is
11 primarily a Maritime Claims Associates employee?
12 A  Not primarily, no.
13 Q  There may be employees of Marine Safety Consultants
14 who from time to time provide services on different
15 files for Mr. Sweeney, but they primarily work for
16 Marine Safety Consultants, is that correct?
17 A  Yes.
18 Q  At some point when the request came in for an
19 accident investigation -- What does an accident
20 investigation entail?
21 A  It entails conducting an investigation into the
22 facts and circumstances by interviewing the
23 individual who was involved in that accident,
24 interviewing witnesses, conducting an on-board

Page 17

1  inspection and obtaining medical records to
2  determine the extent of the injury and then
3  corresponding with the client to report the facts
4  and circumstances, the who, what, why, when, where
5  and how of the accident to the appropriate party.
6  Q  Do you know who the appropriate party was in
7     connection with Mr. Aguiar's accident?
8  A  Other than you suggested in this case it was
9     Sunderland Marine, I have no direct memory if it was
10    Sunderland Marine or somebody else.
11 Q  Would the appropriate party in connection with the
12    commercial fishing industry occurring in New
13    Bedford, would the appropriate party be an insurance
14    company?
15 A  That would be one of the entities, yes.
16 Q  Who would be the other entity?
17 A  The boat owners.
18 Q  Are there any cases that you are working on now
19    where the boat owners, after the deductible was
20    paid, continue to make the payments for medical
21    bills and so forth in New Bedford in the commercial
22    fishing industry?
23 A  Make the payments. There are several instances
24    where the boat owners are requested or required or

Page 18

1  do in fact make the payments; but whether they make
2  payments or are involved in the flow of information
3  because it's their employee, it's their risk and
4  they have to be kept informed and involved in the
5  process.
6  Q  Do you know if that occurred in connection with
7     Mr. Aguiar's case?
8  A  Did what occur?
9  Q  Do you know whether the boat owners were, do you
10    know whether the boat owners were paying Marine
11    Safety Consultants?
12 A  I don't think so. I don't think so.
13 Q  In connection with Mr. Aguiar, you think it's most
14    likely that it was whomever was the marine insurer
15    of FISHING VESSEL MY WAY?
16 A  Eventually, yes.
17 Q  After the deductible was paid?
18 A  Yes.
19 Q  Does a request for an investigation, does that
20    include paying medical bills, paying maintenance and
21    things of that nature, or is that a different type
22    of service?
23 A  That could be part of it. On a case-by-case basis.
24    It's not always the way. It depends on the

Page 19

1  circumstances and the client. Every client has
2  their own method of handling such matters.
3  Q  When a marine insurer contacts Marine Safety
4     Consultants and says we want you to do an accident
5     investigation, Joe Smith got hurt on this fishing
6     vessel and it's coming into port tomorrow, do you
7     understand that the request for an investigation
8     also includes a request to pay medical bills, do
9     maintenance, things of that nature?
10 A  Not automatically.
11 Q  At some point in connection with Mr. Aguiar was
12    there a separate request to pay medical bills and
13    things of that nature?
14 A  I believe that there was some involvement in payment
15    of Mr. Aguiar's medical bills or submission of
16    Mr. Aguiar's medical bills to a third party medical
17    bill review office to make those payments. Whether
18    or not Marine Safety Consultants made any payments
19    from any claim account on behalf of anybody, I don't
20    recall.
21 Q  Do you know why at some point Mr. Sweeney seemed to
22    take over the file at least in terms of medical
23    bills, maintenance payments, advances, things of
24    that nature?

Page 20

1      MR. REGAN: Objection. Go ahead.
2  A  Yes.
3  Q  Why was that?
4  A  Because Russ DuBois left the company and moved.
5  Q  Okay. Got it. Getting back to your involvement in
6     this case chronologically, as you sit here today you
7     don't actually remember the Aguiar case coming in,
8     correct?
9  A  No, not the specific day, not the specific manner in
10    which it came in. I have a recollection basically
11    because I have been reviewing these documents for
12    this case as an expert, I have a recollection that
13    the file had been in the office and Russ had worked
14    on it and Mr. Sweeney had worked on it.
15 Q  Okay. What was your next, your personal next
16    involvement in the case? When I say "yours," I'm
17    going to be, for the rest of this deposition I'm
18    referring to you as an individual rather than your
19    company, Marine Safety Consultants.
20 A  Sometime this past winter I was asked by Mr. Regan
21    if I would be willing to review certain documents in
22    order to perhaps serve as an expert witness if the
23    case ended up in litigation and had to go to trial,
24    if I could work with him on behalf of the boat owner

Page 21

1  to review documentary evidence and submit an opinion
2  as to my, submit a report as to my opinion of the
3  cause and extent of the accident.
4  Q  Was this request made by, in writing or by telephone
5     or both?
6  A  I think by telephone.
7  Q  When did this request from Mr. Regan come in?
8  A  As I said, early in the winter of 2006.
9  Q  Would that be January? February?
10 A  January or early February, somewhere in that time.
11 Q  January or February of 2006 was your first contact
12    with Attorney Regan, correct, in connection with
13    this case?
14 A  I don't recall specifically. I know that's when I
15    set up a file folder for that purpose. Whether or
16    not I had any conversations with Attorney Regan in
17    December of 2005 or around that period of time, I
18    don't recall.
19 Q  But as you sit here today, do you remember any
20    conversations with Mr. Regan in December of 2005?
21 A  As I sit here today, I don't remember specifically
22    whether or not I had any conversations with him in
23    2005.
24 Q  Did you personally do any work in the Aguiar case or

Page 22

1  perform any investigation or discuss it with your
2  son Russ after that first call came in in which you
3  received the, in which Marine Safety Consultants
4  received the assignment to investigate and before
5  your first conversation with Mr. Regan in January or
6  February of 2006?
7  A  I most likely did.
8  Q  Do you have any memory of that?
9  A  Not specifically.
10 Q  Do you have any general memory, whether specific or
11    not?
12 A  As I said, I have a general memory of talking with
13    him about a number of cases that he was working on,
14    and this would have been one of them.
15 Q  Do you actually have a memory of that, or you just
16    believe you probably talked to him?
17 A  No, obviously before January of 2006 I knew about
18    Mr. Aguiar's injury and I knew that Russ had
19    conducted an investigation. Now how I knew that
20    is by conversation and reviewing certain documents
21    that he may have generated; but specifically sitting
22    down with him and saying on or about a certain date
23    I talked with Russ about the Aguiar case, I don't
24    have a specific memory of that over, between 2003

Page 23

1  and 2006. Russ left almost two years ago.
2  Q  Your first memory after that initial contact in
3     October of 2003, your first specific memory
4     regarding Mr. Aguiar's case involved a telephone
5     call from Attorney Regan sometime in January or
6     February of 2006, is that correct?
7  A  Early telephone call or a letter or e-mail, I'm not
8     sure how I became involved at that level.
9  Q  You brought your file with you today, correct?
10 A  Yes.
11 Q  Is there a letter in the file? Why don't you go
12    through the file and identify what each thing is.
13 A  I do not have -- I don't have a letter of
14    engagement, so it must have been a telephone call.
15    MR. ANDERSON: Why don't we mark the file
16    as Exhibit 1, and then we'll go through it and you
17    can identify it and Mr. Regan will copy it or
18    something, I don't know.
19    MR. REGAN: There are two if you want to
20    call them letters, letters from me that are cover
21    letters to a facsimile transmission. Without waving
22    any objection to any letters that may invoke the
23    attorney-client privilege, I'll let those two stay
24    in the file. I don't see any others.

Page 24

1     MR. ANDERSON: Why don't we mark your
2     entire file as Exhibit No. 1, and I'm going to go
3     through it and identify the things, and you can make
4     sure I'm doing it right.
5     [Exhibit 1 marked for identification]
6     MR. ANDERSON: I'm putting a sticker on
7     the outside cover of this blue file.
8  Q  If we flip it over, we have reports and we've got a
9     FedEx return where you FedExed something to
10    Mr. Regan's office on 2-21-06, is that correct?
11 A  Yes.
12 Q  And the next document we have in here is the
13    deposition of Joe Lima, correct?
14 A  Yes.
15 Q  Pages one through four --
16 A  One through 17.
17 Q  Let me go through it. One through four, five
18    through eight, nine through 12.
19    MR. REGAN: It is his complete
20    deposition, a Minuscript with four pages per page.
21    THE WITNESS: Do you have any coffee?
22 Q  This appears to be the entire deposition transcript
23    of Mr. Lima, correct?
24 A  That's what I believe it is.

6 (Pages 21 to 24)