Page 61

1  owners as I'm passing across it. It may have been
2  in conjunction with safety training. I don't
3  recall.
4  Q  Does Marine Safety Consultants do safety training
5     for vessel owners?
6  A  Yes.
7  Q  Who at Marine Safety Consultants actually is an
8     instructor?
9  A  Myself.
10 Q  Who else?
11 A  Mr. Rick Harden, H A R D E N.
12 Q  Anyone else?
13 A  Mr. Tom Tulus is a drill conductor.
14 Q  Anyone else?
15 A  Mr. Dana Collier is a drill conductor.
16 Q  Is there anyone else?
17 A  Collier also is a drill conductor, but he is not
18    actively involved in doing that except on a fill-in
19    basis. It's primarily Tom. Tom Tulus, Dana Collier
20    and Rick Harden.
21 Q  How frequently do you yourself do instruction,
22    safety instruction training when you are being paid?
23 A  Last time was last Thursday that I put on a one-day
24    course.

Page 62

1  Q  Who was that for?
2  A  The City of New Bedford Fishing Vessel Safety Task
3     Force.
4  Q  Is that a government type of organization? What is
5     it?
6  A  City of New Bedford couple years ago promoted active
7     involvement in fishing vessel safety training, and a
8     task force of professionals was put together at the
9     request of the city and then a team of instructors
10    and trainers started putting on safety training
11    classes for the City of New Bedford on behalf of or
12    through the cognizance of the City of New Bedford;
13    and also performed for Massachusetts Fisherman's
14    Partnership and individual boat owners or fleet
15    owners will call and ask for training or drills.
16 Q  There is a coast guard requirement for safety
17    training and safety drills on commercial fishing
18    vessels, correct?
19 A  A federal regulation.
20 Q  And that requires there would be specific types of
21    safety training and specific types of safety drills
22    on commercial fishing vessels, correct?
23 A  Yes.
24 Q  You agree with me that none of that safety training

Page 63

1  or safety drills which are mandated by the federal
2  government involve the operation of winches?
3  A  Not specifically the operation of the winches; but
4     as far as recognition of hazards and safety guards
5     on winches and blocks and machinery, there is a
6     requirement that boat owners and operators maintain
7     safety guards and just a general plan that the
8     machinery be kept in good operating condition.
9  Q  Is there a specific regulation that requires moving
10    machinery, rotating machinery have a safety guard on
11    it when it's on a commercial fishing vessel,
12    correct?
13 A  Yes.
14 Q  But with respect to mandatory training instruction
15    and drills, none of that mandatory training,
16    instruction and drills relates to the operation of
17    the winch. Would you agree with that?
18 A  Not specifically the operation of the winch but in
19    the operation of the vessel as a whole, the concept
20    of safe work practices is stressed in the safety
21    training programs.
22 Q  But --
23 A  It's part of the curriculum.
24 Q  You would agree with me with regard to the coast

Page 64

1  guard regulations that require safety training and
2  safety drills, they are fairly specific in terms of
3  what must be trained and what must be drilled?
4  Would you agree with that?
5  A  That's correct.
6  Q  For example, survival suits, must instruct the crew
7     regarding survival suits, and there are specific
8     drills with respect to the crew must actually go
9     through a set of drills with survival suits,
10    correct?
11 A  That's correct.
12 Q  The same is not true with respect to operation of
13    the winches?
14 A  No. As I said, there is no specific requirement of
15    training of the operation of the winches, but there
16    is in the curriculum the concept of safe work
17    practices to prevent accidents from happening
18    involving the entire vessel, not just a specific
19    piece of equipment.
20 Q  You would agree with me there is no coast guard
21    requirement on an inspected fishing vessel that the
22    operators of the vessel, there is no requirement
23    that the operators of the vessel train the crew
24    specifically with respect to operating the main

Hennessey Corp d/b/a Robert H. Lange Co.
617-523-1874

e87e82fe-f5f1-4add-90ed-076102f80e35

Page 65

1  winch?
2  A  That's correct.
3  Q  And there is no coast guard regulation that says
4     they must drill, perform drills prior to the boat
5     leaving the dock with respect to the operation of
6     the main winch?
7  A  That is correct.
8     [Exhibit 5 marked for identification]
9  Q  I'm going to show you a document marked as Exhibit
10    5. Do you see that?
11 A  Yes.
12 Q  That is your most recent affidavit?
13 A  Yes.
14 Q  Directing your attention to item 10, paragraph 10 --
15 A  Yes.
16 Q  -- it says "I have been on this boat and observed
17    the operation of the winch in the past and am
18    familiar with it's characteristics."
19 A  Yes.
20 Q  When were you on the boat and observed operation of
21    the winch?
22 A  Well, I have been on this boat and observed the
23    operation of this type of winch in the past. That's
24    what I intended to say there. I have not seen this

Page 66

1     specific winch in operation. I may have, but I
2     don't recall specifically, but I have seen this type
3     of winch.
4  Q  So you have been on this boat, correct?
5  A  Yes.
6  Q  FISHING VESSEL MY WAY?
7  A  Yes.
8  Q  And you have also observed the operation of Marco
9     brand winches?
10 A  Yes.
11 Q  But you have never observed the operation of the
12    Marco winch that was on the MY WAY, is that correct?
13 A  I may have but I don't have a specific memory for
14    this case of operating -- I did not operate this
15    winch or see it in operation before this case.
16    [Exhibit 6 marked for identification]
17 Q  I show you another document that we'll mark as
18    Exhibit 6. This is a cover letter that you sent to
19    Mr. Regan dated September 21.
20 A  Yes.
21 Q  Your hourly rate is 85 bucks an hour?
22 A  Off the record I think it's up to 250 now. Yes,
23    that's my rate.
24 Q  That's what you are going to charge me?

Page 67

1  A  This is what I'm going to charge, a thousand dollars
2     an hour.
3  Q  We have the next page on Exhibit 6 we have your
4     resumé?
5  A  Yes.
6  Q  The last page of Exhibit 6, is this a history of all
7     the cases that you have testified to since 2003?
8  A  That's what it says. That's what it is.
9  Q  Is the last page of Exhibit 6 all the cases which
10    you have testified in since the year 2003?
11 A  I believe it is, whether or not -- Here is my
12    practice: When I testify in a case like today, I go
13    back to the office and I'll ask my secretary to
14    include this case on my list to add it on. Whether
15    or not someone had fallen through the cracks, I
16    won't say these are the only cases, but to the best
17    of my knowledge these are the only cases I have
18    testified on in 2003, 2004, 2005 and 2006 including
19    today's as an added.
20 Q  You are aware when you testify as expert witness in
21    a federal court case that you have got to give the
22    other side a list of cases that you have testified
23    in in the last four years?
24 A  Yes, that's why I maintain this.

Page 68

1  Q  2006 you listed two cases the SHEARWATER and Frank
2     Saco?
3  A  Yes.
4  Q  SHEARWATER, what was that case about?
5  A  The SAILING VESSEL SHEARWATER case involved a wooden
6     hull sailing scalloper that is a coast guard-
7     certified passenger vessel that was hauled out of
8     the water in New York on Long Island; and while they
9     were launching it, the travel lift suffered an
10    accident and the vessel suffered some damage. So I
11    was called to give deposition as to the extent of
12    the damages that I observed when I did a damage
13    survey.
14 Q  You performed a damage survey on the SHEARWATER?
15 A  Yes.
16 Q  And your expertise is the cost of the repairs?
17 A  Extent of the damages and the estimated cost of
18    repairs.
19 Q  You were initially hired by the hull insurer?
20 A  Well, there were three parties involved with that
21    case. There's the ship owner, the shipyard and --
22    and the ship. Two parties. I was called by the
23    ship owners. I'm sorry, I was called by the
24    shipyard's attorney to give testimony as to what I

17 (Pages 65 to 68)

Page 69

1  observed during the survey. There were three
2  surveyors involved.
3  Q  When you performed the survey of the SHEARWATER, who
4  hired you when you performed the survey?
5  A  The hull underwriters on behalf of the vessel owner.
6  Q  Underwriters is the name of the insurance company,
7  the marine insurer?
8  A  Yes.
9  Q  The testimony you gave by deposition, was that, were
10  you listed as an expert witness in that case?
11  A  No.
12  Q  Did the people who hired you, were they the ones who
13  wanted you to testify or some other person?
14  A  Some other person.
15  Q  Do you know why they wanted you to testify if they
16  didn't hire you?
17  A  Well, do you want me to tell you the facts of the
18  case?
19  Q  No. Do you remember coming in low and the other
20  side --
21  A  No, nothing to do with that.
22  Q  Frank Saco, Frank Saco you testified at trial. What
23  kind of case was Frank Saco?
24  A  A tugboat case. Mr. Saco was a crew member aboard a

Page 70

1  tugboat and he was bringing a suit against the
2  owners of the tugboat.
3  Q  Was it a Jones Act case?
4  A  Yes.
5  Q  Jones Act case is when a seaman gets injured on the
6  job and wants money?
7  A  Yes, that's one quick summary of it.
8  Q  Were you testifying as an expert witness?
9  A  Yes.
10  Q  Were you testifying as an expert witness on behalf
11  of the defense attorney?
12  A  Yes.
13  Q  Who was the defense attorney?
14  A  Clinton & Muzyka.
15  Q  Who specifically at Clinton & Muzyka?
16  A  Tom Muzyka.
17  Q  Who was the plaintiff's attorney, if you know?
18  A  Mr. Kaplan.
19  Q  David Kaplan?
20  A  Yes.
21  Q  Have you ever worked on a tugboat before?
22  A  Have I ever worked on a tugboat?
23  Q  As a crew member.
24  A  No.

Page 71

1  Q  Have you ever worked as a crew member on a sailboat?
2  A  Yes.
3  Q  Was that at the academy?
4  A  Yes.
5  Q  On the EAGLE?
6  A  Yes.
7  Q  Since the EAGLE have you ever worked as a crew
8  member on the sailboat?
9  A  No.
10  Q  In the case in 2005, Steve Powell, what type of case
11  was that?
12  A  It was a seaman's injury case on a commercial
13  fishing vessel.
14  Q  What we talked about, a Jones Act case?
15  A  Yes.
16  Q  Were you hired as an expert witness?
17  A  I don't recall if I was an expert witness or a fact
18  witness. It is a deposition in my office. I don't
19  recall. Never went to trial.
20  Q  Who was the defense attorney?
21  A  I believe that was Tom Muzyka.
22  Q  Who was the plaintiff's attorney?
23  A  An attorney from New Jersey. I don't recall his
24  name.

Page 72

1  Q  Tom Muzyka represented the --
2  A  -- boat owner, yes.
3  Q  And next case Roland Caron?
4  A  Caron.
5  Q  What was that case about?
6  A  Mr. Caron was a crew member aboard a commercial
7  fishing vessel from Portland, Maine, and he
8  allegedly suffered an injury and it involved the
9  facts and circumstances surrounding that injury.
10  Q  Did the Powell case, what was the piece of equipment
11  that involved in Mr. Powell's alleged injury?
12  A  There was no piece of equipment. His hand became
13  infected.
14  Q  Fish poisoning?
15  A  It is called fish poisoning, but it's not
16  necessarily -- They call it fish poisoning because
17  it happens aboard a fishing vessel, but it's not
18  necessarily involving fishing.
19  Q  What was your area of expertise in the Powell case?
20  A  I was a fact witness as to when I inspected during
21  the investigation aboard the vessel.
22  Q  And more specifically?
23  A  Well, Powell stated, claimed that he suffered his
24  infection, his hand became infected while aboard