Page 73

1  this particular fishing vessel due to dirty water
2  when he went to wash his hands, so I went aboard the
3  vessel and took a sample of the water.
4  Q  That would be a type of investigation assignment?
5  A  Yes.
6  Q  Roland Caron?
7  A  Yes.
8  Q  Were you an expert witness in that case?
9  A  Yes.
10 Q  What type of case was that?
11 A  Mr. Caron was a crew member aboard a dragger from
12    Portland, Maine, and it was involving operation on
13    the deck and they had hauled back a small whale and
14    they were trying to get the whale off the vessel and
15    in the act of trying to get the whale off the
16    vessel, Mr. Caron suffered a shoulder injury.
17 Q  What was your area of expertise in that case?
18 A  Good, general safe practices on work decks.
19 Q  Did you have an opinion in that case that Mr. Caron
20    was negligent in his own conduct?
21 A  I believe I testified that contributing to the
22    incident was the fact that he placed himself under a
23    suspended heavy load without taking proper
24    precautions before climbing under the load or

Page 74

1     standing under the load.
2  Q  Was the load being the small whale?
3  A  Yes.
4  Q  What was the name of the vessel in the Roland Caron
5     case?
6  A  I don't recall.
7  Q  Do you know when you testified in that case?
8  A  Yes, I testified in October of 2004 at trial, and in
9     July of 2004 I gave a deposition before the trial.
10 Q  So you testified twice in that case?
11 A  Deposition was taken like today and eventually it
12    did go to trial and I testified at trial.
13 Q  Did the load, the bag of the net, did it drop in
14    that case on top of Mr. Caron, at least --
15 A  The pilot whale slipped out of the noose which he
16    had placed around the whale, and the whale hit him
17    and knocked him to the deck.
18 Q  They put a noose around the whale which was inside a
19    bag?
20 A  Not, it was on deck. It was outside of the bag.
21 Q  How did they get the whale on deck?
22 A  It came up in the bag, but they dumped it on the
23    deck. And they were trying to --
24 Q  -- hoist it overboard?

Page 75

1  A  Hoist it overboard, yes.
2  Q  So they threw the rope around it, grabbed the cargo,
3     lifted it up, he went underneath it, rope came
4     undone, the whale landed on him?
5  A  That's correct.
6  Q  Did you have an opinion whether there was anything
7     wrong with what the boat did in the Caron case that
8     contributed to Mr. Caron's injury?
9  A  I don't recall all of the testimony. I recall the
10    basic facts, and that's what happened. I don't
11    recall the specific testimony.
12 Q  Do you know what type of winch was used on the
13    vessel involved in the Caron case?
14 A  It was a mechanical hydraulic winch, and they used a
15    smaller winch, take-out winch, and I don't recall
16    the specifics.
17 Q  Do you know if the main winch in the Caron case was
18    the Marco winch?
19 A  It wasn't a Marco winch.
20 Q  Was the main winch in the vessel in the Caron case a
21    Marco winch?
22 A  I don't recall.
23 Q  Michael Richards, what was that case about? Who was
24    the plaintiff's attorney in Roland Caron?

Page 76

1  A  I don't recall. Somebody in Maine.
2  Q  Who was the defense attorney in the Caron case?
3  A  I think was Attorney Michael Sabasek.
4  Q  Michael Richard, what was that case about?
5  A  I don't recall.
6  Q  Says you gave deposition testimony in June of '04.
7     Does that ring a bell?
8  A  No, I don't recall that case without looking at the
9     file folder to refresh my memory.
10 Q  Do you have a memory at all as to what it might have
11    been about?
12 A  No.
13 Q  Says 4-4 of '04 the CAPE FEAR case?
14 A  I believe that was with you.
15 Q  That involved the sinking of a clam vessel?
16 A  Yes.
17 Q  In that case you were testifying on behalf of the
18    defendant?
19 A  Yes.
20 Q  What was your area of expertise in the CAPE FEAR
21    case?
22 A  Fishing vessel safety, and also it was more factual,
23    it had to do with the findings of the safety
24    equipment that I inspected after the accident.

19 (Pages 73 to 76)

Page 77

1  Q  You would agree in the CAPE FEAR case you inspected
2     survival suits --
3  A  Yes.
4  Q  -- after sinking?
5  A  Yes.
6  Q  And that was the sinking that involved the death of
7     two individuals?
8  A  Yes.
9  Q  And you found that the survival suits were
10    functioning properly, correct?
11 A  At the time of my inspection at the coast guard
12    office I found that the survival suit zippers
13    functioned properly.
14 Q  And that was immediately after coast guard personnel
15    and their inspection found that the survival suits
16    were not functioning properly, is that correct?
17 A  I don't think "immediately" would be accurate. It
18    was sometime after.
19 Q  But at least in the CAPE FEAR case coast guard
20    inspected equipment after the casualty, correct?
21 A  Are you asking my recollection of that?
22 Q  Yes.
23 A  Yes, my recollection is that the coast guard had
24    recovered two survival suits and they were taken

Page 78

1     into custody by the coast guard marine safety office
2     in Providence, and I was asked to attend, visit the
3     office. I got permission to conduct my own
4     inspection, and I conducted my own inspection.
5  Q  Your own inspection was conducted after the coast
6     guard personnel conducted --
7  A  Sometime after.
8  Q  You are aware at the time of your inspection that
9     the coast guard found that the survival suit was not
10    functioning properly?
11 A  Correct.
12 Q  And your findings were that the survival suit was
13    functioning properly?
14 A  I found at the time of my inspection they were
15    functioning properly, and I was in the presence of a
16    coast guard officer when I did that.
17 Q  Wayne Arnold case, what was that about?
18 A  That I believe was a hearing on a collision case in
19    Rhode Island.
20 Q  Were you an expert witness in that case?
21 A  I believe so.
22 Q  Who were you working for at the time?
23 A  I think that case, my recollection I was working for
24    Attorney Richard Humpheries.

Page 79

1  Q  L/B ORIN C?
2  A  What's an arbitration involving a collision between
3     two vessels, and my testimony involved rules of the
4     road, safe navigation.
5  Q  While of vessels were involved?
6  A  L/B ORIN C is a wooden lobster boat and the other
7     vessel was a fiberglass charter fishing boat.
8  Q  Why was it an arbitration as opposed to a normal
9     lawsuit?
10 A  You would have to ask the attorneys why they chose
11    arbitration. I think to save time and money.
12 Q  Wayne Arnold case, what was your area of expertise?
13 A  Navigation and rules of the road.
14 Q  I'm sorry?
15 A  Wayne Arnold was the case where they pulled his
16    license. Involved a collision between a motor boat
17    and a personal water craft.
18 Q  Did they want to pull this guy's license or
19    something?
20 A  No, no, it was the person riding the personal water
21    craft died in the collision, and I was asked to
22    review. They happened to have videotape of the
23    incident that someone from shore had taken, and I
24    was asked to testify before a judge in Rhode Island

Page 80

1     as to how I interpreted the sequence of events in
2     the collision.
3  Q  Who asked you?
4  A  Attorney Humpheries.
5  Q  Okay. Then you gave testimony. Was it in a coast
6     guard hearing?
7  A  No, it was a, I don't know what you call it, state
8     court before a magistrate or judge.
9  Q  Was it a criminal matter or criminal?
10 A  I think it was potentially a criminal matter, and it
11    was the purpose of the hearing, to determine --
12 Q  -- whether to bring a charge or not?
13 A  Yes.
14 Q  Promet --
15 A  He was a potential criminal defendant and the issue
16    was do we charge this guy or not.
17 Q  His lawyer hired you to interpret certain videotape?
18 A  I believe that is what it was. The judge was asking
19    all the questions.
20 Q  Promet, what was that case about?
21 A  Promet is a case involving the methodology,
22    definition and practice of the terms "gross tonnage"
23    versus "net tonnage" and the custom and practice and
24    how that all evolved. Promet is a shipyard in Rhode

20 (Pages 77 to 80)

Page 81

1   Island, and they were seeking relief from the state
2   of Rhode Island Tax Court involving how much tax
3   they had paid on bottom paint for fishing vessels.
4   And the state law I believe said that they were
5   basing the amount of tax on tonnage, and it was
6   unclear what tonnage they were using, so I was asked
7   to testify before an arbitrator or state tax
8   arbitrator as to the definition of gross registered
9   tonnage, net tonnage, dead weight tonnage what the
10  difference was.
11  Q  Who hired you?
12  A  Promet.
13  Q  Their attorney --
14  A  Promet hired me, and they were represented by a tax
15     attorney or accountant. I'm not sure what his
16     function was.
17  Q  The initial request came from Promet?
18  A  Yes.
19  Q  James McElroy, what was that case about?
20  A  I don't recall.
21  Q  3-26-03 you testified at trial.
22  A  I don't recall what that was.
23  Q  You have no memory what the James McElroy case was?
24  A  No.

Page 82

1   Q  Michael Smolinski, what was that case about?
2   A  I don't recall.
3   Q  That was testifying in an arbitration in January of
4      '03?
5   A  Yes.
6   Q  GOLDEN NUGGET case. 1-6-03, it was a deposition.
7   A  Yes.
8   Q  Do you know what that was about?
9   A  No, I don't.
10  Q  Were you an expert witness in the Golden Nugget
11     case?
12  A  I don't think so, but I don't recall. I think it
13     had to do something with damages suffered by a
14     vessel and giving testimony as to the extent of
15     damages, but I don't recall. I'd have to pull that
16     file from 2002.
17  Q  What about the Smolinski?
18  A  I don't recall what that was.
19  Q  Same is true with McElroy?
20  A  I'd have to pull those files. They go back to 2000.
21         THE WITNESS: Can I take a short break.
22         MR. ANDERSON: Yes.
23         [Recess]
24         [Exhibit 7 marked for identification]

Page 83

1   Q  I show you a document that we're going to mark as
2      Exhibit 7. Do you recognize that document?
3   A  It appears to be the affidavit that I prepared in
4      February of 2006.
5   Q  Look through it and make sure it's accurate, and you
6      can crossreference it to make sure it's in your file
7      if you would like.
8   A  Exhibit 7.
9   Q  Did you have an opportunity to review what has been
10     marked as Exhibit No. 7 in this deposition?
11  A  Yes.
12  Q  Is Exhibit No. 7 in this deposition a copy of any of
13     the affidavits that we've gone through so far?
14  A  Yes.
15  Q  What is it a copy of?
16  A  Exhibits 3 and 4.
17  Q  Directing your attention to paragraph 5, says, "I am
18     familiar with the facts surrounding the injury to
19     Mr. Carlos Aguiar." Do you see that?
20  A  Yes.
21  Q  What are the facts surrounding the injury of Carlos
22     Aguiar as you understand it to be?
23  A  Basically on the date of his incident they were in
24     the VESSEL MY WAY was in the process of hauling back

Page 84

1   the nets which are attached to the fishing vessel
2   trawl doors. We call them doors, D O O R S.
3   Mr. Aguiar was the deckman, and his job was to work
4   on the work deck near the gallus frames and the
5   doors to transfer the wires from the doors to the
6   net drum, secure the doors and, in preparation for
7   bringing the fish aboard and then in preparation for
8   resetting the doors after they dumped the load of
9   fish that they haul up. He was in the process of
10  securing a safety chain on the port side gallus to
11  the port side door when he, due to a combination of
12  things, he, his right index finger became struck or
13  caught or involved with the hook on the safety wire
14  and suffered an injury to his right index finger.
15  Q  What is your understanding of the mechanism of
16     injury?
17  A  My understanding of mechanism of injury is while he
18     was in the process of putting the pelican safety
19     hook around the chain, the vessel was rolling and
20     the chain came taught and his hand got struck due to
21     the mechanism of the chain and the door moving, the
22     chain came taught and the hook on the pelican hook
23     had not been fully secured and it snapped open and
24     struck him in the right index finger.

21 (Pages 81 to 84)