Page 145

1  question.
2      MR. REGAN: Then ask the question.
3      MR. ANDERSON: I did ask the question and
4  he said "I already answered it." It's a yes or no
5  question.
6      THE WITNESS: I gave an answer. You
7  asked her to re-read your question. I have already
8  given an answer. I said after she read the question
9  what is your answer, I said I have already given my
10 answer.
11     MR. ANDERSON: So you are not going to
12 answer the question? It's a yes or no question.
13 You can say I agree or don't agree.
14     THE WITNESS: Maybe I misunderstood the
15 question. If the court reporter can be so kind as
16 to re-read your question and then re-read my answer
17 that I give previously.
18     *[The last question and answer were read.]
19     THE WITNESS: That's my answer.
20 Q  You will not answer that question yes or no?
21 A  I did. That's my answer, Mr. Anderson.
22 Q  The question calls for a yes or no answer.
23 A  I don't believe that's a yes or no answer.
24 Q  And you can't answer that question yes or no?

Page 146

1  A  I answered the question to the best of my ability
2     based on my understanding of the question.
3  Q  Can you answer it yes or no?
4  A  I do not believe that question is capable of a yes
5     or no answer, so I gave you my answer to the best of
6     my ability based on my experience and my
7     understanding of the question.
8  Q  Okay. Paragraph number 9, paragraph 9 says "mud and
9     extra weight from rocks or other matter." Do you
10    see where it says "whale carcases" crossed out?
11 A  Yes.
12 Q  Did you initially put "whale carcasses" in your
13    affidavit and cross that out at a subsequent point?
14 A  If that appeared in the draft, the typing of the
15    draft, it was probably some boilerplate from another
16    report that I had written that I overwrote before I
17    sent it to Mr. Regan for final typing. I corrected
18    that in my review before I signed it.
19 Q  That was the draft that was faxed to Mr. Regan's
20    office?
21 A  Yes.
22     MR. ANDERSON: Buddy, can I have that
23     draft? I think I'm entitled to it.
24     MR. REGAN: I have to check and see what

Page 147

1  I have. I don't know if it's in existence.
2      MR. ANDERSON: Any sense of when you are
3  going to do it so we can identify now?
4      MR. REGAN: Do you want to stop the
5  deposition and I'll pull my file and look?
6      MR. ANDERSON: No, I want to get going.
7      MR. REGAN: I'll agree with you --
8      MR. ANDERSON: Let me keep asking
9  questions. You are just going to say you don't have
10 it, so --
11 Q  Did you initially write in your draft to Mr. Regan
12    "whale carcass," is that something that you wrote?
13 A  I think I just answered that. When I sent the
14    draft, there was some boilerplate stuff from other
15    documents that I had prepared that I was using as a
16    template and probably appeared in there and it
17    stayed in there until I reviewed it before I signed
18    it and I corrected it. There is no evidence or I
19    never even considered whale carcasses in this case.
20 Q  Says here that other matter and mud etc. can add
21    several hundred to thousands of pounds or more and
22    is the equivalent of being hung up on the bottom.
23    That often creates a situation where the winch may
24    pull a load beyond what it's designed for by the

Page 148

1  brake. Do you see that paragraph?
2  A  Yes. Yes.
3  Q  The hydraulic winch can pull a certain load which is
4     measured in pounds, correct?
5  A  Foot-pounds.
6  Q  Foot-pounds would be radial power?
7  A  Right.
8  Q  And the brake is a friction brake, correct?
9  A  Yes.
10 Q  And you tighten it down and it applies a brake drum,
11    brake pad to a drum, correct?
12 A  Correct.
13 Q  And the strength of that brake can be quantified
14    again in foot-pounds, correct?
15 A  I believe that is the engineering term used to
16    describe the braking power of a brake, yes.
17 Q  With respect to a main tow winch on a commercial
18    fishing vessel, do you have an opinion as to whether
19    the braking power should exceed the power, turning
20    power of hydraulic system?
21 A  I don't think I understand the question. Will the
22    brake be strong enough to stop the winch from moving
23    if you apply hydraulic power to try to overcome the
24    brake?

Page 149

1  Q  That would be another way of saying it.
2  A  Like trying to drive your car with your emergency
3     brake set? It would depend on how much power you
4     apply to the accelerator against the emergency
5     brake.
6  Q  But on a commercial fishing vessel the amount of
7     hydraulic power is fixed, right?
8  A  The brake is not designed to stop the winch from
9     turning against hydraulic power.
10 Q  Correct, but the brake is designed for a certain
11    strength, correct?
12 A  The size of the net drum and the size of the wire
13    and the estimated size of the load that is going to
14    be stopping.
15 Q  And any hydraulic pump or hydraulic system on the
16    winch itself is set for a certain amount of power,
17    correct?
18 A  Correct.
19 Q  Would you agree with me that when determining what
20    type of brake to put on there, you always want a
21    brake that is stronger than the hydraulic motor?
22 A  Stronger than the load which you are going to be
23    lifting and suspending from the brake, yes.
24 Q  Another way to put it is if you are going to lift

Page 150

1     something up with a hydraulic motor, you want to
2     make sure that your brake is strong enough to hold
3     anything that the winch can lift up, is that fair to
4     say?
5  A  Normal design and operating criteria, yes.
6  Q  On a commercial fishing vessel the only time in
7     which you want the winch to actually slip is when
8     the net or other gear is actually hung up on the
9     bottom of the ocean, correct?
10 A  Yes.
11 Q  And the reason is the force being applied to the
12    winch at that point in time is the force of the
13    entire mass of the boat basically traveling forward
14    through the water?
15 A  The force of the propulsion system and the mass of
16    the boat moving the vessel through the water. You
17    don't want to rip your nets or you don't want to
18    sink the vessel and pull yourself down.
19 Q  The brake, the reason that the brake sometimes slips
20    is actually to prevent wires from tarring, nets get
21    wrapped up --
22 A  No. See, the brake is not set when you are towing.
23 Q  Is it your testimony that on a fishing vessel such
24    as the MY WAY, they do not set the hydraulic brakes?

Page 151

1  A  The purpose of the brake is to set the, hold the
2     load after you lift it.
3  Q  When the FISHING VESSEL MY WAY is towing a net, what
4     holds the wire from running out?
5  A  Under normal circumstances the -- On that particular
6     winch I'm not sure at this time as to when they are
7     towing. I'd have to look at the manual on that
8     winch.
9  Q  Paragraph 9 you say, "this often creates a situation
10    where the winch may pull a load beyond what it's
11    designed for by the brake." Do you see that?
12 A  Yes.
13 Q  Why is that relevant to this case?
14 A  Well, in retrospect now eight months after I wrote
15    it, at this time it doesn't appear to be relevant.
16    And at the time I think it was an issue that was
17    presented in the plaintiff's summary of the facts,
18    and I was just addressing it.
19 Q  Paragraph 10 says, "Mr. Aguiar should not have gone
20    in to hook up the door without first making sure
21    that everything was secure and as such he is either
22    directly responsible for causing his own injury or
23    at least is contributorily negligent." Do you see
24    that paragraph?

Page 152

1  A  Yes.
2  Q  What do you mean by "without first making sure that
3     everything was secure"?
4  A  Before you go in there, he has to make sure that the
5     winch is stopped and the brake is set.
6  Q  If the winch -- What is the risk of the brake not
7     being set?
8  A  Then the load is still moving before he goes in
9     there to set the safety chain, the door would still
10    be moving.
11 Q  What if the door is not moving, does he still have
12    to check the brake?
13 A  Yes.
14 Q  Should he physically go and inspect the brake?
15 A  No.
16 Q  How can he tell whether the brake is set?
17 A  The hand signals or eye signals or voice signals in
18    a short distance across the deck, and I believe they
19    testified it's just a look between them. They have
20    done it so many times, he would look and Lima would
21    say okay and he would go in.
22 Q  What do you think he should, very specifically what
23    do you think he should have done differently?
24 A  I believe I put that paragraph in there because

Page 153

1  there was some question early on as to whether or
2  not the winch was not set and the brake was not set,
3  and this would be in my opinion what he should have
4  done if that was the case factually. As it turns
5  out, there is no factual support of the winch moving
6  when he was in there.
7  Q  That is based upon what Mr. Lima says, correct?
8  A  In part, yes.
9  Q  You believe Mr. Lima, right?
10 A  Yes.
11 Q  He didn't do anything and the door just moved,
12    correct?
13 A  Yes.
14 Q  If you believe Mr. Aguiar, the door dropped down
15    into the water, correct?
16 A  Mr. Aguiar described the chain getting taught, and
17    at the same time the chain getting taught he
18    perceived that the door was moving.
19 Q  Okay. You would agree that the -- What is the
20    proper -- You think Mr. Aguiar should have looked at
21    Lima and gotten the eye signal from him that the
22    brake was secure?
23 A  Either an eye signal or hand signal or some
24    indication that the machinery was stopped and it was

Page 154

1  safe for him to go in.
2  Q  Is that the normal practice in the commercial
3     fishing industry?
4  A  Yes.
5  Q  What do you base that on?
6  A  Based on my years of talking to the fishermen and
7     based on years of going to sea, it's a safe marine
8     practice in working with machinery and loads.
9  Q  "I am of the opinion that Carlos Aguiar was at
10    minimum contributorily negligent in causing his own
11    injury, specifically but not limited to going in and
12    attempting to hook up the safety chain without first
13    ascertaining what the operator of the winch had or
14    hadn't done and without first ascertaining whether
15    the brake was firmly engaged and the equipment had
16    stopped moving."
17       Do you see that section?
18 A  Yes.
19 Q  Is that still your opinion?
20 A  If Mr. Aguiar testifies other than what I have
21    already read, that the winch was still moving and
22    operating at the time this happened, then this would
23    be my opinion.
24 Q  If he testifies that the door came to a stop, is

Page 155

1  that still your opinion?
2  A  If the door came to a stop and the brake was set,
3     then there is no way for the door to move upwards.
4  Q  What if he testified simply that the door came to a
5     stop and I didn't see whether the brake was set, is
6     that still your opinion?
7  A  Yes.
8  Q  That failure of Mr. Aguiar to check to see if the
9     brake was set is only relevant if in fact wire was
10    let out from the main towing winch, correct?
11 A  Let out or hauled in.
12 Q  Or hauled in, hauled in --
13 A  If the winch was still operating and the situation
14    was not stabilized.
15 Q  With respect to ascertaining whether the operator of
16    the winch had tightened down the brake, you can't
17    tell from the stern whether the brake is tightened
18    down or not, can you?
19 A  You can tell from the stern if the winch operator
20    tells you it's safe to go in.
21 Q  Correct. But by looking from the stern toward the
22    mid section of the boat, looking at the winch you
23    can't tell whether the winch brake is on or off?
24 A  Well, to some extent you can. If you are looking at

Page 156

1  the winch and the winch operator and he has got his
2  hand on the brake handle and he has stopped moving
3  it and it's secure and he gives you a nod, then the
4  indication is the brake is set, it's okay.
5  Q  If you see him stop moving is what you said,
6     correct?
7  A  If you see that he stopped turning the handle on the
8     brake.
9  Q  "Stopped turning the handle" implies that you saw
10    him moving it?
11 A  Right.
12 Q  If you just look at him and his hand is on the
13    brake, you can't tell whether his hand is on the
14    brake and it's locked down or his hand is on the
15    brake and it's wide open?
16 A  That is why you would want to get a signal from the
17    winch operator that it is secure before you go in.
18 Q  What would the signal be?
19 A  A nod of the head, a verbal command saying okay, go
20    ahead, it's all set, some indication. It would be
21    whatever they would establish on that boat through
22    the years of working together.
23 Q  Do you know what was established on the MY WAY?
24 A  A nod and look that he understood it was all set.

39 (Pages 153 to 156)