Page 157

1  Q  This is Mr. Aguiar?
2  A  Yes.
3  Q  Again this opinion that Mr. Aguiar set forth in 11,
4     the opinion that he was contributorily negligent is
5     only relevant if in fact the brake was not set and
6     that was why the door dropped, correct?
7  A  That's correct.
8  Q  Did you read Mr. Aguiar's affidavit? I show you a
9     copy of the affidavit of Carlos Aguiar.
10        MR. REGAN: It's part of his file.
11        MR. ANDERSON: We'll mark exhibit
12     number -- I had previously put a sticker on a blank
13     piece of paper and we never drew on it. I took it
14     off that piece of paper and put it on the affidavit
15     of Carlos Aguiar.
16        [Exhibit 9 marked for identification]
17 Q  Do you see that?
18 A  Yes.
19 Q  Did you have an opportunity to review that affidavit
20    previously?
21 A  Yes.
22 Q  What part of that affidavit do you not agree with?
23 A  (No response)
24 Q  First of all, I understand you weren't on the boat

Page 158

1     at the time of the accident, correct?
2  A  Right.
3  Q  And, therefore, you can't either agree or disagree
4     when he says a specific fact other than you can say
5     you don't think that is possible.
6  A  Other than to the extent that if a fact in his
7     affidavit is different from what he testified to in
8     his deposition or is contrary to what the physical
9     evidence would suggest is reasonable under the
10    circumstances, then I would say that he would have
11    to go through each item line by line to find areas
12    where I would agree or disagree.
13 Q  Do you believe it's possible that excessive amount
14    of mud could cause the door to drop down into the
15    water, mud in the net?
16 A  No, I don't.
17 Q  You would agree with me no matter how much is the
18    main winch's, how much the weight that the main
19    winch's haul up of the net, that the brake should
20    hold whatever that weight is?
21 A  Under normal circumstances, unless they are hauling
22    up a load that is so heavy that it exceeds the
23    braking power of the mechanism.
24 Q  But shouldn't the braking power of the winch always

Page 159

1     exceed the pulling power of the winches so that
2     whatever you haul up, you can hold?
3  A  Whatever you haul up, that is within the working
4     capacity of the winch and if you are trying to haul
5     something that is heavier than the winch can handle,
6     then the brake wouldn't handle it, either.
7  Q  You can't get it up to the boat?
8  A  Right. Can't get it up to the boat, you are going
9     to break something.
10 Q  If you get hung down on something like a wreck where
11    the thing is not going anywhere, you are wrapped
12    around it, you can haul your winches but at some
13    point your winches are just going to stall out,
14    correct?
15 A  Or a wire is going to brake or the nets will tear or
16    you will pull yourself down by the stern and flood
17    the vessel. A lot of bad things can happen.
18 Q  But you would agree with me if you can get it up off
19    the bottom and up to the stern so the doors are
20    hanging port and starboard side, whatever that load
21    is, whatever that load is, the winches should be
22    able to hold it if they are functioning properly?
23 A  Yes.
24 Q  The affidavit of Carlos Aguiar basically says that

Page 160

1     if the door dropped, it had to have been because the
2     line was, excuse me, wire was paid out from the main
3     winch, correct?
4        MR. REGAN: Objection.
5  A  I'm not sure I understand.
6  Q  In a nutshell what the affidavit of Carlos Aguiar
7     says is if the door dropped, it must be the case
8     that the line was let out from the winch -- Strike
9     that. Withdraw the question. I'll move on.
10       Directing your attention to page three of
11    the affidavit of Carlos Aguiar, do you see the
12    drawing on page three of the affidavit of Carlos
13    Aguiar?
14 A  Yes.
15 Q  That is a schematic drawing?
16 A  Yes.
17 Q  Do you believe that is an accurate schematic drawing
18    of the winch, wire, gallus frame, block, door and
19    net mechanism?
20 A  It's a basic schematic of one side of the vessel.
21    It doesn't show the other side, the other block,
22    other door or wire connected to the door. It's a
23    two-part system, not a one-part system.
24 Q  Correct. But with regard to the mechanical aspects

Page 161

1  of the system, do you believe that schematic drawing
2  is correct?
3  A  Yes, that is a fairly accurate rendition of the
4  system.
5  Q  Does that steel wire, does that stretch?
6  A  Does it stretch?
7  Q  Yes.
8  A  The towing wire?
9  Q  Yes.
10  A  If it stretches, it's an imperceptible amount of
11  stretch.
12  Q  Meaning it has nothing to do with this case?
13  A  No.
14  Q  The door didn't drop because of the elasticity of
15  the towing wire?
16  A  I never said that.
17  Q  As I understand your opinion, you think that the
18  door did not in fact drop relative to the towing
19  block?
20  A  No.
21  Q  But in fact the boat rolled, the door swung out --
22  A  And down.
23  Q  -- and the whole boat, gallus frame, block and
24  everything moved toward the water?

Page 162

1  A  Yes.
2  Q  The movement toward the water gave Mr. Aguiar the
3  perception that the door was dropping?
4  A  Yes.
5  Q  But in fact it was not moving relative to him,
6  correct?
7  A  It was moving relative to him because it was moving
8  away from the fixed platform on which he was
9  standing.
10  Q  It was only moving laterally away from him, it
11  actually wasn't moving vertical?
12  A  He was moving down, too.  He was moving down toward
13  the water, also.
14  Q  I got it.  Okay.  So you don't think this mud in the
15  note has anything to do with this case?
16  A  I don't believe it does.
17  Q  So if somebody testified that mud in the net would
18  cause the door to drop, you would disagree with
19  that?
20  A  My opinion is based on the part that Mr. Lima did
21  not testify that the wire moved.  There was no
22  testimony from him as the winch operator that the
23  wire slipped off the drum at the time of the
24  incident.

Page 163

1  Q  That's assuming that his testimony was truthful,
2  that in fact he never moved the controls, correct?
3  A  That he never moved the controls and there was
4  nothing wrong with the brake and he never had a
5  problem with the brake before or after the incident.
6  Q  Mr. Aguiar testified in his deposition that the door
7  lifted up and dropped down.  Do you remember that
8  testimony?
9  A  Correct, and that is a very, very accurate
10  description of the movement that you would get in a
11  seaway with a boat pitching and rolling.
12  Q  How much pitching and rolling are you talking about?
13  A  I wouldn't say very much.
14  Q  An inch?
15  A  We went through this before.  I don't know, an inch
16  or two inches.  He described that it moved and the
17  chain came taught.  Mr. Lima described the boat was
18  rolling, it always moves, it's a common occurrence.
19  There is no evidence that the wire slipped because
20  Mr. Lima who I believe was truthful in his
21  deposition does not say that the wire slipped and he
22  had to haul it back in.  If the wire slipped, he
23  would have had to haul it back in.  If it slipped
24  and the brake was not holding, it would have gone

Page 164

1  more than just the distance to make the chain come
2  taught, it would have kept on going.
3  Q  If it did keep on going and the door ended up
4  completely in the water --
5  A  He would have kept on going down to the bottom.
6  Q  -- and had to be hauled back up again, that would
7  suggest that it wasn't from the rolling of the boat,
8  it was someone let line out of the winch, correct?
9  A  Or the brake was let go.
10  Q  Or the brake was let go, but somehow the line came
11  out of the winch?
12  A  That's correct.
13  Q  If this occurs -- They were out on George's Bank
14  area fishing at the time of the accident?
15  A  Yes.  I'm not sure of their exact position.
16  Q  At some point east of New Bedford?
17  A  Yes.
18  Q  In New England waters?
19  A  Yes.
20  Q  In New England waters east of New Bedford or east of
21  Nantucket let's say, what is one- to three-foot
22  seas, how would you characterize those?
23  A  East of Nantucket offshore of New England you have
24  sea swells, you have wind-driven sea state, you have

41 (Pages 161 to 164)

Page 165

1  seas caused by shoaling on George's Banks based on
2  the movement of the water over the shoal area from
3  deep water. How I would characterize it? I would
4  characterize it as a seaway that is constantly
5  moving and you have tides and current that are
6  moving in opposite directions all the time. It's a
7  very dynamic waterway that is world renown.
8  Q  The question was how would you characterize one to
9     three feet? I am looking for an answer like that is
10    an average or really calm.
11 A  One to three feet would be a good day, a calm day.
12 Q  You are aware that on many commercial fishing
13    vessels they fish upward to ten- to 15-foot seas?
14 A  Yes.
15 Q  And when they start getting above 15 feet, some
16    people fish, some people don't?
17 A  Right.
18 Q  That's a very calm day.
19 A  That's a good day.
20 Q  If what you are saying is correct with respect to
21    what actually caused the chain to become taught and
22    if that occurred on a calm day, would you agree with
23    me that it must be the case that that chain is
24    getting taught all the time?

Page 166

1  A  No, I would agree that it's a timing evolution. You
2     have to time it and be aware of the movement that
3     you have at the present time and make sure that
4     before you try to secure that hook, that you are
5     confident that the movement is in the direction that
6     will afford you the best opportunity to set the hook
7     and not at the time the vessel is rolling away from
8     you. You have to look at it and say, okay, now I'm
9     going to do it. If it's, the situation that the
10    boat is rolling the other way, you can say I'm going
11    to wait for the roll to come back the other way
12    before I try to secure the hook.
13 Q  So you are saying on the FISHING VESSEL MY WAY in
14    order to secure the pelican hook, you have to time
15    it with the roll of the vessel?
16 A  On every boat you have to time things with the roll
17    and the movement of the boat.
18 Q  I'm not talking about every boat, I'm talking about
19    the FISHING VESSEL MY WAY. Is it your opinion on
20    the FISHING VESSEL MY WAY in order to safely secure
21    the door to the safety chain, a fisherman would have
22    to time the closing of the pelican hook and the
23    securing mechanism with the roll of the boat?
24 A  I'm saying that on any boat including the MY WAY

Page 167

1  that before you set stopper chains or safety chains
2  or ropes, you have to make sure that you are doing
3  it at the period of time when the boat is moving
4  that it's safe to do it.
5  Q  I'm only talking specifically of the chain in the
6     pelican hook that Mr. Aguiar was holding onto at the
7     time of his accident, and I'm specifically talking
8     about the MY WAY.
9  A  I answered that.
10 Q  Is it your opinion that on that vessel with that
11    chain that a crew member in order to safely secure
12    the door would have to time the closing of the
13    pelican hook with the roll of the boat?
14 A  I'm saying it's possible under certain circumstances
15    he would have to do that. But before you put your
16    hand into any position and any objects that are
17    moving or can be moving, you have to make sure that
18    it's safe to do so. So what would a prudent person
19    do is get into that situation, observe the dynamics
20    at that period of time, and make his judgment and
21    action coincidental with his finding of the safe
22    working practice at that moment in time. You can't
23    make a general overall statement that is saying on
24    the MY WAY it's this way on other boats it's a

Page 168

1  different way. It's a safe practice on any boat at
2  sea, whether it's a sailboat or fishing boat.
3  Q  Safe practice to do what?
4  A  To make sure your hands are clear and the work that
5     you are going to be performing can be done in a safe
6     way to not result in injury.
7  Q  It's always true it's a safe practice to do work in
8     a way that will not result in injury, you would
9     agree with me?
10 A  Yes.
11 Q  It's tautology?
12 A  Correct.
13 Q  I'm asking you with respect to the MY WAY, you are
14    an expert on the practices, safe practices on the
15    MY WAY, correct?
16 A  At that particular evolution. I have not gone
17    aboard the MY WAY to evaluate the safe working
18    practices on every aspect of this operation. I'm
19    saying in this instance for securing the safety
20    chain, he should have observed the movement of the
21    boat and the door and his chain in his hand, two
22    hands to make sure he wasn't putting his hand into
23    something is that too risky.
24 Q  The assumption is that the door was even swinging,

42 (Pages 165 to 168)